# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| ISIS BENJAMIN; FANTASIA HORTON; NAEOMI MADISON; BRYNN WILSON; and JOHN DOE;<br><br>on behalf of themselves and all persons similarly situated,<br><br>     Plaintiffs,<br><br>       v.<br><br>COMMISSIONER TYRONE OLIVER, in his official capacity; ASSISTANT COMMISSIONER RANDY SAULS, in his official capacity; STATEWIDE MEDICAL DIRECTOR DR. MARLAH MARDIS, in her official capacity; and CENTURION OF GEORGIA, LLC,<br><br>     Defendants. | Civ. Case No. _____<br><br>**CLASS ACTION** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

JURISDICTION AND VENUE ..........................................................................5

PARTIES.............................................................................................................6

I.    Plaintiffs...................................................................................................6

      A.    Named Plaintiffs.............................................................................6

      B.    Putative Class .................................................................................8

II.   Defendants ...............................................................................................8

FACTUAL ALLEGATIONS ............................................................................11

III.  Background.............................................................................................11

      A.    Background on gender dysphoria ................................................11

      B.    Gender dysphoria treatment in GDC prior to SB185...............16

      C.    Background on SB185...................................................................19

      D.    Defendants' enforcement of SB185 .............................................21

IV.   Defendants have shown deliberate indifference to Plaintiffs and Class
      Members' serious medical needs.................................................................25

      A.    Defendants have known that gender dysphoria is a serious medical need
            requiring individualized treatment, including medically necessary
            hormone therapy...........................................................................25

      B.    Defendants disregarded the known risks associated with gender dysphoria
            by enforcing SB185.......................................................................29

      C.    Defendants' actions in adopting and implementing SB185 were
            subjectively reckless and unreasonable...................................30

      D.    Plaintiffs and Class Members have and will suffer continued harm
            because of Defendant's actions...............................................33

CLASS ACTION ALLEGATIONS ....................................................................47

CLAIM FOR RELIEF .......................................................................................50

PRAYER FOR RELIEF .....................................................................................52

Plaintiffs Isis Benjamin, Fantasia Horton, Naeomi Madison, Brynn Wilson, and John Doe who, by and through their attorneys, state and allege as follows.

## INTRODUCTION

1.     Plaintiffs Isis Benjamin, Fantasia Horton, Naeomi Madison, Brynn Wilson, and John Doe ("Plaintiffs"),[1] by and through their attorneys, bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

2.     Plaintiffs and the putative class they seek to represent are transgender people with gender dysphoria in the custody of the Georgia Department of Corrections ("GDC") (hereinafter "Class Members").

3.     Gender dysphoria is a serious medical condition—characterized by clinically significant stress due to the incongruence between one's gender identity and sex assigned at birth—that requires medical treatment.

4.     Plaintiffs were each diagnosed with gender dysphoria by GDC healthcare providers. Plaintiffs have also been prescribed, or are in the process of seeking evaluations for, gender dysphoria treatment inclusive of hormone therapy

---

[1] Plaintiffs are identified in GDC databases respectively as Yohansan Jovan Stewart (GDC # 1002489911), Sylvester Horton (GDC # 1000536220), Terrell Montiel Madison (GDC # 1002532655), and Brynn Wilson (GDC # 1000859126). John Doe's name is omitted because he is seeking permission to be identified via pseudonym in these court proceedings.

(also known as "hormone replacement therapy" or "HRT"), hair removal treatment, and gender-confirmation surgery.

5.    On May 8, 2025, Brian Kemp, the Governor of Georgia, signed Senate Bill 185, S.B. 185, 2025 Gen. Assemb., Reg. Sess. (Ga. 2025) ("SB185"), a law that prohibits the use of state funds to pay for gender dysphoria treatment for people in GDC custody, including but not limited to the hormone therapy that Plaintiffs and Class Members rely on. During hearings about SB185, bill sponsors indicated that the statute was also intended to prohibit incarcerated people from accessing gender dysphoria treatment via "self-pay." Since the law's passage, several named Plaintiffs have also reported the same.

6.    Accordingly, SB185 bans hormone therapy and other forms of medically necessary care for incarcerated people with gender dysphoria, regardless of medical need, while permitting those same treatments for people with other medical conditions.

7.    Governor Kemp signed SB185 despite federal courts' invalidation of other laws similar to SB185 that ban gender dysphoria treatment in prisons and jails across the country under the Eighth Amendment to the U.S. Constitution.

8.    Defendant Centurion of Georgia, LLC ("Centurion"), the Georgia Department of Corrections healthcare provider, likewise has known from its first-hand experience with similar laws in other states that SB185 puts GDC-incarcerated

2

transgender persons at risk. In Florida, where a similar law was passed, prison officials, including Defendant Centurion's affiliates, continued to provide hormone therapy to incarcerated people without seeking state reimbursement, in recognition of their constitutional obligations. In Idaho, a Centurion affiliate's planned enforcement of a similar law in the state's correctional facilities was altogether enjoined.[2]

9.    Defendants Tyrone Oliver, Randy Sauls, and Marlah Mardis, in their official capacities, also have known that implementing and enforcing SB185 would pose a serious risk of harm to GDC-incarcerated transgender persons with gender dysphoria. Indeed, prior to SB185, Defendants implemented a GDC policy to provide individualized assessments and appropriate gender-affirming care to transgender inmates precisely because they knew the U.S. Constitution requires it.

10.    For these same reasons, Defendants Oliver, Sauls, Mardis, and Centurion (collectively "Defendants") likewise have known that implementing SB185 would be both unconstitutional and dangerous.

11.    Defendants began implementing and enforcing the SB185 system-wide in July 2025. At the direction of Defendants, GDC and Centurion staff notified

---

[2] *Robinson v. Labrador*, 747 F. Supp. 3d 1331 (D. Idaho 2024), *injunction renewed*, No. 1:24-cv-00306-DCN, 2024 WL 4953686 (D. Idaho Dec. 3, 2024), *and injunction renewed*, 2025 WL 673930 (D. Idaho Mar. 3, 2025), *and injunction renewed* 2025 WL 1547067 (D. Idaho May 30, 2025).

Plaintiffs and Class Members who were receiving hormone therapy that pursuant to Defendants' enforcement of SB185, their hormone therapy dosages will either be immediately terminated or be lowered and eventually completely discontinued, and that such care will not be provided by GDC going forward.

12.    Defendants' enforcement of SB185 overrules the medical judgment of GDC's own healthcare providers by terminating the hormone therapy they previously prescribed as medically necessary for Plaintiffs and Class Members.

13.    Pursuant to Defendants' implementation of SB185, Plaintiffs and Class Members are also no longer able to seek evaluations for or receive other forms of medically necessary gender dysphoria care such as hair removal treatment, social transition care (in the form of gender-affirming undergarments or grooming items), and surgery evaluations, regardless of medical need.

14.    Defendants' termination, modification, withdrawal, and denial of Plaintiffs' medically necessary gender dysphoria treatment based on a blanket ban prohibiting individualized medical treatment pursuant to SB185 have unreasonably put Plaintiffs and other Class Members at grave risk of physical and psychological harm, including resurfaced gender dysphoria, depression, anxiety, mood dysregulation, self-harm, self-surgery, or death by suicide. Defendants' actions therefore violate the Eighth Amendment's prohibition on cruel and unusual punishment.

15.    On behalf of themselves and the Class they seek to represent, Plaintiffs therefore seek injunctive and declaratory relief to rectify Defendants' violations of their constitutional rights under the Eighth Amendment and to ensure that Plaintiffs and Class Members have continued access to the medically necessary care they require.

## JURISDICTION AND VENUE

16.    This action arises under 42 U.S.C. § 1983.

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3) and 28 U.S.C. § 2201, which confer original jurisdiction to federal district courts in suits seeking to redress the deprivation of rights secured by the Constitution of the United States, in this case the Eighth Amendment.

18.    Venue lies in the Northern District of Georgia under 28 U.S.C. § 1391(b) because multiple Defendants reside in this District and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

19.    The Atlanta Division is the proper division for this action because at least one Defendant resides in this division and because the cause of action arose in this division. *See* N.D. Ga. L.R. 3.1(B).

## PARTIES

**I.    Plaintiffs**

### A.    Named Plaintiffs

20.    **Plaintiff Isis Benjamin** is a transgender woman with gender dysphoria. She first entered GDC custody in 2020, and most recently in March 2025, and is currently incarcerated at Coastal State Prison. Ms. Benjamin began receiving hormone therapy in 2003 as treatment for her gender dysphoria, and has received hormone therapy for more than two decades. Ms. Benjamin was prescribed hormone therapy by GDC during her 2020-2021 incarceration after it was determined to be medically necessary for her, and is currently seeking an evaluation to resume her medically necessary hormone therapy. Ms. Benjamin is also seeking an evaluation to resume hair removal which was deemed medically necessary treatment for her gender dysphoria prior to her incarceration. Due to Defendants' implementation of SB185, Ms. Benjamin is now unable to access any of her medically necessary gender dysphoria treatment and is at imminent risk of her serious gender dysphoria symptoms of depression, mood swings, and thoughts of self-harm and suicide becoming more severe.

21.    **Plaintiff Fantasia Horton** is a transgender woman with gender dysphoria. She has been in GDC custody since 2011 and is currently incarcerated at Phillips State Prison. Ms. Horton was diagnosed with gender dysphoria in 2019 and since then, has been prescribed hormone therapy by GDC as treatment. Ms. Horton

6

also seeks an evaluation for gender-confirming surgery due to her severe and persistent gender dysphoria symptoms. Due to Defendants' implementation of SB185, Ms. Horton no longer has access to gender dysphoria treatment, including her medically necessary hormone therapy which is currently being discontinued, and is at imminent risk for the return of serious gender dysphoria symptoms such as depression, anxiety, disassociation, panic attacks, and suicidal ideation.

22.    **Plaintiff Naeomi Madison** is a transgender woman with gender dysphoria. She first entered GDC custody in 2019, and most recently in 2024, and is currently incarcerated at Central State Prison. Ms. Madison was first diagnosed with gender dysphoria in 2021 and is seeking an evaluation for hormone therapy and hair removal as treatment for her gender dysphoria. Due to Defendants' implementation of SB185, Ms. Madison is now unable to access gender dysphoria treatment and is at imminent risk of the exacerbation of her gender dysphoria symptoms of depression, anxiety, post-traumatic stress disorder, and severe mood swings.

23.    **Plaintiff Brynn Wilson** is a transgender man with gender dysphoria. He has been in GDC custody since 2012 and is currently incarcerated at Pulaski State Prison. Mr. Wilson has been receiving hormone therapy to treat his gender dysphoria for over seven years. Due to Defendants' implementation of SB185, Mr. Wilson no longer has access to his medically necessary hormone therapy and is at imminent

risk of the return and worsening of his gender dysphoria symptoms of depression, anxiety, and panic attacks.

24.    **Plaintiff John Doe** is a transgender man with gender dysphoria. He has been in GDC custody since 2010 and is currently incarcerated at Lee Arrendale State Prison. Mr. Doe was diagnosed with gender dysphoria in 2019 and has been receiving hormone therapy since June 2020. Due to Defendants' implementation of SB185, Mr. Doe no longer has access to his medically necessary hormone therapy and is at imminent risk of the return of his serious gender dysphoria symptoms such as depression, anxiety, insomnia, and suicidal thoughts.

### B.    Putative Class

25.    The putative class in this case is defined as "All individuals incarcerated in GDC who are seeking or receiving gender dysphoria treatment now proscribed by SB185."

## II.    Defendants

26.    **Defendant Tyrone Oliver** has been the Commissioner of GDC since 2022. As Commissioner, he is responsible for the overall administration of GDC correctional facilities and the training of all GDC correctional officers and administrative staff. He is also responsible for all GDC policies and has policy and decision-making authority at GDC, including over policies that relate to the care and treatment of transgender people with gender dysphoria. Defendant Oliver has a duty to ensure the provision of adequate medical care to all incarcerated people, and to

prevent physical harm. Defendant Oliver adopts, enforces, and ratifies policies, customs, and widespread practices concerning the evaluation and treatment of gender dysphoria. He also exercises control over all personnel who enforce those policies, including GDC's contractors, employees, and agents. At all relevant times, Defendant Oliver was acting under color of state law and is sued in his official capacity for his enforcement of SB185.

27.    **Defendant Randy Sauls** is and was at all relevant times the Assistant Commissioner of the Health Services Division of GDC. As Assistant Commissioner, he is responsible for overseeing GDC policies and services regarding the care, evaluation, and treatment of incarcerated people with gender dysphoria, including responding to identified problems. Defendant Sauls controls, trains, and supervises GDC healthcare personnel, and adopts and enforces policies, customs, and practices concerning the evaluation and treatment of people with gender dysphoria within GDC. As Assistant Commissioner, Defendant Sauls also directs and supervises third-party contractor Centurion. At all relevant times, Defendant Sauls was acting under the color of state law and is sued in his official capacity for his enforcement of SB185.

28.    **Defendant Dr. Marlah Mardis** is and was at all relevant times the Statewide Medical Director for GDC. As Director, she is responsible for overseeing the medical policies and services across GDC facilities. Defendant Mardis controls,

9

trains, and supervises GDC healthcare personnel, and adopts and enforces policies, customs, and practices concerning the evaluation and treatment of people with gender dysphoria within GDC. She is also responsible for approving or denying GDC treatment plans and requests for gender dysphoria treatment, including but not limited to hormone therapy. At all relevant times, Defendant Mardis was acting under color of state law and is sued in her official capacity for her enforcement of SB185.

29.     **Defendant Centurion of Georgia, LLC ("Centurion")** is a subsidiary of Centurion, LLC, also known as Centurion Health, which provides healthcare services to correctional facilities in more than a dozen states, including Georgia, Idaho, and Florida. Centurion is based in the Northern District of Georgia, and its Georgia regional office is located at 1745 Phoenix Blvd., Suite 240, Atlanta, Georgia, 30349. Centurion provides medical services for GDC to people in GDC custody pursuant to a contract that began on July 1, 2024, and directly employs medical providers responsible for ensuring proper medical services and treatment for those in GDC custody. Because Centurion has contracted with the State of Georgia to provide functions traditionally reserved for the State, this action is brought against Centurion as a government entity under 42 U.S.C. § 1983. Dr. Gerald Wynne serves as Centurion's Georgia Statewide Medical Director where he acts as Centurion's agent and develops and implements policies impacting

incarcerated people on Centurion's behalf. At all times relevant to this lawsuit, Centurion and its employees and contractors were acting under color of state law and their actions are fairly attributable to the State of Georgia in its enforcement of for his enforcement of SB185.

## FACTUAL ALLEGATIONS

**III.    Background**

    **A.    Background on gender dysphoria**

30.    Gender dysphoria is a serious medical condition characterized by an incongruence between one's gender identity and the sex they were assigned at birth. It is included in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5"), which is the primary guide for mental health providers in the country, standardizing diagnostic criteria, symptoms, and treatment in order to provide consistency in diagnoses and care nationwide. It is published by the American Psychiatric Association (APA), the main organization for psychiatrists in the country and the largest in the world.

31.    For some, the incongruence between one's gender identity and sex assigned at birth does not cause clinically significant distress. For others, however, this incongruence results in gender dysphoria, which is a serious medical condition identified by clinically significant feelings of stress and discomfort regarding one's assigned gender. This distress often impairs one's ability to function socially and occupationally.

32.    Accepted standards of care for treating gender dysphoria are published by the World Professional Association for Transgender Health (WPATH), an international association of more than 2,000 medical and mental health professionals specializing in the treatment of gender diverse people. WPATH promulgates Standards of Care ("SOC") for the treatment of gender dysphoria worldwide. The most recent guide, WPATH Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 ("SOC-8"), was published in 2022.

33.    Clinical guidelines for hormone therapy gender dysphoria treatment are published by the Endocrine Society, which is the leading professional organization of endocrinologists in the United States. Those guidelines, entitled Endocrine Treatment of Gender Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline ("Endocrine Society Guideline"), were published in 2017.

34.    WPATH's SOCs and the Endocrine Society's Guideline are authoritative guidelines for the treatment of people with gender dysphoria worldwide. WPATH's SOCs require that treatment for those in custody mirror community-based standards of care.

35.    All leading medical expertise and guidelines make clear that gender dysphoria requires individualized, patient-specific treatment planning. Depending on the patient, social transition care, hormone therapy, and surgery may be medically

necessary in order to relieve the patient's clinically significant distress. The medical necessities of each patient must be determined through individualized assessments.

36.    Hormone therapy is recognized as an effective and established endocrine treatment for gender dysphoria. Hormone therapy treats gender dysphoria through masculinizing or feminizing physical changes, reducing the physical incongruence with one's gender identity, and therefore alleviating clinically significant distress.

37.    The American Medical Association, the Endocrine Society, the American Psychiatric Association, and the American Psychological Association all affirm that hormone therapy pursuant to WPATH's SOCs is medically necessary treatment for many people with gender dysphoria.

38.    Numerous studies have demonstrated that hormone therapy treatment for gender dysphoria reduces symptoms of anxiety, depression, and suicidal ideation among patients.

39.    Some instances of gender dysphoria require surgical treatment to reduce the incongruence between one's gender identity and physical sex characteristics. Multiple studies have confirmed that surgical treatment of gender dysphoria are associated with substantial long-term improvements in patient psychological health, quality of life, and reductions in depression and suicidality.

13

40.    Social transition care is also often a medically necessary treatment to alleviate patients' clinically significant distress. Social transition care involves changes to one's gender presentation, and includes dressing, grooming, and other socially significant outward expressions congruent with one's gender identity.

41.    For example, permanent hair removal may be medically required for some transgender women to address gender dysphoria symptoms related to their physical characteristics.

42.    Clothing and grooming items are particularly important for patients receiving hormone therapy treatment since their treatment-induced physical changes make certain clothing and grooming items necessary for both their mental health and basic physical maintenance. Social transition care has been proven to reduce psychopathology, depression, anxiety, suicide attempts, and symptoms of posttraumatic stress disorder among transgender people.

43.    Absent proper gender dysphoria treatment based on patient-specific assessments, it is foreseeable that those with gender dysphoria will experience symptoms such as psychological decompensation, depression, anxiety, self-harm, surgical self-treatment and suicidality. This may actively precipitate other disease processes that were previously stable or absent, such as hypertension, metabolic dysregulation, or major depressive episodes.

14

44.     No psychotherapeutic treatments have demonstrated effectiveness in alleviating gender dysphoria, and as such, psychiatric and therapeutic treatment alone are not substitutes for treating gender dysphoria where other treatment has been medically indicated. Psychiatric treatments may reduce the severity of anxiety or depression but do nothing to resolve the root cause of the clinically significant distress: a patient's physical incongruence with his or her gender identity.

45.     The termination of medically necessary hormone therapy for non-medical reasons predictably causes physiological and psychological harm in gender dysphoria patients.

46.     Terminating feminizing hormone therapy (i.e. estrogen, estradiol, spironolactone) in transgender women with gender dysphoria puts them at risk of thermoregulatory dysregulation, cognitive slowing, increased cardiovascular disease risk, and increased risks of self-surgery (often resulting in long-term damage, chronic pain, disfigurement, disability, or death).

47.     Terminating masculinizing hormone therapy (i.e. testosterone) in transgender men with gender dysphoria puts them at risk of musculoskeletal effects, metabolic dysregulation, cardiovascular effects, neuroendocrine effects, as well as insomnia, irritability, and anhedonia.

48.     Consequences of the discontinuation of medically necessary hormone therapy that are common to both transgender man and women with gender dysphoria

are withdrawal symptoms such as hormonal disequilibrium, mood destabilization and dysregulation—i.e., depression, anxiety, suicidality—that can result in physical injury or death, exacerbation of gender dysphoria symptoms, and the activation of psychiatric conditions (such as bipolar disorder, PTSD, schizoaffective disorder, or the recurrence of psychosis).

49.    For transgender women who have received surgical treatment for their gender dysphoria, hormone therapy is physiologically necessary; certain surgical interventions remove the body's ability to independently produce sex hormones, requiring exogenous administration to maintain physical health. For these individuals, termination of hormone therapy may cause impaired immune systems, hypertension, hypoglycemia, electrolyte imbalance, fatigue, depression, and metabolic dysregulation.

50.    Transgender men who have undergone surgical treatment may experience irreversible harm if their hormone therapy is terminated by destabilizing them physiologically and psychologically. For these individuals, hormone therapy cessation may cause severe fatigue, depression, anxiety, lipid and glucose dysregulation, psychological decompensation and increased suicide risk.

**B.    Gender dysphoria treatment in GDC prior to SB185**

51.    For more than a decade, GDC Standard Operating Procedures ("SOP") have recognized and authorized gender dysphoria treatment, including hormone

16

therapy, as necessary medical treatment. *See* GDC Management & Treatment of Offenders Diagnosed with Gender Dysphoria, SOP 507.04.68 (2015); GDC Classification & Management of Transgender and Intersex Offenders, SOP 220.09 (2019); GDC Management & Treatment of Transgender Offenders, SOP 507.04.68 (2022); GDC Identification, Evaluation, & Treatment of Gender Dysphoria, SOP 508.40 (2023).

52.    GDC's policies prior to SB185 stated that "constitutionally appropriate" management of gender dysphoria required "thorough medical and mental health evaluations" and the development of individualized treatment plans based on patient needs. SOP 507.04.68 (§§ I; IV.C.2-3) (2022). *See also* SOP 508.40 (§ IV.D) (2023) ("All offenders who identify as Transgender and request hormone treatment … will be referred to the Medical Department to be evaluated and referred to an endocrinologist"); SOP 507.04.68 (§ IV.C.5) (2022) (providing those in GDC custody "who report to have symptoms consistent with or have been diagnosed with Gender Dysphoria … a current individualized assessment and evaluation"; SOP 220.09 (§ IV.K.5) (2019) ("all gender-related hormone treatment that may be provided while the offender is in custody occurs after an individualized assessment of the offender by a medical practitioner").

53.     GDC's prior policy also provided social transition care, providing, upon request, "women's hygiene or undergarments to a transgender female, or the opposite for transgender males." SOP 220.09 (§ IV.G.7) (2019).

54.     It was GDC policy prior to SB185 that hormone therapy be prescribed to Plaintiffs and Class Members only when GDC's own medical providers, in consultation with GDC's Statewide Medical Director (Defendant Mardis) and Statewide Mental Health Director, had deemed it "*medically necessary* for the treatment of the offender." SOP 507.04.68 (§ IV.D.1.d) (2022) (emphasis added); *see also* SOP 220.09 (§ IV.K.4.b) (2019) ("GDC will provide transgender offenders with individualized assessments and care, to include … [w]hen warranted, hormone treatment throughout their incarceration"); *id.* (§ IV.K.8) (requiring a "documented medical need").

55.     GDC's SOPs entitled Classification & Management of Transgender and Intersex Offenders, SOP 220.09 (2019), Management & Treatment of Transgender Offenders, SOP 507.04.68 (2022), and Identification, Evaluation, & Treatment of Gender Dysphoria, SOP 508.40 (2023), were in effect prior to the passage of SB185. They were still published on GDC's website in July 2025 when Defendants began taking direct steps to enforce SB185 against Plaintiffs and Class Members.

C.     **Background on SB185**

56.     In April 2025, the Georgia General Assembly passed SB185, prohibiting the use of public funds for "[s]ex reassignment surgeries," "[h]ormone replacement therapies," and "[c]osmetic procedures or prosthetics intended to alter the appearance of primary or secondary sexual characteristics." O.C.G.A. § 42-5-2(e)(1)(A)-(C).

57.     As enacted, the law contains no exceptions allowing the expenditure of funds for prohibited treatments, even when deemed medically necessary for gender dysphoria patients.

58.     SB185, however, does permit the otherwise prohibited treatments when "medically necessary" for medical conditions that are "not gender dysphoria." O.C.G.A. § 42-5-2(e)(2)(A).

59.     SB185, therefore, does not wholly bar the prohibited treatments. Instead, it bans such care only when the condition being treated is gender dysphoria. In other words, SB185 bars GDC from providing medical treatment based on GDC's own medical providers' individualized assessments *only* to those diagnosed with gender dysphoria.

60.     On March 3, 2025, Georgia State Senator Josh McLaurin stated in session his belief that SB185 would violate the Eighth Amendment prohibition on "cruel and unusual punishment… I.e. you can't deny medical care while you're

incarcerated because you don't have the means to go get your own care. You're stuck. So the state has to provide your health care… And yet, this bill just exempts medical care from one group of those individuals."[3]

61.     Civil rights organizations, including the Southern Poverty Law Center, Equality Georgia, and the Center for Constitutional Rights also submitted letters and gave testimony explaining the unconstitutionality of SB185's blanket healthcare ban and the profound harm that it would cause.

62.     In response to a query from Georgia legislators regarding SB185, GDC, through GDC General Counsel Ammons, acknowledged that GDC's costs associated with providing cosmetic or prosthetic gender dysphoria treatment to people in custody were *de minimis*. In contrast, during hearings on the bill, Georgia legislators were informed by testimony that SB185 would likely impose significant costs on the State because of litigation that would inevitably ensue challenging its constitutionality.

63.     Nevertheless, the General Assembly passed SB185, and Governor Kemp signed it into law on May 8, 2025.

---

[3] Ross Williams, *Georgia Senate OKs bill to outlaw gender-affirming care for inmates in state custody*, GEORGIA RECORDER (Mar. 4, 2025), https://georgiarecorder.com/2025/03/04/georgia-senate-oks-bill-to-outlaw-gender-affirming-care-for-inmates-in-state-custody/.

64.    SB185 § 2(e)(2) directs the Georgia Board of Corrections to adopt rules and regulations implementing SB185. The Georgia Board of Corrections' SB185 implementing rule, Rule 125-4-4-.13 Treatment of Gender Dysphoria and Intersex Offenders, was initially approved on June 5, 2025, and confirms that state funds may not be used for any provision of gender-affirming medical treatment. It also confirms that "Offenders may receive treatments otherwise prohibited … if such are medically necessary for the treatment [*sic*] medical conditions that are not gender dysphoria or for sex reassignment." Rule 125-4-4-.13(2)(E).

65.    GDC policy states that individuals in its custody "may not file a grievance about ... [m]atters over which the Department has no control, including ... any matters established by the laws of the state." Statewide Grievance Procedure, SOP 227.02 (§ IV.B.2.b) (2019).

66.    SB185 is a state law and is therefore a matter over which the Department of Corrections has no control.

67.    Policies and regulations that are developed by the Georgia Board of Corrections are also matters "over which the Department has no control." SOP 227.02 (§ IV.B.2.b) (2019).

**D.    Defendants' enforcement of SB185**

68.    On or about June 9, 2025, Defendant Centurion, together with Defendants Sauls and Mardis, developed a plan for implementing SB185 within

21

GDC and terminating all existing gender dysphoria hormone therapy for Plaintiffs and Class Members, and that plan was approved by Defendant Oliver.

69.    Defendants' enforcement of SB185 was modeled off Centurion's federally enjoined forced detransition plan in Idaho, despite Defendants' knowledge that Centurion's Idaho plan had already been enjoined as unconstitutional.

70.    Defendants' planned implementation of SB185 called for Defendants to formally commence "the detransition process" beginning the first full week of July 2025. Pursuant to the plan, all incarcerated people would be fully transitioned off hormone therapy no later than October 3, 2025.

71.    The only individuals exempt are people who require the prohibited treatments for conditions *other* than gender dysphoria, and that all gender dysphoria patients with existing hormone therapy prescriptions will be forcibly detransitioned.

72.    Accordingly, Defendants have implemented SB185 by prohibiting hormone therapy and other gender dysphoria treatments regardless of medical need or treatment history, including barring individualized evaluations for such care. It only permits hormone therapy to be administered for the limited purpose of "transitioning [people] off such therapy." O.C.G.A. § 42-5-2(e)(2)(D).

73.    Defendants provide Plaintiffs and Class Members currently prescribed hormone therapy with only two options, both of which result in a complete cessation of their medically necessary hormone treatment, effectively leaving them with no

option, at all. Under the first option, Plaintiffs and Class Members can "consent" to the immediate cessation of their medically necessary hormone therapy. Under the second option, Plaintiffs and Class Members can "consent" to having their hormone therapy eliminated over the course of several weeks, based on their current dosage.

74.     Notably, however, Plaintiffs and Class Members are not given the option of continuing their medically necessary hormone therapy. And even if Plaintiffs and Class Members refuse to "consent" to one of the two options, their hormone therapy will be terminated by Defendants anyway.

75.     Furthermore, Defendants' enforcement plan as presented to GDC providers expressly acknowledges that implementing SB185 will harm people with gender dysphoria in GDC custody by causing prompt withdrawal symptoms and leading to a deterioration in overall physical and mental health.

76.     On July 23, 2025, the Center for Constitutional Rights and Bondurant Mixon & Elmore also notified Defendants Oliver, Sauls, Mardis and Centurion via letter that their plan to institute a blanket ban on the evaluation and treatment of gender dysphoria within GDC would violate the Eighth Amendment and constitute deliberate indifference to a serious medical need ("July 23 Notice Letter"), furnishing additional notice. The July 23 Notice Letter emphasized that implementing SB185 was not necessary, citing the example where the Florida Department of Corrections and Defendant Centurion continued providing

incarcerated people constitutionally required medical care, including specifically hormone therapy, notwithstanding the passage of an almost identical state law.

77.    The July 23 Notice Letter also explained that a permanent ban on gender dysphoria treatment would have catastrophic effects on the physical and psychological well-being of Plaintiffs and Class Members. The letter explained that by terminating healthcare, Plaintiffs and Class Members would experience a return of the severe symptoms of untreated gender dysphoria, including anxiety, depression, suicidality, and self-injury, culminating in self-castration and suicide attempts, in addition to numerous physical symptoms of withdrawal.

78.    The Letter also notified Defendants that none of the proposals in their planned enforcement of SB185 reasonably addressed the grave and foreseeable health risks posed by implementation. Specifically, the Letter informed Defendants that counseling services were not a recognized form of gender dysphoria treatment, nor a substitute for medically necessary hormone therapy. The Letter also explained that "tapering" people off hormone therapy gradually did nothing to mitigate the anxiety, depression, suicidality, and suicide, self-castration, and self-injury attempts that were a foreseeable consequence of Defendants' blanket ban, nor physical consequences like bone density issues and cardiovascular events.

79.    The Letter ended by urging Defendants to abandon their enforcement of SB185 for the sake of preventing severe physical and psychological harm to Plaintiffs and Class Members, including disabling injuries or death by suicide.

80.    As of the commencement of this action, Defendants have not responded to the Letter.

IV.    **Defendants have shown deliberate indifference to Plaintiffs and Class Members' serious medical needs.**

A.    **Defendants have known that gender dysphoria is a serious medical need requiring individualized treatment, including medically necessary hormone therapy.**

81.    Defendants are responsible, individually and collectively, for creating, implementing, and enforcing policies, customs, and practices concerning the provision of medical and mental health treatment to people in GDC custody, and ensuring that all incarcerated people, receive adequate medical treatment for their serious medical needs, including Plaintiffs and Class Members diagnosed with gender dysphoria. Defendants administer this care pursuant to GDC's SOPs.

82.    Three SOPs largely governed the care of transgender people in GDC custody prior to SB185: Classification & Management of Transgender and Intersex Offenders, SOP 220.09 (2019); Management & Treatment of Transgender Offenders, SOP 507.04.68 (2022); and Identification, Evaluation, & Treatment of Gender Dysphoria, SOP 508.40 (2023).

83.     Defendants Oliver and Sauls have actual knowledge of these SOPs because they were responsible for adopting and implementing them, and Defendants Mardis and Centurion have actual knowledge of the SOPs because they each had responsibilities regarding the care and treatment of people with gender dysphoria in custody and were responsible for enforcing the SOPs.

84.     Accordingly, each of the Defendants have known that people with gender dysphoria have "serious medical needs which may not be ignored," and that to be diagnosed with gender dysphoria, an individual must "meet the Diagnostic and Statistical Manual of Mental Disorders (DSM) criteria." SOP 507.04.68 (§ IV.A.6) (2022).

85.     Defendants have actual knowledge of their duty to provide Plaintiffs and Class Members "constitutionally appropriate" medical treatment according to "[c]urrent, accepted standards of care," because it was emphasized by GDC's own policies. SOP 507.04.68 (§§ I; IV.C.3) (2022). In fact, Defendant Mardis has acknowledged that the World Professional Association for Transgender Health (WPATH) Standards of Care for the Health of Transgender and Gender Diverse People should govern gender dysphoria treatment for those in GDC custody.

86.     Defendants also know—and knew before enforcing SB185—that hormone therapy is a vital form of gender dysphoria treatment. SOP 507.04.68 (§ IV.D.1.d) (2022); SOP 220.09 (§ IV.K.4.b) (2019). Indeed, in a prior case brought

on behalf of a transgender woman with gender dysphoria in GDC custody, Defendants Oliver, Sauls, and Centurion "concede[d] HRT is necessary." *Doe v. Ga. Dep't of Corr.*, 730 F. Supp. 3d 1327, 1342 (N.D. Ga. 2024), *appeal dismissed as moot*, No. 24-11382, 2025 WL 1206229 (11th Cir. Mar. 6, 2025).

87.    Defendants were further aware that counseling services are unreasonable and inadequate treatment for Plaintiffs' and Class Members' gender dysphoria symptoms. That is precisely why they were approved for hormone therapy prior to SB185 by GDC providers, including approval from Defendant Mardis herself.

88.    Accordingly, Defendants knew that discontinuing treatment evaluations and terminating hormone therapy already determined to be medically necessary by GDC providers and Defendant Mardis on a blanket basis did not constitute "constitutionally appropriate" medical treatment consistent with "[c]urrent, accepted standards of care." SOP 507.04.68 (§§ I; IV.C.3) (2022).

89.    Defendants also knew that policies categorically banning or restricting gender dysphoria treatment were presumptively unconstitutional.

90.    In 2014, after a successful Eighth Amendment challenge, GDC withdrew a "freeze-frame" policy that denied hormone therapy and gender dysphoria treatment evaluations to people without a documented history of pre-incarceration care. *Diamond v. Owens*, 131 F. Supp. 3d 1346 (M.D. Ga. 2015). In its place, GDC

implemented the SOPs discussed in the preceding paragraphs, which acknowledge that patient need determines what gender dysphoria care is medically necessary and thus what care is "constitutionally appropriate." That policy stated that anyone "in the custody of the Department with a possible diagnosis of Gender Dysphoria will receive a current individualized assessment and evaluation." SOP 507.04.68 (§§ I; IV) (2015).

91.     Defendants were aware that enforcing a blanket ban on gender dysphoria treatment like SB185 would deny people in custody access to healthcare they need.

92.     Defendants were also aware that blanket bans on gender dysphoria treatment were likely unconstitutional.

93.     In 2020, the Eleventh Circuit stated that it would "almost certainly" find unconstitutional Florida's similar policy categorically restricting gender dysphoria treatment within its prisons if the policy had not been rescinded before the court reached the issue. *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). This, too, provides Defendants with further notice of the dubious legality of a blanket ban categorically barring gender dysphoria treatment and social transition care, including evaluations for such care.

94.     In 2024, when a comparable treatment ban was introduced in Idaho, Defendant Centurion began tapering incarcerated people off of their prescribed

hormone therapy just as proposed by Defendants and required by SB185. However, Defendant Centurion's Idaho detransition plan was preliminarily enjoined under the Eighth Amendment as Defendants are well aware.

95.     When a comparable treatment ban was introduced in the Florida Department of Corrections ("FDOC") in 2023, where Defendant Centurion was the prison healthcare provider, Centurion continued to provide hormone therapy in recognition of the fact that denying people in custody access to medically necessary healthcare would violate the Eighth Amendment.

96.     Similarly, the Federal Bureau of Prisons ("BOP") continued to provide hormone therapy to incarcerated people with gender dysphoria notwithstanding the provisions of a treatment ban that was introduced in 2025.

**B.     Defendants disregarded the known risks associated with gender dysphoria by enforcing SB185.**

97.     Defendants had ample notice of SB185's unconstitutionality; the grave, life-threating danger its implementation posed to Plaintiffs and Class Members. Specifically, Defendants knew that denying gender dysphoria treatment to Plaintiffs and Class Members places them at imminent risk of experiencing symptoms such as anxiety, depression, fatigue, muscle and joint pain, severe mood swings, self-harm, self-surgery, suicidal ideation, physical injury and death.

98.     Defendants also knew the existence of alternatives—such as continuing to follow their constitutional obligations like Defendant Centurion did when faced with a similar bill in Florida.

99.     Still, Defendants have proceeded to implement SB185 and a blanket ban on individualized medical assessments and treatment for gender dysphoria care such as hormone therapy, social transition care, hair removal treatment, and gender-affirming surgical care across GDC facilities beginning in July 2025.

100.    Accordingly, each Defendant has played a role in the implementation of SB185 across GDC despite knowing that categorically denying gender dysphoria treatment—including but not limited to treatment previously approved—would harm Plaintiffs and Class Members physical and psychological well-being.

101.    And in doing so, Defendants have violated, and continue to violate, accepted and applicable medical standards of care for the treatment of gender dysphoria and flouted their responsibility under the Eighth Amendment to ensure that Plaintiffs and Class Members receive adequate medical care, directly causing Plaintiffs' and Class Members' injury.

**C.    Defendants' actions in adopting and implementing SB185 were subjectively reckless and unreasonable.**

102.    Based on GDC's prior SOPs and litigation, Defendants are aware that their actions in implementing SB185 would prevent GDC's own medical providers from evaluating individuals for and prescribing medically necessary and

constitutionally appropriate care to individuals diagnosed with gender dysphoria, and that denying such care on a blanket basis posed grave health risks.

103.   Based on prior litigation against GDC, Defendants have also known of the significant harms associated with withholding gender dysphoria treatment due to repeated incidents where people with gender dysphoria in GDC custody attempted suicide or self-castration after being denied access to care. *Doe*, 730 F. Supp. 3d at 1350 ("Plaintiff has on multiple occasions attempted self-castration and suicide"); *Diamond*, 131 F. Supp. 3d at 1356-57 (describing repeated suicide and self-castration attempts by a transgender woman who was denied hormone therapy).

104.   Defendants knew before SB185 even passed that their implementation of a blanket ban would cause significant harm. Indeed, on March 31, 2025, shortly before SB185 was brought to the Georgia House Public and Community Health Committee for discussion, Defendant Commissioner Oliver and GDC General Counsel Jennifer Ammons acknowledged the harm that enforcing a gender dysphoria treatment ban would cause at GDC. In a text conversation regarding SB185, a true and correct copy of which is produced below, Ammons texted Defendant Oliver: "We definitely have no plan to inject folks to **forcibly detransition them**. **Holy cow!"** to which Defendant Oliver responded "**I know!"**



*March 31ˢᵗ and April 1ˢᵗ text exchange between GDC General Counsel Jennifer Ammons and Defendant Oliver*

105.    Despite acknowledging the harm that would result from the proposed idea that GDC "forcibly detransition" transgender people diagnosed with gender dysphoria, that is precisely the conduct that Defendant Oliver is now enacting and enforcing.

106.    Despite its knowledge that gender dysphoria is a serious medical condition requiring medically necessary and constitutionally required treatment, including hormone therapy and social transition care; and its duty to provide

adequate health services to those incarcerated in GDC facilities pursuant to its contract with the State of Georgia, Defendant Centurion Health collaborated with other Defendants to enforce SB185.

107.   Even though Defendants knew that people with gender dysphoria have "serious medical needs which may not be ignored," SOP 507.04.68 (§ IV.A.6) (2022), and that hormone therapy had already been deemed medically necessary for Plaintiffs and some Class Members by GDC's own healthcare providers and Defendant Mardis, Defendants nonetheless instituted a blanket ban that summarily interfered with and overruled these treatment decisions and terminated care. Defendants also banned all Plaintiffs and Class Members from receiving medical evaluations to determine their individualized gender dysphoria treatment needs.

108.   Defendants took these actions despite being aware that the categorical denial of gender dysphoria treatment and forcible termination of hormone therapy, irrespective of any patient-specific medical evaluation or judgment, greatly risks Plaintiffs' and Class Members' gender dysphoria symptoms worsening or returning.

**D.    Plaintiffs and Class Members have and will suffer continued harm because of Defendant's actions.**

109.   Due to Defendants' actions in implementing SB185 across GDC, Plaintiffs and Class Members are already experiencing profound and significant harm. Specifically, Plaintiffs are in the process of permanently losing access to gender dysphoria care and treatment evaluations because of Defendants'

enforcement of SB185, even though it poses a grave threat to their physical and mental health.

110.   In July 2025, Defendants began taking steps to reduce and eliminate Plaintiffs and Class Members' hormone therapy dosages.

111.   And at Defendants' direction, GDC and Centurion staff have begun notifying Plaintiffs and Class Members who were awaiting evaluations to start treatment such as hormone therapy or hair removal that gender dysphoria treatment was no longer being provided to people in GDC, and they would no longer have access to social transition care such as gender-affirming undergarments.

*Plaintiff Isis Benjamin*

112.   Plaintiff Isis Benjamin is a transgender woman who has been living as a woman since she was 18 years old. She first received hormone therapy as treatment for her gender dysphoria in 2003 and consistently received such treatment for almost two decades except for the periods she was in GDC custody. Ms. Benjamin's gender dysphoria treatment has included estrogen pills, biweekly estradiol shots, and spironolactone.

113.   Ms. Benjmain was also prescribed laser hair removal treatment after a medical provider determined it was medically necessary treatment for her gender dysphoria because of the ways facial and body hair worsen her gender dysphoria symptoms and lead to depression. Ms. Benjamin has also received some surgical

treatment for her gender dysphoria. Hormone therapy and hair removal treatment have greatly aided Ms. Benjamin's gender dysphoria symptoms, such as depression, mood swings, disordered eating and thoughts of self-harm and suicide. However, because of her ongoing gender dysphoria symptoms, gender confirmation surgery will ultimately be necessary for Ms. Benjamin.

114.    Ms. Benjamin was re-diagnosed with gender dysphoria by GDC staff upon initial intake in 2020. GDC providers determined hormone therapy was medically necessary for Ms. Benjamin's gender dysphoria, so she continued her regimen of spironolactone and estradiol until her release in 2021.

115.    When Ms. Benjamin reentered GDC custody in March 2025, she began the process of trying to reinitiate the hormone therapy she has relied upon for almost two decades. Ms. Benjamin also sought approval to continue the hair removal treatment that was previously determined to be medically necessary treatment for her gender dysphoria.

116.    On or about June 22, a GDC provider informed Ms. Benjamin that neither her request for an assessment for hormone therapy nor laser hair removal treatment would progress because Defendant Oliver had informed all GDC healthcare providers there would be no new prescriptions or approvals for gender dysphoria treatment due to SB185.

117.   On or about July 16, 2025, the Warden of Coastal State Prison reaffirmed to Ms. Benjamin that she would be unable to receive hormone therapy in the future because of SB185.

118.   Ms. Benjamin was also informed by a GDC nurse that due to SB185, social transition care items such as bras and undergarments would no longer be available.

119.   Ms. Benjamin was further informed by a GDC healthcare provider that she would not be permitted to pay for any gender dysphoria treatment herself because of SB185.

120.   On July 23, 2025, GDC initiated individual sick calls for all transgender people at Coastal State Prison. Ms. Benjamin was called into a meeting with a GDC healthcare provider who reiterated that all gender dysphoria treatment would be terminated due to SB185. The provider also acknowledged that denying Ms. Benjamin hormone therapy might cause her to have thoughts of suicide or self-harm, but that because of SB185 she was unable to do anything to assist as it was "above her pay grade."

121.   By categorically denying Ms. Benjamin access to gender dysphoria treatment, including the hormone therapy she has relied on for over two decades, Defendants have caused Ms. Benjamin's gender dysphoria symptoms to worsen,

jeopardizing her mental and physical health and putting her at grave risk of self-harm.

*Plaintiff Fantasia Horton*

122.  Plaintiff Fantasia Horton is a transgender woman with gender dysphoria incarcerated at Phillips State Prison in the Northern District. Ms. Horton has been receiving biweekly injections of estradiol, a form of hormone therapy, as medically necessary treatment for her gender dysphoria as determined by GDC psychologist Dr. Weaver and GDC endocrinologist Dr. Malloy. Ms. Horton has received hormone therapy since her gender dysphoria diagnosis in 2019.

123.  As early as age 12, Ms. Horton began recognizing herself as a girl. She has known she was a woman since about the age of 19, but because she was serving in the military during the enforcement of "Don't Ask Don't Tell" she decided to wait till she was done with military service to transition.

124.  Prior to being approved for hormone therapy, Ms. Horton experienced severe gender dysphoria symptoms such as depression, anxiety, disassociation, panic attacks, and suicidal ideation. She also engaged in self-harm and attempted suicide multiple times.

125.  After being diagnosed with gender dysphoria, GDC endocrinologist Dr. Malloy determined that hormone replacement therapy was medically necessary treatment to mitigate the severe distress of her gender dysphoria. Ms. Horton has

since been treated with hormone therapy in the form of biweekly estradiol injections in the amount of 15 mL. Due to hormone therapy, Ms. Horton's health and well-being have greatly improved, so much so that Ms. Horton was able to stop taking medication to treat her depression and anxiety.

126.   On Tuesday, July 8, 2025, shortly after Ms. Horton received her biweekly hormone therapy, she was called in to a meeting with a GDC psychologist. The psychologist informed Ms. Horton that because of SB185, she would no longer be able to receive hormone therapy, surgery, or any other gender dysphoria treatment from GDC.

127.   The GDC psychologist did so at the instruction of Defendant Centurion's Georgia Statewide Medical Director Gerald Wynne and Defendants Sauls and Mardis' SB185 implementation plan.

128.   Ms. Horton explained to the GDC psychologist that hormone therapy is crucial treatment for her gender dysphoria, her mental health, and her anxiety and depression. However, the GDC psychologist informed Ms. Horton nothing could be done because of GDC's implementation of SB185. Ms. Horton was offered no other treatment.

129.   In mid-July, Ms. Horton met with Dr. Wynne via video conference, where he reconfirmed that she would no longer receive hormone therapy due to SB185. Dr. Wynne told Ms. Horton she could terminate her hormone therapy "cold

turkey" or be "detransitioned" over several weeks by receiving half doses. Ms. Horton chose the latter.

130.    Ms. Horton explained to Dr. Wynne the necessity of her hormone therapy treatment and explained to him her history of suicidal ideation and prior suicide attempts when she was previously denied gender dysphoria treatment. Dr. Wynne did not respond directly to these concerns and instead reiterated to Ms. Horton that SB185 proscribed provision of her hormone therapy treatment.

131.    While hormone therapy is critically important treatment in alleviating Ms. Horton's gender dysphoria symptoms, it has been insufficient to adequately treat them, indicating a need for further treatment. Ms. Horton submitted a request seeking to be evaluated by a GDC medical provider to determine if she required gender-confirmation surgery as treatment for her gender dysphoria in 2024 and again in July 2025.

132.    But as a result of SB185, Ms. Horton is now blocked from receiving a medical evaluation to determine if surgery is necessary treatment for her gender dysphoria, even though her severe gender dysphoria symptoms indicate that she needs treatment beyond the hormone therapy she was prescribed prior to SB185.

133.    In Ms. Horton's mid-July video conference meeting with Dr. Wynne, she asked, in the absence of hormone therapy, if she could instead have gender-affirming surgery. Dr. Wynne repeated that such care was barred because of SB185.

134.   Ms. Horton then asked Dr. Wynne if she or her family could pay for the continuation of her hormone therapy or for surgical treatment. Dr. Wynne informed her that due to SB185 neither her nor her family would be permitted to pay for any gender dysphoria treatment.

135.   Dr. Wynne further informed Ms. Horton that under GDC's grievance policy the termination of her hormone therapy was non-grievable because it was a matter established by state law—SB185.

136.   When Ms. Horton asked Dr. Wynne if any alternative gender dysphoria treatments would be made available to her, Dr. Wynne told her no.

137.   Despite requesting the gradual termination of her hormone therapy, Ms. Horton was denied her treatment at her regular appointment on July 28, 2025. Ms. Horton received a half-dose of her hormone therapy at her August 5, 2025 appointment. There, she was informed she would receive partial doses for the upcoming weeks but that her treatment would be terminated by the end of the month.

138.   Within the one week Ms. Horton was denied her hormone therapy treatment, her suicidal thoughts returned. Ms. Horton now fears for her life should her medically necessary care continue to be withheld from her.

139.   Due to Defendants' policies and actions in terminating her treatment, Ms. Horton is now at grave risk of physical and psychological harm. Three years ago, after losing access to hormone therapy for just one week after her prison's

supply of hormone therapy was temporarily depleted, Ms. Horton's mental health plummeted and her depressive symptoms returned.

140.   If she is permanently denied access to hormone therapy and treatment evaluations, Ms. Horton's mental pain, suicidality, and thoughts of self-harm will return, putting her life at risk.

*Plaintiff Naeomi Madison*

141.   Plaintiff Naeomi Madison is a transgender woman with gender dysphoria. Ms. Madison was first diagnosed with gender dysphoria in 2021 while incarcerated at Dooley State Prison.

142.   Since she was fourteen years old, Ms. Madison knew she was a woman. By the time she was 21, she was fully expressing herself and living openly as a transgender woman, both in her personal and professional life.

143.   Ms. Madison's gender dysphoria symptoms include depression, anxiety, post-traumatic stress disorder, and severe mood swings.

144.   After Ms. Madison received her gender dysphoria diagnosis, she began the process of being evaluated for hormone therapy by GDC, which halted when she was released from custody in August 2021.

145.   Ms. Madison was reincarcerated in 2023 and was diagnosed with gender dysphoria again by Dr. Clarity at a GDC facility called Patten Probationary Detention Center in Lakeland, Georgia. Ms. Madison was diagnosed with gender

dysphoria by GDC for a third time in 2024 by Dr. Harris while housed at Baldwin State Prison.

146.   However, Baldwin State Prison did not provide her with any gender dysphoria treatment following her diagnosis, which prompted Ms. Madison to file a *pro se* case, about GDC's failure to provide her care. *Madison v. Berry*, No. 5:24-cv-00014-TES-CHW, 2024 WL 2330005 (M.D. Ga. May 22, 2024), *report & recommendation adopted*, 2024 WL 5662508 (M.D. Ga. June 21, 2024).

147.   In February 2024, Ms. Madison was approved for hormone therapy by an endocrinologist at Washington State Prison. However, Ms. Madison was released in April 2024 before she saw an endocrinologist.

148.   While Ms. Madison's lawsuit, *Madison v. Berry*, partially survived a motion to dismiss, her release mooted the suit.

149.   Ms. Madison was reincarcerated in November 2024 on a parole violation and began the process of trying to start the hormone therapy GDC providers previously approved.

150.   Ms. Madison also requested laser hair removal treatment and an evaluation for gender-affirming surgery due to her severe gender dysphoria symptoms.

151.   Now, due to SB185, hormone therapy and treatment evaluations are no longer available, and she is now permanently cut off from receiving any treatment *whatsoever* for her severe gender dysphoria.

152.   By permanently denying Ms. Madison access to medical care with no individualized medical judgment whatsoever, Defendants have prolonged and worsened her gender dysphoria symptoms, and placed her at grave risk of physical and psychological harm.

*Plaintiff Brynn Wilson*

153.   Plaintiff Brynn Wilson is a transgender man who was diagnosed with gender dysphoria at Lee Arrendale State Prison over seven years ago, and since then has been receiving biweekly testosterone injections, a form of hormone therapy, as treatment prescribed by GDC providers.

154.   Mr. Wilson has known he was a boy since around age 12. He grew up feeling trapped in the wrong body, severely impacting his mental health. Mr. Wilson's gender dysphoria symptoms include depression, anxiety, and panic attacks.

155.   Hormone therapy greatly improved Mr. Wilson's gender dysphoria symptoms, so much so that Mr. Wilson's panic attacks ceased.

156.   However, due to Defendants' enforcement of SB185, Mr. Wilson's hormone therapy is now being terminated. Mr. Wilson met by video call with a doctor in early July and was told that GDC would either terminate his hormone

43

therapy immediately or wean him off. He chose to be weaned off. The doctor told him he might have mood swings or feel agitated or even suicidal as his hormone therapy ended.

157.   Being forced to start Defendants' detransition process has negatively impacted Mr. Wilson's health, and once his hormone therapy is completely terminated and Mr. Wilson experiences a menstrual cycle once again, it will trigger his gender dysphoria symptoms, including depression, anxiety, and panic attacks.

*Plaintiff John Doe*

158.   Plaintiff John Doe is a transgender man with gender dysphoria incarcerated at Lee Arrendale State Prison in the Northern District of Georgia. Mr. Doe has been receiving hormone therapy since June 2020 after he was diagnosed with gender dysphoria in 2019 by a GDC psychologist, Dr. Straub.

159.   In 2020, a GDC endocrinologist, Dr. Malloy, determined that hormone therapy was medically necessary treatment for Mr. Doe's gender dysphoria, and prescribed him testosterone, which he has consistently been administered since June 2020; Mr. Doe receives a weekly testosterone injection in the amount of 200 mg.

160.   Mr. Doe's access to hormone therapy has reduced his gender dysphoria symptoms and made an enormous improvement in his health and well-being, lessening his life-long feelings of anxiety and depression. He no longer suffers from insomnia and sleeps peacefully, especially the night of a testosterone shot because it

makes him feel relaxed and calm. As a result of hormone therapy, Mr. Doe stopped praying to God to take his life. However, following Defendants' enforcement of SB185, this treatment is no longer available.

161.    Mr. Doe learned that GDC would begin terminating his hormone therapy on July 15, 2025. A mental health counselor at Arrendale read a prepared statement about SB185 and told Mr. Doe that he would receive counseling as needed after GDC terminated his hormone therapy.

162.    Then, on July 17, 2025, Mr. Doe met by video call with Dr. Wynne, who told Mr. Doe that he could no longer receive hormone therapy. Dr. Wynne told Mr. Doe he could either immediately terminate hormone therapy or be weaned off. Mr. Doe chose the latter.

163.    GDC will terminate Mr. Doe's hormone therapy over 90 days. He received two-thirds of his prescribed dose on July 24, 2025. Eventually, GDC will cut his dose down to one-third of his prescribed dose, and then terminate care altogether.

164.    Although Defendants' actions have already prompted a return of many of Plaintiffs' and Class Members' gender dysphoria symptoms as well as emotional distress, additional harms are foreseeable if they are forced to go without treatment for a prolonged period.

165. For instance, Plaintiffs and Class Members like Fantasia Horton who are transgender women with gender dysphoria receiving hormone therapy are at imminent risk of physiological harms such as hormonal disequilibrium, mood destabilization, vasomotor instability, thermoregulatory dysregulation, cognitive slowing, increased cardiovascular disease risk, the involuntary masculinization and increased risks of self-castration (often resulting in long-term damage, chronic pain, disfigurement, disability, or death) as their hormone therapy treatment is terminated.

166. Meanwhile, Plaintiffs and Class Members like Brynn Wilson and John Doe who are transgender men with gender dysphoria receiving hormone therapy are at imminent risk of physiological harms such as hormonal disequilibrium, mood destabilization, musculoskeletal effects, metabolic dysregulation, cardiovascular effects, neuroendocrine effects, insomnia, irritability, anhedonia, and involuntary feminization as their hormone therapy treatment is terminated.

167. Forced detransition and denial of gender dysphoria care will also put Plaintiffs and Class Members at imminent risk of severe psychological injury such as depression, anxiety, suicidality, and psychological decompensation that can result in physical injury or death; acute stress responses and symptoms such as hypervigilance, panic, and the activation of psychiatric conditions (such as bipolar disorder, PTSD, schizoaffective disorder, or the recurrence of psychosis).

168.   All of these harms to Plaintiffs and Class Members could easily be prevented if Defendants followed their constitutional obligations and ensured that Plaintiffs and Class Members had access to individualized gender dysphoria treatment and care.

## CLASS ACTION ALLEGATIONS

169.   Because Defendants' actions in implementing SB185 have jeopardized the health and safety of hundreds of people in GDC custody with gender dysphoria diagnoses, Plaintiffs bring this action on their own behalf and on behalf of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Civil Rules of Civil Procedure.

170.   For purposes of the merits, Plaintiffs represent a class defined as "All individuals with gender dysphoria diagnosis or who meet the criteria for diagnosis who are or will be incarcerated in GDC and subject to SB185's treatment ban."

171.   This class is easily ascertainable. Individuals who have received or requested gender dysphoria treatment while in GDC custody can be identified from institutional records.

172.   As defined, the class meets all requirements of Federal Rule of Civil Procedure 23(a):

*Rule 23(a)(1)—Impractability, Numerosity*

173.   The class is too numerous for joinder of all members to be practicable. Per a public records request to the Georgia Department of Corrections, there are

47

approximately 273 transgender people in GDC custody as of April 3, 2025. Of these 273 transgender people in custody, 201 already have a diagnosis of gender dysphoria confirmed by GDC. As of June 1, 2025, there were 126 transgender people in GDC custody receiving hormone therapy, while others were awaiting initial evaluations.

174.   GDC operates 94 facilities statewide where Plaintiffs and Class Members are incarcerated. Many additional Class Members are likely to be incarcerated at those facilities. Plaintiffs and Class Members' geographical dispersion also make joinder impracticable.

175.   In addition to existing Class Members, new Class Members will likely enter GDC custody during the litigation. Joining new Class Members as they enter GDC custody would be impracticable.

*Rule 23(a)(2)—Commonality*

176.   There are questions of law or fact common to the class. Common questions include: (1) whether gender dysphoria is a serious medical need; (2) whether gender dysphoria requires individualized medical treatment; (3) whether SB185's blanket ban on gender-affirming care regardless of medical necessity is an objective, serious deprivation of medically necessary care; and (4) whether Defendants are subjectively aware that withholding the care banned by SB185 poses a substantial risk of harm to inmates with gender dysphoria.

*Rule 23(a)(3)—Typicality*

177.   Plaintiffs' claims are typical of those of the class. If Defendants are allowed to enforce SB185, all Plaintiffs and Class Members will experience the same harm: they will lose or be denied access to medical care necessary to treat their gender dysphoria, including individualized evaluations for such care. All Plaintiffs and Class Members share a legal theory: that SB185's blanket ban on gender-affirming care violates the Eighth Amendment. And all Plaintiffs and Class Members seek the same relief: an injunction stopping the enforcement of SB185.

*Rule 23(a)(4) & Rule 23(g)—Adequacy of Representation*

178.   The Named Plaintiffs are adequate representatives of the class. They do not have conflicts with other Class Members, they seek the same relief, and they will represent the class fairly and adequately. All Plaintiffs and Class Members share an interest in accessing gender dysphoria treatment.

179.   The Named Plaintiffs, in their capacity as class representatives, are also adequately represented by counsel. Counsel at the Center for Constitutional Rights and Bondurant Mixson & Elmore LLP have experience litigating class actions, and civil rights lawsuits on behalf of transgender persons and incarcerated persons in federal court.

*Rule 23(b)(2) - Class-wide Injunctive Relief*

180.   The requirements of Rule 23(b)(2) are met because Defendants have acted, or will act, on grounds generally applicable to the class, and final injunctive

relief and corresponding declaratory relief are appropriate respecting the class. GDC medical staff have informed Plaintiffs and Class Members prescribed and receiving hormone therapy that their hormone therapy will soon be reduced and ultimately discontinued due to SB185. Other Plaintiffs and Class Members have been informed that evaluations for gender dysphoria treatment will no longer be provided. GDC and the other Defendants will similarly enforce SB185's blanket ban on gender-affirming medical care prescribed to treat gender dysphoria regardless of individualized medical need.

## CLAIM FOR RELIEF

### Count I: Violation of Eighth Amendment Under 42 U.S.C. § 1983
### Denial of Adequate Medical Treatment

*Against All Defendants*

181.   Plaintiffs repeat and reallege the allegations in paragraphs 20-179 as if fully set forth herein.

182.   Plaintiffs and Class Members each have gender dysphoria, an objectively serious medical need that places them at imminent risk of serious and irreparable physical and psychological harm without adequate treatment in accordance with clinical guidelines.

183.   Defendants are responsible for providing adequate and necessary medical treatment to Plaintiffs and Class Members, including treatment for gender dysphoria.

184.   Defendants have known that Plaintiffs and Class Members require individualized medical evaluations to assess the need for treatment of their gender dysphoria, including but not limited to hormone therapy, social transition care, hair removal treatment, and gender-affirming surgical care.

185.   Despite knowing that gender dysphoria is a serious medical condition requiring treatment, for which hormone therapy may be medically necessary care, and that counseling is no substitute, Defendants have begun enforcing SB185 by imposing a blanket ban on medically necessary gender dysphoria treatment and social transition care for those in GDC custody that denies Plaintiffs and Class Members access to necessary healthcare while overriding the medical assessments and judgment of GDC's own medical providers.

186.   Defendants' enforcement of SB185 and its blanket prohibition on gender dysphoria treatment and evaluations for non-medical reasons is an objectively serious deprivation that violates the Eighth Amendment's prohibition on cruel and unusual punishments and constitutes deliberate indifference to a serious medical need.

187.   Defendants implemented SB185's categorical ban on gender dysphoria treatment despite knowing it would put Plaintiffs and Class Members at a substantial risk of serious harm, including physical and psychological injury.

188.   Defendants also unreasonably adopted SB185's categorical ban on gender dysphoria treatment including hormone therapy already deemed medically necessary by GDC despite knowing it was unconstitutional, and that alternatives to enforcement existed as demonstrated by the action of Centurion's affiliate in Florida.

189.   By denying Plaintiffs and Class Members medically necessary treatment for their gender dysphoria, Defendants have caused and will continue to cause them substantial and predictable physical and psychological harm by withholding effective treatment for an objectively serious medical condition that the GDC itself has recognized and provided treatment for prior to SB185.

190.   In the absence of injunctive and declaratory relief, Plaintiffs and Class Members are at grave risk for and will continue to suffer worsening physical and psychological symptoms of their gender dysphoria.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Benjamin, Horton, Madison, Wilson, and Doe respectfully requests that this court enter judgement in their favor and against Defendants as follows:

A.    Entering preliminary and permanent injunctive relief:

B. enjoining Defendants, including their contractors, employees, agents, and anyone acting in concert with Defendants, from enforcing SB185 as well as

any policies, customs, practices, implementing SB185 and/or categorically limiting access to gender dysphoria treatment;

C. directing Defendants, their contractors, employees, agents, and anyone acting in concert with them, to resume providing hormone therapy to Plaintiffs and Class Members in the dosages and amounts approved by GDC prior to Defendants' enforcement of SB185;

D. directing Defendants, their contractors, employees, agents, and anyone acting in concert with them, to provide hormone therapy evaluations in accordance with GDC policies in effective immediately prior to SB185;

E. directing Defendants, their contractors, employees, agents, and anyone acting in concert with them, to continue providing Plaintiffs and Class Members additional forms of gender dysphoria treatment and gender dysphoria evaluations based on individualized medical judgment and patient medical need, in accordance with the Constitution, GDC's pre SB185 policies, and applicable standards of medical care;

F. Entering declaratory relief declaring SB185 and Defendants' enforcement thereof unconstitutional under the Eighth Amendment and Defendants' practice in categorically denying Plaintiff and Class Members necessary medical treatment unconstitutional in violation of the Eighth Amendment;

G.      Provisionally and permanently certify the Class;

H.      Award reasonable costs of this suit and attorneys' fees and expenses

        pursuant to 42 U.S.C. § 1988; and

I.      Grant any further relief as the Court may deem just, proper, and

        appropriate.

Respectfully submitted this 8th day of August, 2025.


Emily C. R. Early,                                  */s/ Amanda Kay Seals*
GA Bar No. 810206                                   Amanda Kay Seals
eearly@ccrjustice.org                               GA Bar No. 502720
A. Chinyere Ezie*                                   seals@bmelaw.com
cezie@ccrjustice.org                                Matthew R. Sellers
Celine Zhu*                                         GA Bar No. 691202
czhu@ccrjustice.org                                 sellers@bmelaw.com
CENTER FOR CONSTITUTIONAL RIGHTS                    BONDURANT, MIXSON & ELMORE, LLP
666 Broadway, 7th Floor                             1201 W Peachtree St NW
New York, NY 10012                                  Suite 3900
Phone: (212) 614-6464                               Atlanta, GA 30309
                                                    Phone: (404) 881-4100
D. Korbin Felder*                                   Fax: (404) 881-4111
kfelder@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
P.O. BOX 12046
Jackson, MS 39236
Phone: (601) 228-6101


*Pro hac vice* admissions forthcoming


*Counsel for Plaintiffs*