# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| ISIS BENJAMIN; FANTASIA HORTON; NAEOMI MADISON; BRYNN WILSON; and JOHN DOE;<br><br>on behalf of themselves and all persons similarly situated,<br><br>     Plaintiffs,<br><br>       v.<br><br>COMMISSIONER TYRONE OLIVER, in his official capacity; ASSISTANT COMMISSIONER RANDY SAULS, in his official capacity; STATEWIDE MEDICAL DIRECTOR DR. MARLAH MARDIS, in her official capacity; and CENTURION OF GEORGIA, LLC,<br><br>     Defendants. | Civ. Case No. _____<br><br>**CLASS ACTION** |

# PLAINTIFFS' EMERGENCY MOTION FOR <u>PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................2

I.    Gender dysphoria is a serious medical condition requiring treatment, as Defendants' own pre-SB185 policies recognize. ...........................................2

II.   SB185 categorically prohibits hormone therapy & individualized gender dysphoria care. ...................................................................................5

III. In July 2025, Defendants began implementing SB185 within GDC and terminating medically necessary hormone therapy. ........................................6

IV. Plaintiffs represent a class of incarcerated transgender people with gender dysphoria who now face imminent harm. .......................................................8

ARGUMENT ....................................................................................................9

I.    Plaintiffs are likely to succeed on the merits of their Eighth Amendment claim that Defendants have shown deliberate indifference to serious medical needs. ..................................................................................................10

    A.    Gender dysphoria is an objectively serious medical need posing a substantial risk of serious harm. ..........................................................11

    B.    Defendants have actual knowledge of Plaintiffs' substantial risk of harm. ....................................................................................................12

    C.    By implementing SB185 within GDC, Defendants disregarded the risk of harm with deliberate indifference. ..........................................15

    D.    Defendants caused Plaintiffs' injuries................................................21

II.   The Provisional Class will suffer irreparable harm absent injunctive relief. 22

III. The balance of equities and the public interest favor Plaintiffs. ...................23

IV. The bond requirement should be waived....................................................25

CONCLUSION ................................................................................................25

## INTRODUCTION

Plaintiffs Fantasia Horton, Brynn Wilson, Isis Benjamin, Naeomi Madison, and John Doe are transgender people with gender dysphoria incarcerated in the Georgia Department of Corrections ("GDC"). Defendants are the prison officials and correctional healthcare provider responsible for ensuring that Plaintiffs and others in GDC custody receive adequate medical care. Namely, Oliver, Mardis, and Sauls are GDC employees while Centurion of Georgia, LLC ("Centurion") has contracted to provide prison healthcare services within the State.[1] Plaintiffs bring this emergency motion on behalf of themselves and a putative class of more than 100 transgender individuals who are "incarcerated in GDC [and] who are seeking or receiving hormone therapy now proscribed by" Georgia Senate Bill 185 (collectively, "the Provisional Class").[2]

Senate Bill 185 ("SB185") prohibits gender dysphoria treatment—including hormone therapy—for people in GDC custody without regard to individualized medical need. Defendants began enforcing SB185, which was signed into law on

---

[1] Centurion is a proper defendant for 42 U.S.C. § 1983 purposes because providing healthcare within GDC is "a function which is traditionally the exclusive prerogative of the state." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985) (collecting cases).

[2] This motion seeks narrower relief, on behalf of a narrower class, than the permanent injunctive relief sought on behalf of a wider class in the contemporaneously filed Complaint. Plaintiffs have also filed a Motion for Provisional Class Certification and a motion for expedited procedure, pursuant to Local Rule 7.2(B).

May 8, 2025, in July 2025. Pursuant to SB185, Defendants have begun terminating all hormone therapy prescribed to members of the Provisional Class, even though *GDC's own healthcare providers* previously determined it was medically necessary. In addition, members of the Provisional Class can no longer receive evaluations for gender dysphoria, a serious medical need, and Defendants have withdrawn other gender dysphoria treatment, making hormone therapy especially critical.

SB185's categorical ban on medically necessary care is causing transgender people catastrophic and irreparable harm. Accordingly, Plaintiffs seek an order preliminarily enjoining Defendants from implementing and enforcing SB185, and restoring the pre-SB185 status quo, where the Provisional Class could receive medically necessary hormone therapy to treat their gender dysphoria.

## BACKGROUND

**I.   Gender dysphoria is a serious medical condition requiring treatment, as Defendants' own pre-SB185 policies recognize.**

Gender dysphoria is a diagnosable medical condition common among transgender people—arising from the incongruence between an individual's gender identity and their birth-assigned sex—that results in clinically significant distress. Declaration of Dr. Randi Ettner ("Ettner Decl."), Ex. 1, ¶¶ 31(a)-(b);[3] Declaration of

---

[3] To avoid duplicative exhibits, Plaintiffs' Motion for Preliminary Injunction, Motion for Provisional Class Certification, and Local Rule 7.2(B) Motion for Expedited Procedure all refer to a common set of numbered exhibits. Those exhibits will be attached to a forthcoming notice of filing, which Plaintiffs will file when the clerk assigns this matter a case number.

Dr. J. Sonya Haw ("Haw Decl."), Ex. 2, ¶¶ 11-12. The accepted standards for gender dysphoria treatment, which apply in correctional settings, require individualized medical treatment based on patient need. Ettner Decl. (Ex. 1) ¶¶ 45–59, 163–66; Haw Decl. (Ex. 2) ¶¶ 16–17, 21–32, 34–35, 54, 61; Ex. 10, SOP 507.04.68 (§ IV.C.3); Ex. 8, NCHC Position Stmt. at 1, 3-4; Ex. 15, Mardis Feb. 27 Email at 1 (applying guidelines). Under the accepted standards, medically indicated care for gender dysphoria includes hormone therapy, hair removal treatment, social transition care, and gender-confirmation surgery. Ettner Decl. (Ex. 1) ¶¶ 65–94; Haw Decl. (Ex. 2) ¶¶ 14, 19, 21–30. Psychotherapy is not a substitute for medically indicated gender dysphoria treatment, nor are treatments aimed primarily at the treatment of anxiety or depression. Ettner Decl. (Ex. 1) ¶¶ 95-97; Haw Decl. (Ex. 2) ¶¶ 33, 43–45, 63.

Without adequate treatment, gender dysphoria patients typically experience anxiety, depression, suicidality, and attempts at suicide, self-harm, and self-castration. Ettner Decl. (Ex. 1) ¶¶ 124-162, 167; Haw Decl. (Ex. 2) ¶¶ 32, 42–43, 49–51, 56–57, 61–62. In addition to exacerbating dysphoria symptoms, physiological harms arise from terminating clinically indicated hormone therapy, including hormonal disequilibrium, mood destabilization, musculoskeletal effects, metabolic dysregulation, neuroendocrine effects, cardiovascular effects, psychological and neuropsychiatric effects, vasomotor instability, mood

dysregulation, cardiometabolic risks. Ettner Decl. (Ex. 1) ¶¶ 151–154; Haw Decl. (Ex. 2) ¶¶ 42, 46–49, 61–62. Denying or withdrawing necessary care also causes severe and worsening dysphoria symptoms, putting patients at grave risk of severe harm or death. Ettner Decl. (Ex. 1) ¶¶ 147-150, 167; Haw Decl. (Ex. 2) ¶¶ 42–43, 49–51, 56–57, 61–62. The risks of self-castration and suicide are particularly acute in prisons, especially where officials withhold treatment based on categorical rules and limit provisions for social-transition care, all contrary to accepted standards of care. Ettner Decl. (Ex. 1) ¶¶ 147-148, 155, 167; Haw Decl. (Ex. 2), ¶¶ 30, 56.

Years ago, Defendants adopted and enforced three longstanding policies on gender dysphoria treatment. Ex. 9, SOP 508.40; Ex. 10, SOP 507.04.68; Ex. 11, SOP 220.09. These policies stated the truth—known to Defendants—that transgender people with gender dysphoria have "serious medical needs which may not be ignored." Ex. 10, SOP 507.04.68 (§ IV.A.6). The policies acknowledged that patients require comprehensive medical evaluations and individualized treatment plans informed by the prevailing standards of care. Ex. 9, SOP 508.40 (§§ IV.A–E); Ex. 10, SOP 507.04.68 (§§ I; IV.A.6; IV.C); Ex. 11, SOP 220.09 (§§ IV.K.4–5).

The policies also acknowledged the essential role hormone therapy plays in treating gender dysphoria. Ex. 10, SOP 507.04.68 (§§ IV.C–D); Ex. 9, SOP 508.40 (§ IV.D); Ex. 11, SOP 220.09 (§§ IV.K.4–8). The policies authorized hormone therapy only when GDC healthcare personnel—including Defendant Mardis—

4

deemed *it medically necessary* care for a patient. Ex. 11, SOP 220.09 (§ IV.K.8);

Ex. 9, SOP 508.40 (§ IV.D); Ex. 10, SOP 507.04.68 (§§ IV.C.3; IV.D; IV.D.1.d).

## II. SB185 categorically prohibits hormone therapy & individualized gender dysphoria care.

SB185 appeared during a legislative session characterized by unprecedented

attacks against the transgender community.[4] The law bans "[h]ormone replacement

therapies," "[s]ex reassignment surgeries or any other surgical procedures …

performed for the purpose of altering primary or secondary sexual characteristics,"

and "[c]osmetic procedures or prosthetics intended to alter the appearance of

primary or secondary sexual characteristics" for people in GDC custody. SB185 §§

1(e)(1)(A)–(C).[5] SB185 contains no medical necessity exception for gender

dysphoria, even though *all* the treatment it prohibits can be medically necessary

treatment for the condition. SB185 § 1(e)(2)(A); Haw Decl. (Ex. 2) ¶¶ 39(c), 40(g);

Ettner Decl. (Ex. 1) ¶¶ 65–94; Ex. 8, NCHC Stmt. at 3–4. SB185 even requires that

gender dysphoria patients currently receiving prescribed hormone therapy be

---

[4] Jan Mooney & Mark Spencer, *Bills targeting transgender medical care continue to move through the Legislature*, GA. RECORDER (Apr. 2, 2025), https://georgiarecorder.com/2025/04/02/bills-targeting-transgender-medical-care-continue-to-move-through-the-legislature/.

[5] While SB185 specifically prohibits the use of state funds for gender dysphoria treatment, in legislative hearings, bill sponsor Senator Randy Robertson clarified that it was also intended to prohibit self-pay for the care. Ga. House of Reps., 2025–2026 Reg. Sess., Pub. & Cmty. Health Comm. Hr'g (Apr. 1, 2025), https://vimeo.com/1071507707?fl=pl&fe=vl (43:24-43:55).

forcibly "transition[ed] off such therapy." SB185 § 1(e)(2)(D). And yet, all the prohibited treatments remain available when "medically necessary" for conditions that are "*not* gender dysphoria." SB185 § 1(e)(2)(A).

In sum, SB185 (1) imposes a blanket ban on hormone therapy, irrespective of medical need; (2) terminates all hormone therapy already determined by GDC to be medically necessary for Provisional Class members; and (3) prohibits other Provisional Class members from being evaluated for hormone therapy or receiving other medical treatment for their gender dysphoria going forward. *Id.*; Benjamin Decl. (Ex. 3) ¶¶ 14–25; Horton (Ex. 4) ¶¶ 16–19. SB185 thus represents a significant departure from both accepted standards for gender dysphoria treatment, Haw Decl. (Ex. 2) ¶ 55; Ettner Decl. (Ex. 1) ¶¶ 55–59, 163–66, and GDC's long-standing policies. Ex. 19, GDC May 29 Ltr. (stating GDC's gender dysphoria policies have been statutorily overridden).

## III.    In July 2025, Defendants began implementing SB185 within GDC and terminating medically necessary hormone therapy.

In June 2025, the Georgia Board of Corrections initially approved Rule 125-4-4-13, Treatment of Gender Dysphoria and Intersex Offenders, a regulation implementing SB185 across GDC. Ex. 14, Board Rule 125-4-4-.13. The rule mirrors the statutory language and denies gender dysphoria treatment regardless of medical necessity. *Id.* at 2. Thereafter, Defendants began enforcing SB185 using a plan developed by Defendants Centurion and Mardis, GDC's Statewide Medical

Director, and approved by Defendants Oliver and Sauls, GDC's Commissioner and Assistant Commissioner over the Health Services Division. Ex. 20, SB 185 Implementation Plan at 1. Defendants modeled their plan after a Centurion plan already enjoined four times in Idaho. Ex. 18, May 29 Mardis Email at 1.

Defendants' enforcement plan for SB185 bans hormone therapy and gender dysphoria treatment with no exception for medical necessity and prohibits continuing hormone therapy for those currently receiving it, except for the "purpose of transitioning off." Ex. 20, SB 185 Implementation Plan at 11. Those receiving hormone therapy have only two "options," both leading to complete cessation of hormone therapy no later than October 3, 2025: they can "consent" to the immediate cessation of their hormone therapy, or they can "consent" to having their hormone therapy eliminated over the course of several weeks. *Id.* at 1, 12.

On July 21, 2025, after Defendants' plan to enforce SB185 became public, Plaintiffs' counsel contacted Defendants to inform them that withdrawing hormone therapy from gender dysphoria patients—even gradually—and denying them individualized treatment or evaluations violated the Eighth Amendment and jeopardized patients' health in ways that counseling could not mitigate. Ex. 21, July 21 Notice Ltr. at 5–6. Counsel also informed Defendants that alternatives to categorically terminating medically necessary care existed, citing Centurion's actions in Florida as an example. *Id.* at 5. Counsel gave Defendants until July 30,

2025, to confirm that they would cease enforcing SB185. *Id.* at 8. Defendants disregarded the notice and continued implementing SB185 across GDC, despite knowing that their actions put the Provisional Class at imminent risk of physical and psychological harm. *See, e.g.*, Benjamin Decl. (Ex. 3) ¶¶ 17–24; Horton Decl. (Ex. 4) ¶¶ 13–22.

## IV. Plaintiffs represent a class of incarcerated transgender people with gender dysphoria who now face imminent harm.

As a result of Defendants' actions, members of the Provisional Class have lost access to individualized gender dysphoria treatment and medically necessary hormone therapy. Ex. 20, SB 185 Implementation Plan at 1, 9–11. Plaintiff Fantasia Horton, a transgender woman, and Plaintiffs Brynn Wilson and John Doe, transgender men, are losing access to the hormone therapy that GDC healthcare providers previously determined was medically necessary treatment for each's gender dysphoria. Horton Decl. (Ex. 4) ¶¶ 13–22; Wilson Decl. (Ex. 6) ¶¶ 8–10, 13–14; Doe Decl. (Ex. 7) ¶¶ 8, 17. Plaintiff Isis Benjamin, a transgender woman who entered GDC custody in March 2025, cannot resume the hormone therapy she has relied on for twenty years—almost half her life. Benjamin Decl. (Ex. 3) ¶¶ 17–24. And Plaintiff Naeomi Madison, who was seeking an initial evaluation for hormone

therapy after being diagnosed with gender dysphoria by GDC, will never have access to any treatment. Madison Decl. (Ex. 5) ¶¶ 7–17.[6]

Defendants' indiscriminate withholding of gender dysphoria treatment has already triggered anxiety, severe dysphoria symptoms, and withdrawal in Plaintiffs and, likely, Provisional Class members. Benjamin Decl. (Ex. 3) ¶¶ 24–27; Horton Decl. (Ex. 4) ¶¶ 17–18, 23–26 (Ex. 4); Madison Decl. (Ex. 5) ¶ 18; Wilson Decl. (Ex. 6) ¶¶ 13–14, 16; Doe Decl. (Ex. 7) ¶¶ 13–15; *see also* Ettner Decl. (Ex. 1) ¶¶ 116–117, 124–170; Haw Decl. (Ex. 2) ¶¶ 42–51, 56–57, 61–62 (describing foreseeable consequences of treatment withdrawal). These symptoms will worsen as treatment is withheld, putting patients at grave risk of physical injury or death. Ettner Decl. (Ex. 1) ¶¶ 145–48; Haw Decl. (Ex. 2) ¶¶ 42–43, 46–51, 56–59, 62.

## ARGUMENT

The Provisional Class is entitled to a preliminary injunction prohibiting Defendants from enforcing SB185 to remove their access to hormone therapy and evaluations for it. Federal Rule of Civil Procedure 65 governs the entitlement to preliminary injunctive relief. Movants must show they have (1) "a substantial

---

[6] Although not within the relief sought by this motion, Plaintiffs and Class Members are also losing access to other critical forms of gender dysphoria treatment including social-transition items like undergarments, hair removal treatment, and surgery evaluations. *See, e.g.*, Compl. filed herewith. The absence of other forms of care makes hormone therapy even more essential in the interim. *See* Ettner Decl. (Ex. 1) ¶¶ 128–130, 155–56.

likelihood of success on the merits"; (2) "will suffer an irreparable injury unless the injunction is granted"; (3) "the harm from the threatened injury outweighs the harm the injunction would cause the opposing party"; and (4) "the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020).[7] Plaintiffs satisfy these requirements.

## I.    Plaintiffs are likely to succeed on the merits of their Eighth Amendment claim that Defendants have shown deliberate indifference to serious medical needs.

"The Eighth Amendment's prohibition against cruel and unusual punishments protects a prisoner from deliberate indifference to serious medical needs." *Kuhne v. Fla. Dep't of Corr.*, 745 F.3d 1091, 1094 (11th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "To prevail on a claim of deliberate indifference, plaintiffs must satisfy both an objective and a subjective inquiry, ... and must establish a necessary causal link between the challenged conduct and their injuries." *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024). The objective prong asks whether Plaintiffs have an "objectively serious medical need." *Id.* at 1283. The subjective prong asks whether defendants "(1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) engaged in conduct that amounts to

---

[7] Where, as here, "the government is the opposing party," "[t]he third and fourth factors merge." *Id.* at 1271; *accord Nken v. Holder*, 556 U.S. 418, 435 (2009). Unless otherwise noted, quotations, citations, and alterations original to legal citations are omitted, and alterations and emphasis within this brief are added.

subjective recklessness." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 836–40 (1994)). The subjective recklessness requirement is met when "the defendant actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm." *Id.* (quoting *Wade v. McDade*, 106 F.4th 1251, 1253 (11th Cir. 2024) (en banc)).

Plaintiffs have a substantial likelihood of succeeding on the merits of their Eighth Amendment claim. Plaintiffs do not need to "prove [their] case in full," *Camenisch*, 451 U.S. at 395, or show that the evidence "positively guarantees a final verdict in [their] favor." *Levi Strauss*, 51 F.3d at 985. But because Defendants have shown deliberate indifference to the Provisional Class's serious medical needs by banning hormone therapy without regard to medical necessity and with full knowledge of the harm it will cause, Plaintiffs satisfy Rule 65's first prong.

### A. Gender dysphoria is an objectively serious medical need posing a substantial risk of serious harm.

Gender dysphoria is an objectively "serious medical need[]." Ex. 10, SOP 507.04.68 (§ IV.A.6). This point—expressly observed in Defendants' own policies—is not controversial. Binding Eleventh Circuit authority establishes there is "no debate" on the question. *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1265–66 (11th Cir. 2020). Elsewhere, Defendants Oliver, Sauls, and Centurion have conceded the same. *Doe v. Ga. Dep't of Corr.*, 730 F. Supp. 3d 1327, 1337 (N.D. Ga. 2024), *appeal dismissed as moot*, No. 24-11382, 2025 WL 1206229 (11th Cir.

Mar. 6, 2025).

Psychiatric needs implicate the Eighth Amendment, as do "self-inflicted injuries, including suicide." *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir. 1994). Thus, even were gender dysphoria not a serious enough medical need to implicate the Eighth Amendment—and it is, as confirmed above—the depression, anxiety, and risk of suicide and self-harm attendant to untreated gender dysphoria would suffice. *See id.*; *De'lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (self-harm risk caused by terminating hormone therapy was serious medical need); *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996) ("In this circuit, it is established that psychiatric needs can constitute serious medical needs").

**B.  Defendants have actual knowledge of Plaintiffs' substantial risk of harm.**

Defendants knew that denying individualized gender dysphoria treatment put patients at a substantial risk of harm. The GDC policies in place before SB185's passage make clear that gender dysphoria is a "serious medical need[] which may not be ignored," Ex.10, SOP 507.04.68 (§ IV.A.6), "characterized by clinically significant distress," Ex. 9, SOP 508.40 (§ III.A).[8] Defendants knew that people with a confirmed or suspected gender dysphoria diagnosis require a "thorough medical

---

[8] All referenced policies were live and accessible at GDC's website as of July 31, 2025. Ex. 13, GDC SOP Compilation at 5 (referencing Ex.11, SOP 220.09); at 14-15 (referencing Ex. 10, SOP 507.04.68); at 23 (referencing Ex. 9, SOP 508.40).

and mental health evaluation" to determine, among other things, whether hormone therapy is necessary, Ex. 10, SOP 507.04.68 (§ IV.A.6); Ex. 9, SOP 508.40 (§ IV.D). And Defendants knew that "appropriate management" of the condition requires individualized medical treatment, Ex. 10, SOP 507.04.68 (§§ IV.A.6; C.3); Ex. 9, SOP 508.40 (§ IV.E.2), pursuant to "[c]urrent, accepted standards of care." Ex. 10, SOP 507.04.68 (§ IV.C.3).

Defendants' policies also confirm their knowledge that hormone therapy is an integral part of gender dysphoria treatment and that psychotropic drugs and counseling are *not a substitute*. *See, e.g.*, Ex. 9, SOP 508.40 (§ IV.D). Again, Defendants Oliver, Sauls, and Centurion "concede[d] HRT [hormone therapy] is necessary" in prior court filings. *Doe*, 730 F. Supp. 3d at 1342. Medical necessity determinations were a prerequisite for Plaintiffs' hormone therapy. *See, e.g.*, Horton Decl. (Ex. 4) ¶¶ 7–8; Doe Decl. (Ex. 7) ¶¶ 7–8. Indeed, under the pre-SB185 policies, trained clinicians—like Defendant Mardis—had to determine that hormone therapy was "medically necessary" before any member of the Provisional Class could receive it. Ex. 10, SOP 507.04.68 (§ IV.D.1.d). "[A]ll gender-related hormone treatment that may be provided while the offender is in custody occurs *after* an individualized assessment of the offender by a medical practitioner." Ex. 11, SOP 220.09 (§ IV.K.5).

13

Multiple sources confirm that Defendants also knew that denying gender dysphoria treatment without consideration of need would cause severe harm. To begin, the risk was obvious, as Defendant Oliver's text message about SB185 before its passage confirms. Ex. 16, Oliver-Ammons Text Message (reproduced below).



Defendants also knew of the significant harms associated with withholding gender dysphoria treatment in favor of counseling because multiple gender dysphoria patients in GDC custody have attempted suicide or self-castration *multiple times* when GDC withheld necessary gender dysphoria care. *Doe*, 730 F. Supp. 3d at 1333–35 (describing transgender plaintiff's repeated suicide and self-castration attempts after she was offered counseling by GDC but denied hormone therapy); *Diamond v. Owens*, 131 F. Supp. 3d 1346, 1353, 1356–58 (M.D. Ga. 2015) (same); Ex. 21, July 21 Notice Ltr. at 7 (noting "numerous incidences").

Defendants also knew of the dangers blanket treatment bans pose—even when counseling is permitted—because of recurrent litigation against GDC and Centurion that led to the rescission of similar policies before SB185's enactment. *See, e.g.*, *Robinson v. Labrador*, 747 F. Supp. 3d 1331, 1343 (D. Idaho 2024) (enjoining Centurion from enforcing a law comparable to SB185 in Idaho); *Diamond*, 131 F. Supp. 3d at 1353–54 (GDC voluntarily rescinding hormone therapy restrictions).

### C. By implementing SB185 within GDC, Defendants disregarded the risk of harm with deliberate indifference.

As the Eleventh Circuit explained in *Keohane*, "responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate *is the very definition of 'deliberate indifference'—anti-medicine, if you will*." 952 F.3d at 1266–

15

67.[9] Yet, that is precisely what Defendants are doing. Defendants implemented SB185—an indiscriminate healthcare ban—and are denying gender dysphoria treatment and evaluations without regard to patient need.

Like the Eleventh Circuit in *Keohane*, other courts have repeatedly found the denial of medically necessary gender dysphoria care to be the "paradigm of deliberate indifference." *Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (blanket surgery ban stated a valid Eighth Amendment claim); *see also Fields v. Smith*, 653 F.3d 550, 555 (7th Cir. 2011) (enjoining blanket ban on hormone therapy and surgery similar to SB185); *Doe v. McHenry*, 763 F. Supp. 3d 81, 88–89 (D.D.C. 2025) (enjoining ban similar to SB185 within the BOP); *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013) (reversing dismissal of Eighth Amendment claim based on failure to provide gender confirmation surgery); *Diamond*, 131 F. Supp. 3d at 1372–75, 1382 (GDC policy restricting hormone therapy but offering counseling stated an Eighth Amendment claim). Defendants also engaged in textbook deliberate indifference when they permanently banned individualized medical treatment and gender dysphoria treatment evaluations based on clinicians' independent medical judgment going forward. *See Keohane*, 952 F.3d at 1266–67.

---

[9] Although *Keohane* was decided prior to the Eleventh Circuit's rearticulation of the deliberate indifference standard, it continues to be relied on in this Circuit. *See, e.g.*, *Lewis v. Waitts*, No. 24-CV-81305-RAR, 2024 WL 5165886, at *3 (S.D. Fla. Dec. 19, 2024) (sustaining claim based on *Keohane*'s "shoulder-shrugging" language).

By enforcing SB185, Defendants have also terminated hormone therapy that GDC personnel—including the Statewide Medical Director, Defendant Mardis— deemed medically necessary. Ex. 10, SOP 507.04.68 (§ IV.D.1.d) (necessity finding a prerequisite for care); Ex. 11, SOP 220.09 (§ IV.K.8) (requiring a "documented medical need"). "Intentional failure to provide service acknowledged to be necessary is the deliberate indifference proscribed by the Constitution," *Ancata*, 769 F.2d at 704, and gender dysphoria treatment is no exception to this well-settled rule. *See, e.g., Kothmann v. Rosario,* 558 F. App'x 907, 912 (11th Cir. 2014); *Keohane*, 952 F.3d at 1266–67 (same); *Diamond*, 131 F. Supp. 3d at 1372–75 (same).

Defendants, meanwhile, have overridden healthcare providers' decisions to prescribe treatment and done so for non-medical reasons. Eleventh Circuit precedent confirms this "knowing[] interfere[nce] with a physician's prescribed course of treatment" constitutes deliberate indifference. *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011); *see also Truschke v. Chaney*, No. 517-CV-093, 2018 WL 814579, at *5 (S.D. Ga. Feb. 9, 2018), *adopted by*, 2018 WL 1513354 (S.D. Ga. Mar. 27, 2018) (same).[10] The core principle articulated in these cases that withholding medical treatment irrespective of patient need constitutes deliberate indifference remains equally true under the criminal recklessness standard. *See, e.g.*,

---

[10] Like *Keohane*, *Bingham* continues to be considered authoritative by courts in the Circuit post-*Wade*. *See, e.g.*, *Waitts*, 2024 WL 5165886, at *2.

*Stalley*, 124 F.4th at 1286 ("[T]he knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to … constitute deliberate indifference.") (citing *Ancata*, 769 F.2d at 704).

### 1. Correctional policies similar to SB185 have been enjoined or abandoned as unconstitutional.

Unsurprisingly, given the above, courts have been enjoining bans like that imposed by Defendants for more than a decade. In 2014, the Eleventh Circuit affirmed the denial of a motion to dismiss a lawsuit brought by an incarcerated plaintiff denied hormone therapy but offered counseling. *Kothmann*, 558 F. App'x at 912. The plaintiff's claims survived a motion to dismiss on qualified immunity grounds because by 2010 "the law was sufficiently clear to put [officials] on notice that refusing to provide … what [the officials] knew to be medically necessary hormone treatments" violates the Eighth Amendment. *Id.*

In 2015, when GDC officials adopted a policy restricting hormone therapy but providing counseling instead, a court similarly held that clearly established law made any reasonable officer aware that GDC's policy was unconstitutional. *Diamond*, 131 F. Supp. 3d at 1372–75, 1384. GDC ultimately rescinded that policy and agreed to start providing its patients "constitutionally appropriate" gender dysphoria treatment based on "a current individualized assessment and evaluation." Ex. 12, SOP 507.04.68–2015 Ed. (§§ I; IV). Thus, not only were GDC officials aware of the harms these bans can cause, they were aware of their constitutional infirmity.

18

In 2020, the Eleventh Circuit made an even stronger pronouncement against blanket treatment bans. *Keohane* began after a transgender plaintiff was denied hormone therapy but offered counseling pursuant to a FDOC freeze-frame policy. 952 F.3d at 1262–63 & 1263 n.1. Although Florida mooted plaintiff's claims for injunctive relief when it "formally rescinded its freeze-frame policy and replaced it with a new one that *properly attends to inmates' individualized medical needs*," the Eleventh Circuit stated that the Eighth Amendment "*almost certainly*" rendered the policy unconstitutional. *Id.* at 1266–67. The Court stated "[u]nsurprisingly to us… similar policies erecting blanket bans on gender-dysphoria treatments—without exception for medical necessity—have [been] held [to] evince deliberate indifference." *Id.* at 1267.

Just last year, another federal court enjoined Defendant Centurion from implementing an SB185-like ban in Idaho, where it is the correctional healthcare provider. *Labrador*, 747 F. Supp. 3d at 1343.[11] Also in 2024, Centurion continued to provide hormone therapy to incarcerated people in Florida—notwithstanding an analogous categorical ban—based on the recognition that enforcing the hormone ban would be unconstitutional. *Keohane v. Dixon*, Case 4:24-cv-00434-AW-MAF, Doc.

---

[11] The preliminary injunction against Centurion was later extended three more times. *Labrador,* 747 F. Supp. 3d at 1342–43 (issuing first preliminary injunction); *injunction renewed*, Case No. 1:23-cv-00306, 2024 WL 4953686 (D. Idaho Dec. 3, 2024); *injunction renewed*, 2025 WL 673930 (D. Idaho Mar. 3, 2025); *injunction renewed* 2025 WL 1547067 (D. Idaho May 30, 2025).

55, at 10 (N.D. Fla. Dec. 27, 2024).

### 2. Defendants' actions in enforcing SB185 were not reasonable.

Although Defendants cannot be held liable where they "responded reasonably" to a risk of harm, *Farmer*, 511 U.S. at 844, Defendants' actions here were ***not*** reasonable. First, and as shown above, numerous courts have already found similar plans unconstitutional and, as noted above, Defendants are no strangers to those decisions. Second, Defendants' own pre-SB185 policies confirm their understanding of the vital role that medically necessary hormone therapy plays in treating gender dysphoria, that care bans are unlawful, and that counseling is not a substitute. *See, e.g.,* Ex. 10, SOP 507.04.68 (§§ IV.C–D); Ex. 9, SOP 508.40 (§ IV.D); Ex. 11, SOP 220.09 (§§ IV.K.4–8). For these very reasons, Defendants' pre-SB185 policies required transgender people in GDC custody "to be evaluated and referred to an endocrinologist" without delay as soon as they requested hormone therapy. Ex. 9, SOP 508.40 (§ IV.D).

Accordingly, Defendants' decision to terminate hormone therapy for non-medical reasons and offer members of the Provisional Class "counseling" instead is no more reasonable than a decision to provide cancer patients throat lozenges instead of chemotherapy. *See* Arg. § I.D, *supra* (enjoining similar policies). Deliberate indifference, after all, can arise from choosing an "easier and less efficacious course of treatment." *Ancata*, 769 F.2d at 704; *accord Steele*, 87 F.3d at 1269–70 n.2.

Allowing patients to elect between having hormone therapy "terminated immediately" or "tapered off gradually" does not transform Defendants' unconstitutional actions into reasonable ones. The care is—as Defendants themselves have already determined—medically necessary. Denial now or later remains denial. Recognizing this, courts elsewhere have refused to differentiate policies that gradually "taper" plaintiffs off hormone therapy from policies calling for abrupt cessation, because in each case, the result is the unconstitutional denial of medically necessary treatment. *See Fields v. Smith*, 712 F. Supp. 2d 830, 853, 863 (E.D. Wis. 2010), *aff'd,* 653 F.3d 550 (7th Cir. 2011) (law that tapered people off hormone therapy over several months was facially unconstitutional); *De'lonta*, 330 F.3d at 632–36 (challenge to hormone therapy "taper" policy stated a valid Eighth Amendment claim). Moreover, "tapering" individuals off hormone therapy does nothing to mitigate the anxiety, depression, suicidality, and self-harm risks that foreseeably result when gender dysphoria treatment is denied, jeopardizing the lives of Provisional Class members. Ettner Decl. (Ex. 1) ¶¶ 117–119, 138–139; Haw Decl. (Ex. 2) ¶¶ 42–43, 45, 49–51, 56–57, 61–62.

### D.    Defendants caused Plaintiffs' injuries.

A plaintiff satisfies the Eighth Amendment's causation requirement by showing that "a policy or custom that [defendants] *established or utilized*" leads to the challenged constitutional deprivation. *Zatler v. Wainwright*, 802 F.2d 397, 401

(11th Cir. 1986). Because the Provisional Class lost access to gender dysphoria treatment and evaluations when Defendants began enacting SB185's categorical ban, they satisfy the causation requirement.

## II.  The Provisional Class will suffer irreparable harm absent injunctive relief.

Plaintiffs are also entitled to preliminary relief because irreparable injury "is likely in the absence of an injunction." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22 (2008). Defendants' enforcement of SB185 has deprived, and will permanently deprive, the Provisional Class of gender dysphoria treatment, an injury that "cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010); *accord Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019) (deprivation of one's "constitutional right to adequate medical care is sufficient to establish irreparable harm.").

Because Defendants have prohibited necessary care, the Provisional Class also faces irreparable harm in the form of severe and worsening gender dysphoria symptoms, including depression, anxiety, suicide ideation, physical injury and/or death, from self-harm, suicide and castration attempts. Haw Decl. (Ex. 2) ¶¶ 42–43, 49–51, 56–57, 61–62; Ettner Decl. (Ex. 1) ¶¶ 124–162. Psychological harm constitutes irreparable injury, including suicide risks, *Keohane*, 952 F.3d at 1265, psychological distress, suicidal ideation, and self-castration risks. *Edmo*, 935 F.3d at 797–98; *accord Doe*, 730 F. Supp. 3d at 1349. As the *Kingdom v. Trump* court noted,

when discussing the BOP's analogous ban, thoughts of suicide and self-harm after interruption of hormone therapy are "not the sorts of harms capable of recompense through normal judicial processes." No. 1:25-CV-691-RCL, 2025 WL 1568238, at *11 (D.D.C. June 3, 2025).

Provisional Class members whose hormone therapy is being unjustifiably terminated also face irreparable harm due to the "severe complications" and "severe physical effects" of hormone therapy withdrawal. *Fields*, 653 F.3d at 554. These severe health risks include "muscle wasting, high blood pressure, and neurological complications," *id.*; hormonal disequilibrium, metabolic dysregulation, vasomotor instability, thermoregulatory dysregulation, cognitive slowing, insomnia, cardiovascular disease, and neuroendocrine and musculoskeletal effects, among others. Ettner Decl. (Ex. 1) ¶¶ 151–162; Haw Decl. (Ex. 2) ¶¶ 46–49, 61 (detailing same). None of these harms are speculative. They are each a foreseeable risk of withholding gender dysphoria treatment from patients Defendants know have "serious medical needs." Ex. 10, SOP 507.04.68 (§ IV.A.6). Nor must Plaintiffs "await a tragic event" to request an injunction; "the Eighth Amendment protects against future harm to inmates." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

### III.   The balance of equities and the public interest favor Plaintiffs.

Again, the Provisional Class will suffer profound harm absent an injunction, while Defendants will suffer no harm from continuing to provide individualized

medical treatment for a condition they acknowledge is too "serious … [to] be ignored," in compliance with the Eighth Amendment and their pre-SB185 policies. Ex. 10, SOP 507.04.68 (§ IV.A.6); Bkg., § I, *supra.* The balance of equities also favors the Provisional Class because the injunction sought "extend[s] no further than necessary to correct" the violations arising from SB185's enforcement. *See* 18 U.S.C. § 3626 (a)(2). The requested injunction would not create new obligations for Defendants. It would merely preserve the "last uncontested act between the parties" prior to implementation of SB185. *FHR TB, LLC v. TB Isle Resort, LP.*, 865 F. Supp. 2d 1172, 1193 (S.D. Fla. 2011). "[M]aintenance of the status quo is," after all, "the primary purpose of preliminary injunctive relief," *Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir. 1983), and preliminary injunctive relief here would restore the pre-SB185 regime where doctors made individualized gender dysphoria treatment decisions based on patient need. *See* Bkg., § I, *supra.*

Further, the requested injunction targeting unconstitutional conduct is "plainly ... not adverse to the public interest." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). "[T]he public ... has no interest in enforcing an unconstitutional law." *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010). Nor does the Provisional Class's incarceration weaken the public interest. Rather, "the public interest always is served when citizens' constitutional rights are protected, including ... offenders." *Reed v. Long,* 420 F. Supp. 3d 1365, 1379 (M.D. Ga. 2019).

**IV.    The bond requirement should be waived.**

Finally, bond is neither necessary nor appropriate given the important constitutional rights Plaintiffs seek to vindicate, and Defendants' acknowledgement that the cost of gender dysphoria treatment for incarcerated people is "de minimis." Ex. 17, GDC May 12 Email at 5. The Court has discretion to require "no security at all" in the circumstances. *BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005); *Reed*, 420 F. Supp. 3d at 1380–81 (waiving bond for indigent plaintiffs enforcing constitutional rights).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion and enter a preliminary injunction: (1) enjoining Defendants from enforcing SB185 against Plaintiffs and Class Members seeking or receiving hormone therapy; (2) directing Defendants to resume providing hormone therapy to Plaintiffs and Class Members in the dosages and amounts approved by GDC pursuant to its pre-SB185 policies related to gender dysphoria; and (3) directing Defendants to continue providing Plaintiffs and Class Members evaluations for hormone therapy in accordance with GDC's pre-SB185 policies related to gender dysphoria.

*[Signature appears on following page.]*

Respectfully submitted this 8th day of August, 2025.

*/s/ Amanda Kay Seals*

Emily C. R. Early,                                Amanda Kay Seals
GA Bar No. 810206                            GA Bar No. 502720
eearly@ccrjustice.org                         seals@bmelaw.com
A. Chinyere Ezie*                              Matthew R. Sellers
cezie@ccrjustice.org                           GA Bar No. 691202
Celine Zhu*                                        sellers@bmelaw.com
czhu@ccrjustice.org                           BONDURANT, MIXSON & ELMORE, LLP
CENTER FOR CONSTITUTIONAL RIGHTS    1201 W Peachtree St NW
666 Broadway, 7th Floor                     Suite 3900
New York, NY 10012                           Atlanta, GA 30309
Phone: (212) 614-6464                        Phone: (404) 881-4100
                                                          Fax: (404) 881-4111

D. Korbin Felder*
kfelder@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
P.O. BOX 12046
Jackson, MS 39236
Phone: (601) 228-6101


*Pro hac vice* admissions forthcoming

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that the foregoing **PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** has been prepared with one of the following font and point selections approved by the Court in Local Rule 5.1(C). Specifically, the pleading was prepared using Times New Roman, 14-point font.

*/s/ Amanda Kay Seals*