# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ISIS BENJAMIN; FANTASIA HORTON; NAEOMI MADISON; BRYNN WILSON; and JOHN DOE; on behalf of themselves and all persons similarly situated,<br><br>         Plaintiffs,<br><br>v.<br><br>COMMISSIONER TYRONE OLIVER, in his official capacity; ASSISTANT COMMISSIONER RANDY SAULS, in his official capacity; STATEWIDE MEDICAL DIRECTOR DR. MARLAH MARDIS, in her official capacity; and CENTURION OF GEORGIA, LLC,<br><br>         Defendants. | Civil Action No.<br>1:25-cv-04470-VMC |

## PRELIMINARY INJUNCTION ORDER AND OPINION

This case raises a constitutional challenge to a Georgia law that prohibits the use of state resources to provide hormone replacement therapies for the treatment of gender dysphoria to those who are incarcerated in Georgia Department of Corrections ("GDC") facilities. The Court held a hearing on Plaintiffs' Motion for Provisional Class Certification (Doc. 2) and Plaintiffs' Motion for Preliminary Injunction (Doc. 3) on August 29, 2025. Prior to the hearing, Defendant Centurion of Georgia, LLC ("Centurion"), the contract medical provider for the GDC filed a

response essentially stating its intent to comply with the state law at issue to the extent it is enforceable. (Doc. 24). The remaining Defendants, Defendant Tyrone Oliver, Commissioner of GDC, Defendant Randy Sauls, Assistant Commissioner of the Health Services Division of GDC, and Defendant Dr. Marlah Mardis, Statewide Medical Director for GDC (collectively, "State Defendants," Doc. 1 ¶¶ 26–28), opposed both motions filed by Plaintiffs. (Docs. 25, 26). At the hearing, the Court took the matters under advisement.[1]

At its core, this case is no different from any case challenging prison medical care. When prison officials present expert evidence that they have made a treatment decision based on medical judgment, the Court will ordinarily defer to that reasonable exercise of judgment. But when a prisoner presents evidence that the treatment decision was based on something other than medical judgment, and backs it up with uncontroverted expert evidence that the prison's decision put them at a serious risk of harm, the prisoner generally prevails. When properly framed this way, the result here is straightforward. For the reasons that follow, the

---

[1] At the hearing, the State Defendants made an oral motion for stay pending appeal in the event the Court granted the Motion for Preliminary Injunction. (Doc. 42). The Court denies the Motion with leave to renew no later than seven days from the date of entry of this Order to the extent the State contends this Order presents absent class members with an imminent and irreparable risk of injury. Any response by Plaintiffs must be filed as soon as possible but no later than seven days after the renewed motion.

Court grants Plaintiffs' Motion for Provisional Class Certification and Plaintiffs' Motion for Preliminary Injunction.

## Background

This is a constitutional challenge to Georgia Senate Bill 185, 2025 Georgia Laws Act 69 ("S.B. 185"), which went into effect upon approval by the Governor on May 8, 2025. (*See id.* § 2). S.B. 185 amended O.C.G.A. § 42-5-2(e)(1) to preclude "state funds or resources" from being used for, among other purposes, "[h]ormone replacement therapies" to treat gender dysphoria, as the Court explains further below.

## I. The Plaintiffs

### A. Isis Benjamin

Isis Benjamin is a 43-year-old transgender woman in the custody of the Georgia Department of Corrections ("GDC"). (Declaration of Isis Benjamin, "Benjamin Decl.," Doc. 11-3 ¶ 1). She entered GDC custody in March 2025 and has been housed at three facilities since that time: Georgia Diagnostic and Classification Prison, Lee State Prison, and Coastal State Prison, where she is currently incarcerated. (*Id.* ¶ 3). Ms. Benjamin socially transitioned in 1999 and received her first dose of hormone therapy in 2003. (*Id.* ¶¶ 7–8). She took it consistently for almost two decades except for periods where she was in GDC custody. (*Id.* ¶ 8). Her therapy consisted of estrogen pills, biweekly estradiol shots,

and/or spironolactone. Ms. Benjamin also received some surgical treatment for her gender dysphoria. (*Id.* ¶¶ 8–9).

During her first incarceration at GDC in 2020–21, Ms. Benjamin was re-diagnosed with gender dysphoria by a GDC counselor and later evaluated by a GDC healthcare provider who confirmed that her hormone therapy was medically necessary. (*Id.* ¶ 12). When she began her second incarceration at GDC in March 2025, her gender dysphoria diagnosis was re-confirmed. However, she did not receive treatment. (*Id.* ¶ 14). Ms. Benjamin was later told that her request for hormone therapy was denied because of S.B. 185. (*Id.* ¶¶ 19, 22).

Losing access to the gender dysphoria healthcare that she needs has been devastating for Ms. Benjamin's mental and physical health. (*Id.* ¶ 25). She has suffered from depression, loss of appetite, mood swings, uncontrollable crying, and suicidal ideations. (*Id.* ¶ 26).

**B.    Fantasia Horton**

Fantasia Horton is a 37-year-old transgender woman in the custody of the GDC (Declaration of Fantasia Horton, "Horton Decl.," Doc. 11-4 ¶ 1). She is currently incarcerated at Phillips State Prison in Gwinnett County, Georgia. (*Id.* ¶ 4). She has been in GDC custody since 2011 and is serving a life sentence with parole. (*Id.*).

Ms. Horton formerly served in the military, which is when she discovered she was transgender. (*Id.* ¶ 5). In 2019, she was diagnosed with gender dysphoria while incarcerated in GDC. (*Id.* ¶ 7). After she was diagnosed with gender dysphoria by a GDC psychologist, Dr. Weaver, she met with an endocrinologist, Dr. Malloy, who determined that hormone therapy was a medically necessary treatment for her gender dysphoria and prescribed her treatment. (*Id.*).

Since 2019, Ms. Horton received hormone therapy consistently apart from one week that the GDC ran out of medication. (*Id.* ¶ 8). Her hormone therapy is a biweekly estradiol injection in the amount of 15 ml, as well as spironolactone pills. (*Id.*). On July 8, 2025, she was told by a psychologist that because of S.B. 185, she would no longer be able to receive hormone therapy, surgery, or any other gender dysphoria treatment from GDC. (*Id.* ¶ 13). After just one week without hormone therapy, Ms. Horton felt depressed and drained. (*Id.* ¶ 23). She experienced a recurrence of suicidal thoughts. (*Id.*).

### C.    Naeomi Madison

Naeomi Madison is a 25-year-old transgender woman in the custody of the GDC. (Declaration of Naeomi Madison, "Madison Decl.," Doc. 11-5 ¶ 1). She is currently incarcerated at Central State Prison in Macon-Bibb County, Georgia. (*Id.* ¶ 4). Ms. Madison first entered GDC custody in 2019 to serve a five-year sentence. (*Id.*). She was released in August 2021 and then reincarcerated in August 2023.

(*Id.*). She was then released again in April 2024 but was reincarcerated on a parole violation in November 2024. (*Id.*).

Ms. Madison was diagnosed with gender dysphoria on three separate occasions by the GDC during these periods but was unable to complete the process to receive hormone therapy because she was in and out of prison. (*Id.* ¶¶ 7–10). During the third prison stay at Baldwin State Prison, she was denied hormone therapy, and after completing the grievance process, filed a prisoner civil rights case. *Madison v. Berry*, No. 5:24-cv-00014-TES-CHW, 2024 WL 2330005 (M.D. Ga. May 22, 2024), *report & recommendation adopted*, 2024 WL 5662508 (M.D. Ga. June 21, 2024). The case was later dismissed without prejudice. (*Id.* ¶ 10). In 2025, while incarcerated at Central State Prison on the parole violation, she was told she could not receive hormone therapy because of S.B. 185. (*Id.* ¶ 17).

### D. Brynn Wilson

Brynn Wilson is a 32-year-old transgender man in the custody of the GDC. (Declaration of Brynn Wilson, "Wilson Decl.," Doc. 11-6 ¶ 1). He is currently incarcerated at Pulaski State Prison in Hawkinsville, Georgia and has been incarcerated there since 2012. (*Id.* ¶ 2). Mr. Wilson was diagnosed with gender dysphoria at Lee Arrendale State Prison by a GDC doctor more than seven years ago. (*Id.* ¶ 8). After being diagnosed by the GDC, he began receiving hormone therapy in the form of a testosterone injection of 0.6mL every two weeks. He has

continuously received testosterone injections for approximately seven years. Wilson Decl. (*Id.* ¶¶ 8–10). Mr. Wilson discovered his testosterone treatments would be discontinued in July 2025. (*Id.* ¶ 13). He was told by the GDC doctor that he might have mood swings, agitation, or suicidal thoughts as he came off testosterone, and he has felt irritated and had trouble sleeping and concentrating without the medication. (*Id.* ¶¶ 13, 14).

### E.    John Doe

John Doe is a 49-year-old transgender man in the custody of the GDC. (Declaration of John Doe, "Doe Decl.," Doc. 11-7 ¶ 1). He is currently incarcerated at Lee Arrendale State Prison in Habersham County, Georgia. (*Id.* ¶ 4). He was diagnosed with gender dysphoria in 2019. (*Id.* ¶ 7).

In 2020, a GDC endocrinologist determined hormone therapy was a medically necessary treatment for Doe's gender dysphoria and prescribed him testosterone, which he began receiving in June 2020. (*Id.* ¶ 8). He discovered his hormone therapy would be discontinued on July 17, 2025. (*Id.* ¶ 17). If his hormone therapy were discontinued, Doe worries his depression and anxiety would become severe. (*Id.* ¶¶ 13–14). He is also concerned about the resurgence of headaches and insomnia. (*Id.* ¶ 14).

## II.    Gender Dysphoria

Gender dysphoria is both the name of the formal psychological diagnosis and the psychiatric term for the severe and unremitting emotional pain that the condition gives rise to. (Declaration of Randi Ettner, Ph.D., "Ettner Decl.," Doc. 11-1 ¶ 29). The diagnostic criteria for gender dysphoria in adults in the American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-V") are as follows:

> a.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:
>
> > 1.    A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics.
> >
> > 2.    A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.
> >
> > 3.    A strong desire for the primary and/or secondary sex characteristics of the other gender.
> >
> > 4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
> >
> > 5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
> >
> > 6. A strong conviction that one has the typical feelings and reactions of the other gender (or some

8

> alternative gender different from one's assigned gender).
>
> b.     The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

(Ettner Decl. ¶ 31) (citing DSM-V at 452–53). Once a diagnosis of gender dysphoria is established, individualized treatment should be initiated. (*Id.* ¶ 45).

The World Professional Association for Transgender Health (WPATH) is "an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, public policy, and respect in transgender health." E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S5 (2022), https://doi.org/10.1080/26895269.2022.2100644 ("WPATH SOC"). "One of the main functions of WPATH is to promote the highest standards of health care for individuals through the Standards of Care (SOC) for the health of [transgender and gender diverse] people." *Id.* According to WPATH, "[t]he SOC-8 is based on the best available science and expert professional consensus." *Id.* "The SOC was initially developed in 1979, and the last version was published in 2012." *Id.*

"The Clinical Guidelines Subcommittee (CGS) of the Endocrine Society deemed the diagnosis and treatment of individuals with GD/gender incongruence a priority area for revision and appointed a task force to formulate evidence-based recommendations." W. Hembree et al., *Endocrine Treatment of*

*Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3872 (2017) ("Endocrine Society Guidelines"), https://doi.org/10.1210/jc.2017-01658. The result was the Endocrine Society Guidelines, "an evidence-based guideline for the hormonal treatment of transgender persons that was formulated using the Grading of Recommendations, Assessment, Development, and Evaluation ('GRADE') system." (Doc. 11-1 ¶ 47).

According to Plaintiffs' experts, Dr. Randi C. Ettner, a clinical and forensic psychologist with 35 years of expertise concerning the diagnosis and treatment of gender dysphoria, and Dr. Sonya Haw, a clinical endocrinologist and practicing physician for 11 years, the WPATH SOC and the Endocrine Society Guidelines are the internationally recognized guidelines for the treatment of persons with gender dysphoria and inform medical treatment throughout the world. (*Id.* ¶ 48; Declaration of Sonya Haw, M.D., "Haw Decl.," Doc. 11-2 ¶ 11). The American Medical Association, the Endocrine Society, the American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology and the National Commission on

Correctional Healthcare all endorse protocols in accordance with the SOC and Endocrine Society Guidelines. (Ettner Decl. ¶ 49).

Dr. Ettner testified that the WPATH SOC "establish that for individuals with persistent, well-documented gender dysphoria, hormone therapy is often an effective, essential, and medically necessary treatment." (*Id.* ¶ 65). She explained that "[h]ormone therapy is a well-established and effective means of treating gender dysphoria," and that "[t]he American Medical Association, the Endocrine Society, the American Psychiatric Association, and the American Psychological Association all agree that hormone therapy in accordance with the WPATH Standards of Care is medically necessary treatment for many individuals with gender dysphoria." (*Id.* ¶ 66; Haw Decl. ¶ 14).

Dr. Haw concurred with Dr. Ettner's opinions, writing that "[t]ransgender individuals have individualized needs with respect to gender dysphoria treatment," and that "[s]imilar to the management of chronic diseases, the treatment of gender dysphoria relies on several considerations regarding risks versus benefits of various interventions, individual comorbidities, prior surgical history, and underlying reproductive anatomy, among other factors." (Doc. 11-2 ¶ 16). "Therefore," she explained, "it is important for healthcare professionals to understand the specific needs of each patient to better individualize their care." (*Id.* ¶ 17). "Additionally, treating gender dysphoria with a 'one-size-fits-all'

approach would be medically inappropriate and contrary to accepted standards of medical and other professional care, putting the patient potentially at risk of undue harm from conditions like osteoporosis, vasomotor dysregulation, and severe mental health exacerbation." (*Id.*).

Recently, judges have criticized the WPATH SOC as ideologically motivated. *Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1260–61 (11th Cir. 2024) (Lagoa, J., concurring in denial of rehearing en banc) ("[R]ecent revelations indicate that WPATH's lodestar is ideology, not science); *United States v. Skrmetti*, 145 S. Ct. 1816, 1848 (2025) (Thomas, J., concurring) ("[N]ewly released documents suggest that WPATH tailored its Standards of Care in part to achieve legal and political objectives. . . . [and] recent reporting has exposed that WPATH changed its medical guidance to accommodate external political pressure.").[2] But unlike other challenges to prison transgender policies, Plaintiffs' claims do not solely rely on these guidelines and Plaintiffs offer testimony of experts which draw both on the guidelines and their own clinical experience. *Cf. Bayse v. Ward*, --- F.4th ----, No. 24-11299, 2025 WL 2178446, at *6 (11th Cir. Aug. 1, 2025) ("[T]he standards of care from the Association . . . are far too equivocal to be evidence that social

---

[2] Much of the criticism stems from the WPATH SOC's standards of care for children and adolescents, criticized in H. Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* 13 (Apr. 2024). *See Skrmetti*, 145 S. Ct. at 1836–37. Of course, this case does not involve treating minors and so much of this criticism is inapt here.

transitioning accommodations were medically necessary for Bayse."). (*But see* Ettner Decl. ¶ 1) ("I am a clinical and forensic psychologist with 35 years of expertise concerning the diagnosis and treatment of gender dysphoria."); (Haw Decl. ¶ 1) ("I have extensive training and experience treating transgender and gender diverse adults in my clinical practice and engage in research, medical education and quality improvement programs on this topic.").

## III.    GDC's Historical Policies

GDC's policies previously mirrored the DSM-V and WPATH SOC. For example, GDC Standard Operating Procedure ("SOP") 508.40 defined gender dysphoria as "clinically significant distress and impairment in social, occupational, or other important areas of functioning secondary to a marked incongruence between an individual's experienced/expressed gender and assigned gender." (Doc. 11-9, § III.A). GDC's SOP 507.04.68, "Management and Treatment of Transgender Offenders," provided that gender dysphoria is a "serious medical need[] which may not be ignored," and required that "[c]urrent, accepted standards of care [] be used as a reference for developing the treatment plan." (Doc. 11-10, §§ IV.A.6, IV.C.3). Treatment plans could include hormone therapy if the following criteria were met:

> a. The offender has the capacity to make a fully informed decision and to consent to treatment;
>
> b. The offender is at least eighteen (18) years of age;

13

c. Any significant medical or mental health concern(s) exist and are reasonably well controlled; and

d. Medical provider in consultation with Contract Vendor Statewide Medical Director, GDC Statewide Medical Director and Statewide Mental Health Director deems hormonal treatment is medically necessary for the treatment of the offender.

(*Id.* § IV.D.).

## IV.    S.B. 185 and Implementation

As noted above, S.B. 185 went into effect upon approval by the Governor on May 8, 2025. It amended O.C.G.A. § 42-5-2, which previously provided that "it shall be the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention." O.C.G.A. § 42-5-2(a) (2024). The statute as revised contains a new subsection (e) which provides:

(1) Except as otherwise provided for in paragraph (2) of this subsection, no state funds or resources shall be used for the following treatments for state inmates:

(A) Sex reassignment surgeries or any other surgical procedures that are performed for the purpose of altering primary or secondary sexual characteristics;

(B) Hormone replacement therapies; and

(C) Cosmetic procedures or prosthetics intended to alter the appearance of primary or secondary sexual characteristics.

(2) The board shall adopt rules and regulations regarding the procedures and therapies prohibited by this subsection, which shall provide for the following limited instances in which the treatments set forth in paragraph (1) of this subsection shall be authorized:

> (A) Treatments for medical conditions where such treatments are considered medically necessary, provided that such condition is not gender dysphoria or the purpose of such treatment is not for sex reassignment;

> (B) Treatments for individuals born with a medically verifiable disorder of sex development, including individuals born with ambiguous genitalia or chromosomal abnormalities resulting in ambiguity regarding the individual's biological sex;

> (C) Treatments for individuals with partial androgen insensitivity syndrome; and

> (D) Hormone replacement therapy treatment for state inmates who were being treated with such therapy prior to the effective date of this Act, provided that the provision of such therapy is solely for the purpose of transitioning off such therapy.

O.C.G.A. § 42-5-2(e) (2025). To implement the statutory change, the State Board of Corrections issued a rule which provides in part:

> 2. Procedures:

> B. If an offender is believed to be or self-reports that he or she has a diagnosis of Gender Dysphoria, the medical provider shall ensure that the offender receives a complete medical history and physical examination. In conjunction with the mental health professional, specific historical details, including hormone use/prescriptions

and prior surgical procedures, shall be documented in the medical record.

C. If a referral from Mental Health is made to Medical for an offender who is Intersex or has a diagnosis of Gender Dysphoria, a treatment plan will be developed that promotes the physical and mental health of the patient.

D. No state funds or resources shall be used for the following treatments:

> 1. Sex reassignment surgery or any other surgical procedure to be performed for the purpose of altering the primary or secondary sexual characteristics;

> 2. Hormone replacement therapy, except as provided in Paragraphs (E) or (F), infra [for medical conditions that are not gender dysphoria or for sex reassignment]; or

> 3. Cosmetic procedures or prosthetics intended to alter the appearance of primary or secondary sexual characteristics.

. . .

H. Offenders with gender dysphoria who were being treated with hormone replacement therapy prior to May 8, 2025, and offenders who enter the GDC's custody thereafter who are already receiving hormone replacement therapy for Gender Dysphoria may continue to receive such therapy solely for the purpose of transitioning off such therapy.

Ga. Comp. R. & Regs. R. 125-4-4-.13.

Gerald Wynne, D.O., Centurion's Statewide Medical Director, provided a declaration stating that as of August 18, 2025, there are approximately 340 persons in GDC's custody who have been diagnosed with gender dysphoria. (Declaration

16

of Gerald Wynne, D.O., "Wynne Decl.," Doc. 28-1 ¶¶ 1, 3). Of those, 107 patients

were receiving hormone replacement therapy as of June 30, 2025. (*Id*.). Centurion

began tapering all patients off hormone replacement therapy in July 2025 as

requested by GDC. (*Id*. ¶ 28-1). Dr. Wynne adopted a blanket implementation plan

to have all inmates transitioned off hormone therapy by no later than October 3,

2025, noting that "[t]he recommended process for removing a patient from HRT is

a slow taper to minimize side effects over a 2–3-month process." (Doc. 11-20 at

ECF p. 2). With respect to the side effects of tapering, he stated:

> All patients undergoing tapering are monitored by
> mental health and medical professionals. For medical
> monitoring, each patient has a meeting with the
> statewide medical director every four weeks. Patients
> may submit a request for additional medical care or
> evaluation if they have acute concerns during the
> tapering process. In addition, all patients received an
> initial evaluation by mental health staff prior to tapering.
> Based on that evaluation, mental health professionals
> determined how frequently follow-up evaluations
> should be scheduled based on patient-specific needs. All
> patients receive follow-up evaluations at least once every
> four weeks, with some receiving evaluations more
> frequently.

(Doc. 28-1 ¶ 6).

Kathryn Owen, Ph.D., is GDC's Statewide Mental Health Director.

(Declaration of Kathryn Owen, Ph.D, "Owen Decl.," Doc. 25-2 ¶ 1). In her

declaration, she stated that tapered patients already receiving mental health

treatment will continue to receive such treatment, and those who are not have

access to it through a referral process. (*Id.* ¶¶ 7–9). She also stated that GDC has policies to address self-harm and suicide risks. (*Id.* ¶ 11–12).

## V.    Clinical Risks of Tapering

Withdrawing from hormone treatment poses health risks and non-reversible physical changes. (*Id.*). Centurion's own materials acknowledge the following:

> HRT Withdrawal Symptoms
>
> • Common Side Effects of discontinuation of HRT
>
>> – Testosterone HRT: fatigue, muscle and joint pain, headaches, muscle loss, fat gain, mood swings (irritability, depression), oily skin, acne, nausea, bloating.
>>
>> – Estrogen HRT: hot flashes, night sweats, mood changes, fatigue, anxiety, headaches, muscle and joint pain
>
> • Reversible changes
>
>> – Skin changes
>
> • Non-reversible changes
>
>> – Testosterone HRT: voice changes, facial hair growth, male pattern baldness
>>
>> – Estrogen HRT: growth of breast tissue

(Doc. 11-20 at ECF p. 14).

According to Dr. Ettner, "although it is never clinically appropriate to discontinue medically necessary treatment for non-medical reasons under the

accepted standards of care, the State's proposed policy of uniformly tapering all transgender incarcerated persons off hormone therapy over a 4–8 week period carries additional foreseeable harm." (Ettner Decl. ¶ 117). She explains that "this fixed tapering schedule fails to consider individual dosage, duration of treatment, psychological vulnerabilities, or the potential for severe destabilization unique to each patient." (*Id.*).

For example, "[f]or GDC patients with gender dysphoria, even a gradual taper will risk a resurgence of dysphoria, depression, or suicidality—effects that may be irreversible or life-threatening and which cannot be effectively resolved with psychotherapy or other mental health treatment as a replacement for hormone therapy, surgery, or social transition . . . ." (*Id.*). She opines that "increase[d] access to counseling to compensate for the forced withdrawal of medically necessary hormone therapy violates accepted clinical standards of care and practice in psychology for incarcerated persons with gender dysphoria," and that "[c]ounseling cannot reverse or mitigate the physiological and psychological consequences of discontinuing hormone therapy in patients for whom it is medically indicated." Significantly, "[f]rom a neuroendocrine perspective, withdrawal of hormone therapy initiates a cascade of dysregulation that can severely destabilize psychological functioning," including:

> a. **Hormonal disequilibrium**: Cessation of testosterone or estrogen disrupts the hypothalamic-pituitary-adrenal

(HPA) axis, increases cortisol secretion, and heightens stress sensitivity (Berga, S.L., *et al.* 2001);

b. **Mood destabilization**: Withdrawal often results in emotional dysregulation, irritability, and impaired impulse control—factors that rapidly erode mental stability (Colizzi, M., Costa, R., & Todarello, O. 2014);

c. **Exacerbation of gender dysphoria**: The reappearance or worsening of incongruent physical traits intensifies distress and dysphoria, significantly elevating the risk of suicidality (Turban, J. L., *et al.* 2020; Pompeo, A., *et al.* 2022);

d. **Reactivation of psychiatric symptoms**: In individuals with cooccurring psychiatric disorders such as bipolar disorder, PTSD, or schizoaffective disorder, the loss of hormonal regulation may precipitate recurrence of psychosis or affective episodes. (Mueller, S. C., *et al.* 2017).

(*Id.* ¶ 151). Based on her clinical experience and the WPATH SOC and Endocrine Society Guidelines, the clinical risks can be further broken down by gender as follows:

**Testosterone Withdrawal (Transgender Men):**

The discontinuation of exogenous testosterone, as required by SB185, risks a rapid decline in circulating androgen levels, which in turn causes the following significant multisystem effects:

a. **Musculoskeletal Effects**: Decline in lean muscle mass and strength (muscle wasting), decreased bone mineral density, and increased fatigue.

b. **Metabolic Dysregulation**: Altered insulin sensitivity and elevation in fasting glucose levels, which may

increase the risk of insulin resistance or exacerbate existing metabolic syndrome.

**c. Neuroendocrine Effects**: Downregulation of androgen receptor activity and dysregulation of the hypothalamic-pituitary-gonadal (HPG) axis leading to symptoms such as neuroexcitability, emotional lability, and increased stress responsivity.

**d. Cardiovascular Effects**: Testosterone withdrawal can lead to elevated sympathetic nervous system activity, increasing cardiac reactivity, thereby raising the risk of hypertension and arrhythmias.

**e. Psychological and Neuropsychiatric Effects**: Withdrawal is associated with insomnia, irritability, anhedonia, increased suicidality, and the reactivation or worsening of major depressive disorder.

(*Id.* ¶ 153).

**Estrogen Withdrawal (Transgender Women)**:

The removal of estrogen therapy, as SB185 mandates, risks similar destabilization of numerous physiological systems, including:

**a. Vasomotor Instability**: Estrogen withdrawal leads to hot flashes, night sweats, and thermoregulatory dysregulation—symptoms also common in surgical or menopausal estrogen withdrawal.

**b. Mood Dysregulation**: Estrogen modulates serotonin, dopamine, and norepinephrine pathways; withdrawal is associated with significant increases in depression, anxiety, and cognitive slowing.

**c. Cardiometabolic Risk**: Estrogen withdrawal can increase LDL cholesterol, reduce HDL cholesterol, and increase systemic inflammation, all of which contribute to cardiovascular disease risk.

21

**d. Reappearance of Masculinized Features**: Loss of estrogen's suppressive effect on male secondary sex characteristics results in the return of facial and body hair, unwanted erections, and increased muscle mass.

**e. The Role of Risk Itself as a Mechanism of Harm**:

Even prior to the onset of physical symptoms, the anticipation of forced detransition and reemergence of incongruent secondary sex characteristics can trigger acute stress responses and a cascade of mood and anxiety symptoms. This includes hypervigilance, panic, and risk of psychological decompensation. The withdrawal process can destabilize the hormone milieu, particularly in patients with longstanding therapeutic response to hormone treatment.

(*Id.* ¶ 154).

The risks are different for transgender women who have undergone orchiectomy (removal of the testes) or other genital surgeries, because the removal of gonadal tissue eliminates the body's ability to produce sex hormones. (*Id.* ¶ 157). Termination of exogenous estrogen in such cases can result in:

a.    Impaired immune function due to diminished lymphocyte production. (Giltay & Gooren 2000).

b.    Hypertension and hypoglycemia.

c.    Electrolyte imbalance.

d.    Severe fatigue, depression, and metabolic dysregulation.

(*Id.* ¶ 158) (citing Hembree, *supra*).

Dr. Haw concurred as to the medical risks of hormone therapy discontinuation, writing that "it will undoubtedly cause physical and psychological changes and put them at imminent risk for severe mental health symptoms such as depression, anxiety and suicidality, in addition to the physiological risks." (Haw Decl. ¶ 42).

Physical withdrawal symptoms can vary, because "[h]ormone therapy suppresses the body's endogenous hormone production and secretion, assuming reproductive organs are intact," but "[o]nce hormone therapy is stopped, the rate at which the body starts to again make and secrete its endogenous sex hormones will vary dramatically person to person." (*Id.* ¶ 47). Based on her experience "as an endocrinologist and emerging research data, discontinuing hormone therapy for transgender individuals who have previously been on hormone therapy also places the human body at risk of the following:"

      a. **osteoporosis**: brittle bones and high risk of fragility fracture (Frenkel et al.);

      b. **vasomotor dysregulation**: heat intolerance, night-sweats, dizziness, and headaches (Charlton et al. 2024, Hamoda et al. 2024);

      c. **metabolic changes**: rapid weight changes (either gain or loss) which can pose risk to other conditions like gallbladder disease, diabetes, hyperlipidemia (high cholesterol) and hypertension; changes to distribution of lean muscle mass and adipose tissue which can also increase risk of insulin sensitivity (and diabetes risk) and obesity (Weidlinger et al, 2024); and

d. **mental health symptoms**: depression/anhedonia, anxiety, suicidality, sleep disturbances (insomnia or hypersomnia), inability to concentrate, and dementia (Noachtar et al. 2023).

(*Id.* ¶ 49). These symptoms can range from mild to severe and can significantly impact quality of life, ability to perform activities of daily living, and overall disease risk and well-being. (*Id.*).

## Legal Standard

### I.    Preliminary Injunction

A preliminary injunction is "an extraordinary remedy." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). A district court has broad discretion to grant injunctive relief if the movant shows: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301,1306 (11th Cir. 1998). "In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). The third and fourth factors "'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez v. Governor of Ga.*,

978 F.3d 1266, 1271 (11th Cir. 2020) (quoting *Swain v. Junior*, 961 F.3d 1276, 1293

(11th Cir. 2020)) (alteration in original).

## II.    Class Certification

A class action may be maintained only when it satisfies all the requirements

of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule

23(b). *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997)

(footnotes omitted). Rule 23(a) requires Plaintiffs to show that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These four requirements commonly are referred to as the

'prerequisites of numerosity, commonality, typicality, and adequacy of

representation,' and they are designed to limit class claims to those 'fairly

encompassed' by the named plaintiffs' individual claims." *Piazza v. Ebsco Indus.,*

*Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457

U.S. 147, 156 (1982)).

If Rule 23(a) is satisfied, Rule 23(b) further provides that a class action may

be maintained only where one of the three following requirements is met:

(1) prosecuting separate actions by or against individual members of the class would create a risk of prejudice to the party opposing the class or to those members of the class not parties to the subject litigation, *see* Fed. R. Civ. P. 23(b)(1);

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole, *see* Fed. R. Civ. P. 23(b)(2); or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy, *see* Fed. R. Civ. P. 23(b)(3).

The party seeking class certification bears the burden of showing that the Rule 23 requirements are met. *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and the merits of a suit may be considered "only to the extent [] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Nevertheless, courts must perform a "rigorous analysis" to ensure that Rule 23's requirements are satisfied before certifying a class, *Falcon*, 457 U.S. at 161, even where some of the requirements are not in dispute, *Valley*, 350 F.3d at 1188, or where the Court must decide disputed questions of fact that

26

bear on the inquiry, *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233–34 (11th Cir. 2016). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."); *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008) ("Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence."). This "rigorous analysis" frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim." *M. H. v. Berry*, No. 1:15-CV-1427-TWT, 2017 WL 2570262, at *3 (N.D. Ga. June 14, 2017) (citing *Dukes*, 564 U.S. at 351).

## Discussion

First, the Court considers the named Plaintiffs' requests for preliminary injunctive relief. Next, the Court discusses provisional class certification.

## I.    Preliminary Injunction

Plaintiffs allege that Defendants' implementation of S.B. 185 violates their Eighth Amendment right against cruel and unusual punishment under color of state law, entitling them to injunctive relief against enforcement of that law under 42 U.S.C. § 1983. (Doc. 1 ¶¶ 181–190). For reasons that differ from Plaintiff to Plaintiff, the Court agrees.

27

### A.    Deliberate Indifference

The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020). To state a claim for deliberate indifference, a plaintiff must allege (1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury. *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016), *abrogated on other grounds by Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024) (en banc).[3]

"A deliberate-indifference claim entails both an objective and a subjective component." *Bayse*, 2025 WL 2178446, at *5 (citing *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020)). "As to the objective component, an inmate must establish, 'as a threshold matter, that he suffered a deprivation that was, objectively, sufficiently serious.'" *Id.* (quoting *Wade*, 106 F.4th at 1262). "And as to the subjective component, an inmate must prove that 'the defendant acted with subjective recklessness as used in the criminal law.'" *Id.* (quoting *Wade*, 106 F.4th at 1262). In other words, "the defendant was actually aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Wade*, 106 F.4th at 1261.

---

[3] There does not appear to be any dispute about causation here.

The Eighth Amendment does not federalize medical malpractice claims—
"the Constitution doesn't require that the medical care provided to prisoners be
"perfect, the best obtainable, or even very good." *Keohane*, 952 F.3d at 1266
(quoting *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991)). "Rather, '[m]edical
treatment violates the [E]ighth [A]mendment only when it is so grossly
incompetent, inadequate, or excessive as to shock the conscience or to be
intolerable to fundamental fairness.'" *Id.* (quoting *Harris*, 941 F.2d at 1510)
(alterations in original).

Thus, it is generally the case that "where medical professionals disagree as
to the proper course of treatment . . . 'a simple difference in medical opinion
between the prison's medical staff and the inmate as to the latter's diagnosis or
course of treatment [cannot] support a claim of cruel and unusual punishment.'"
*Id.* at 1274 (quoting *Harris*, 941 F.2d at 1505 and citing *Waldrop v. Evans*, 871 F.2d
1030, 1033 (11th Cir. 1989); *Lamb v. Norwood*, 899 F.3d 1159, 1163 (10th Cir. 2018);
*Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014)) (alteration in original). That said,
the Eleventh Circuit has observed in passing that "responding to an inmate's
acknowledged medical need with what amounts to a shoulder-shrugging refusal
even to consider whether a particular course of treatment is appropriate is the very
definition of 'deliberate indifference . . . .'"*Id.* at 1266–67.

29

### i.    Gender dysphoria is a serious medical need.

Plaintiffs have all been diagnosed with gender dysphoria (*see supra* Background § I),[4] and they and their experts contend that gender dysphoria is a serious medical need. (Doc. 3 at 11; Ettner Decl. ¶ 23; Haw Decl. ¶ 56). State Defendants do not squarely address Plaintiffs' argument.

"A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)). "In either case, 'the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm.'" *Id.* (quoting *Farrow*, 320 F.3d at 1243). Plaintiffs' evidence of their diagnoses and the testimony of their experts are sufficient to establish a likelihood of success on the merits that gender dysphoria is a serious medical need. And the Board of Corrections' own Rule implementing S.B. 185 incorporates by reference the DSM-V criteria discussed above, *see* Ga. Comp. R. & Regs. R. 125-4-4-.13 ("[t]o be diagnosed with Gender Dysphoria, the offender, must meet the Diagnostic and Statistical Manual of

---

[4] Dr. Wynne testified that he was familiar with the Plaintiffs as patients and had reviewed their medical records but did not cast doubt on their testimony that they have been diagnosed with gender dysphoria. (Doc. 28-1 ¶¶ 7–11; Supplemental Declaration of Gerald Wynne, D.O. dated Aug. 27, 2025, "Supp. Wynne Decl.," Doc. 46).

Mental, Disorders (DSM) criteria"), and that includes the criterion that "[t]he condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." (Ettner Decl. ¶ 31) (quoting DSM-V at 452–53). This constitutes further evidence that there is no factual dispute that a diagnosis of gender dysphoria presents an objectively serious medical need. *See Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) ("It is thus clear that prisoners are guaranteed the right under the eighth amendment to be free from deliberate indifference by correctional institutions to their serious physical or psychological needs."). Plaintiffs have established a likelihood of success on the merits as to this element.

> ii. **Withdrawing hormone treatment from inmates already receiving treatment constitutes disregard of a risk of serious harm**

Defendants' withdrawal of hormone therapy needlessly subjects Plaintiffs who are currently receiving hormone therapy (Ms. Horton, Mr. Wilson, and Doe) to physical and mental side effects. Because Defendants' only justification for placing these Plaintiffs in increased danger of these side effects is that they do not want to "use taxpayer money" to fund interventions they deem "controversial" (Doc. 25 at 6), the Court finds that Defendants "have inflicted unnecessary pain or suffering upon the prisoner[s]," and a finding of likely deliberate indifference follows. *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993)

31

The Eleventh Circuit has been clear that "complete withdrawal of treatment" states a claim for deliberate indifference. *Brown*, 387 F.3d at 1351. And it made short work of the argument that "clinic visits" could substitute for medication, holding that "[d]eliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment." *Id.* (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)) ("'When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.'").

*Brown* involved a prisoner with HIV and hepatitis. *Id.* at 1346. He filed a complaint seeking injunctive relief after a prison doctor stopped his medication. He alleged that as a result of the withdrawal of medicine, "he [] suffer[ed] from prolonged skin infections, severe pain in his eyes, vision problems, fatigue, and prolonged stomach pains." *Id.* The defendants argued "that these allegations fail to allege imminent danger of serious physical injury because skin problems do not constitute serious injury and Brown's allegations of eye problems are too vague," contending that "although [Brown's] illness may ultimately lead to serious physical problems and even death, Brown's allegations [did] not show that his treatment put[] him in imminent danger." *Id.* at 1250. The Eleventh Circuit rejected this argument, writing that "the afflictions of which Brown currently complains,

32

including his HIV and hepatitis, and the alleged danger of more serious afflictions if he is not treated constitute imminent danger of serious physical injury." *Id.* "That Brown's illnesses are already serious," it wrote, "does not preclude him from arguing that his condition is worsening more rapidly as a result of the complete withdrawal of treatment." *Id.*

Here, Plaintiffs' experts have testified that "[f]rom a neuroendocrine perspective, withdrawal of hormone therapy initiates a cascade of dysregulation that can severely destabilize psychological functioning," placing them at an increased risk of self-harm and suicidality. (Ettner Decl. ¶ 151; Haw Decl. ¶ 62). Moreover, risks of physiological symptoms such as muscle wasting, decreased bone mineral density and osteoporosis, increased risk of diabetes, hypertension, and arrhythmias, cardiovascular disease risk are posed. (Ettner Decl. ¶ 153–54; Haw Decl. ¶ 49).

Dr. Wynne testified that prisoners undergoing tapering are monitored, that Ms. Horton denied any physical health side effects associated with tapering, and that Mr. Wilson's only complaint was a return of menses. (Wynne Decl. ¶¶ 6, 9, 11). Dr. Wynne further testified that at a medical monitoring follow up, Doe did not report complaints associated with tapering. (Supp. Wynne Decl. ¶ 5). Dr. Owen testified that tapered patients have access to mental health treatment and the GDC has policies to address concerns of self-harm. (Owen Decl. ¶¶ 10–11). But

as *Brown* made clear, inmates facing a foreseeable risk of harm from a withdrawn medication do not need to wait for the harms to occur to bring a deliberate indifference claim. 387 F.3d at 1350.

The Court does not read *Brown* as requiring a prison to never taper a patient off a treatment if there is some risk of side effects posed. For example, a prison doctor can determine in his medical judgment that an inmate no longer needs as high a dose of a pain medication, even if tapering off leads to the prisoner experiencing increased pain or discomfort. *Collins v. Ferrell*, No. 21-14027, 2024 WL 4677418, at *5–6 (11th Cir. Nov. 5, 2024). But Defendants' implementation of S.B. 185 was not a medical judgment, it was a policy judgment. Neither Dr. Owen nor Dr. Wynne testified that in their professional opinion that there was any possible benefit to the tapering course of treatment that could offset the risk of the harm posed by the withdrawal side effects. Under *Brown*, this is deliberate indifference.

### iii. Blanket refusal to provide a medically indicated treatment cannot be justified by political "controversy."

While the remaining Plaintiffs (Ms. Benjamin and Ms. Madison) have not received hormone therapy since 2024, they have previously received such therapy and seek to resume it. Dr. Ettner testified that "for individuals with persistent, well-documented gender dysphoria, hormone therapy is often an effective, essential, and medically necessary treatment." (Ettner Decl. ¶ 65). GDC's historical

policies provided that gender dysphoria treatment plans could include hormone therapy if, among other things, the relevant medical directors deemed hormonal treatment as medically necessary. (Doc. 11-10 § IV.D.) However, under S.B. 185 and implementing rules, Plaintiffs and all inmates with gender dysphoria are categorically prohibited from receiving hormone treatment.

The state's categorical ban on receiving hormone therapy is in tension with case law recognizing that, in appropriate circumstances, hormone therapy can be medically necessary for gender dysphoria. For example, in *Kothmann v. Rosario*, 558 F. App'x 907, 910 (11th Cir. 2014), a transgender state prisoner brought a § 1983 action against a prison's chief health officer, alleging she violated his Eighth Amendment rights by repeatedly denying his requests for hormone treatment for his gender identity disorder ("GID"). The prisoner alleged he had been taking hormone therapy for six years prior to his incarceration. *Id.* at 909. The Court of Appeals held that the prisoner plausibly alleged a deliberate indifference claim because the prisoner alleged facts sufficient to show that the health officer knew that hormone treatment was the recognized, accepted, and medically necessary treatment for Kothmann's GID and knowingly refused Kothmann's repeated requests for such treatment.[5] *Id.* at 910; *accord Diamond v. Owens*, 131 F. Supp. 3d

---

[5] The court noted the limited nature of its ruling, explaining "[a]t this Rule 12(b)(6) stage, we do not decide whether hormone treatment in fact was medically

1346, 1373 (M.D. Ga. 2015) ("Diamond has alleged the Defendants knew the medically accepted and recognized gender dysphoria treatment pursuant to the Standards of Care; knew about Diamond's diagnosis, treatment history, and attempts to commit suicide and self-harm; and communicated with her directly about her gender dysphoria. But they knowingly and repeatedly refused her requested treatment, refused to refer her for treatment, and, at most, prescribed or authorized treatment—psychotropic drugs and counseling—they knew was medically inadequate.").

Next, in *Keohane*, a transgender female inmate brought a § 1983 action for declaratory and injunctive relief asserting an Eighth Amendment claim for deliberate indifference to serious medical needs arising from, among other issues, failure to provide hormone therapy and denial of social-transitioning-related requests for access to female clothing and permission for inmate to wear long hair. 952 F.3d at 1262. Like here, the inmate challenged a blanket policy that had the effect of denying her hormonal treatment, but the policy was repealed after the litigation was filed. *Id.* at 1263, 1267. Though the Eleventh Circuit did not reach the merits on mootness grounds, it made several important observations in passing. First, the court noted that the breadth of deference given to prison medical officials

---

necessary . . . [or] what other kinds of treatment could adequately address Kothmann's GID." 558 F. App'x at 911.

does not permit them to refuse to even consider whether a course of treatment is appropriate. *Id.* at 1266–67 ("It seems to us that responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference'—anti-medicine, if you will."). Second, the court noted that, "other courts considering similar policies erecting blanket bans on gender-dysphoria treatments—without exception for medical necessity—have held that they evince deliberate indifference to prisoners' medical needs in violation of the Eighth Amendment." *Id.* at 1267 (citing *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011); *Hicklin v. Precynthe*, No. 4:16-CV-01357-NCC, 2018 WL 806764, at *11 (E.D. Mo. Feb. 9, 2018); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 247 (D. Mass. 2012)).

So what has changed since *Keohane* was decided in 2020? The State Defendants say it plainly: "SB 185 represents the State's view that certain controversial sex-change interventions should not be facilitated and funded at taxpayer expense." (Doc. 25 at 5). But "controversy" does not take a medical question and turn it into a policy question. (*Contra id.* at 1) ("While Plaintiffs present this as a medical question, it is ultimately a legal one: does the Constitution require a State to recognize, facilitate, and pay for cosmetic interventions that allow a person to present and live as the opposite sex?"). An Eighth Amendment

exception for political controversy could end up swallowing the rule that inmates are entitled to a baseline of medical care bearing some relationship to the standard of care provided to the public at large. If it were otherwise, prison officials could deny inmates the COVID-19 vaccine or treat a measles outbreak with chicken soup.

Nonetheless, in recent cases involving transgender minors, concurring jurists have invoked political controversy and criticized reliance on expert evidence in determining the meaning of the Constitution. *See Eknes-Tucker*, 114 F.4th at 1248 (Lagoa, J., concurring in denial of rehearing en banc) ("But frankly, whether puberty blockers and cross-sex hormones qualify as 'life-saving' treatment—or even 'medical care'—is a policy question informed by scientific, philosophical, and moral considerations."); *Skrmetti*, 145 S. Ct. at 1839–40 (Thomas, J., concurring) ("The Court rightly rejects efforts by the United States and the private plaintiffs to accord outsized credit to claims about medical consensus and expertise. . . . The views of self-proclaimed experts do not 'shed light on the meaning of the Constitution.'") (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 272–73 (2022)). But those cases involved issues of constitutional interpretation that did not rely on factual determinations about the medical standard of care.

*Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1221–24 (11th Cir. 2023) was about "[t]he fundamental right to "make decisions concerning the care, custody, and control of [one's] children." *Id.* at 1221 (quoting *Meyer v. Nebraska*, 262 U.S. 390 (1923)). But determinations about "whether a right at issue is one of the substantive rights guaranteed by the Due Process Clause" are guided by a historical analysis. *Id.* at 1220 (quoting *Dobbs*, 597 U.S. at 237). Similarly, *Skrmetti* addressed whether a law violated the Equal Protection Clause by creating impermissible classifications based on sex; this is a determination that did not require expert testimony. *Cf.* 145 S. Ct. at 1830 ("In the medical context, the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny.").

In contrast, even judges that have expressed skepticism for interventions for transgender inmates have acknowledged the role experts play in deliberate indifference cases. *See Edmo v. Corizon, Inc.*, 949 F.3d 489, 498–99 (9th Cir. 2020) (O'Scannlain, J., respecting denial of rehearing en banc) ("Had the district court understood that Edmo's experts' role in WPATH marks them not with special insight into the legally acceptable care, but rather as mere participants in an ongoing medical debate, they would have acknowledged this case for what it is: a 'case of dueling experts.'") (citation omitted); *Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014) ("That the DOC has chosen one of two alternatives-both of which are

reasonably commensurate with the medical standards of prudent professionals, and both of which provide Kosilek with a significant measure of relief—is a decision that does not violate the Eighth Amendment."); *Keohane*, 952 F.3d at 1274 ("[T]he testifying medical professionals were—and remain—divided over whether social transitioning is medically necessary to Keohane's gender-dysphoria treatment.").

But this is not a case of dueling experts—neither of State Defendants' experts have embraced the notion that hormone therapy is never a medically appropriate treatment for gender dysphoria. Instead, State Defendants offer only a citation in their brief to what they describe as "[a] systematic review of the evidence in the Journal of the Endocrine Society," which they contend "confirms that the medical debate is unsettled." (Doc. 25 at 14) (citing Kellan E. Baker, *et al.*, *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Rev., J. of the Endocrine Soc'y*, 5(4), https://pmc.ncbi.nlm.nih.gov/articles/PMC7894249/pdf/bvab011.pdf). But they do not supply an expert to put this study into context, and the Court cannot take judicial notice of the allegedly unsettled nature of a medical debate.[6] At best, State Defendants' proffered study is probative of whether Plaintiffs' experts'

---

[6] As Plaintiffs note in Reply, the article affirms that hormone therapy is "an essential component of care." *See* Baker, *supra* at 13.

testimony is "based on sufficient facts or data" and is "the product of reliable principles and methods" under Federal Rule of Evidence 702(b) & (c), because the Rules of Evidence do not apply to preliminary questions of admissibility. Fed. R. Evid. 104(a). Even so, the Court would find the proffered study goes to weight, not admissibility. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) ("The district court[ ] err[ed] . . . [by] misconce[iving] of the limited 'gatekeeper' role envisioned in *Daubert*. By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.") (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C. Cir. 1996) (alterations in original). And even taking into account this study in assessing the weight to be given Plaintiffs' experts, the Court still accords controlling weight to the experts' testimony because the State Defendants do not offer any expert opinion in contrast, as explained above. Plaintiffs not currently receiving hormone therapy have shown a likelihood of success on the merits as to their deliberate indifference claim based on the refusal to consider them for hormone therapy.

B.    **Remaining Preliminary Injunction Factors[7]**

For the reasons the Court gave in section I.A.ii., above, Plaintiffs receiving hormone therapy (Ms. Horton, Mr. Wilson, and Doe) are at imminent irreparable risk of harm from withdrawal of treatment. The remaining Plaintiffs who are being refused consideration for hormone therapy face irreparable injury as well. As an initial matter, the Court agrees with the Ninth Circuit's conclusion that "the deprivation of [an inmate's] constitutional right to adequate medical care is sufficient to establish irreparable harm," because a deliberate indifference claim always requires a showing of a substantial risk of serious harm. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019). But even putting aside this notion, the remaining Plaintiffs show irreparable harm.

Ms. Benjamin has testified that "[l]osing access to the gender dysphoria healthcare that I need has been devastating for [her] mental and physical health," and that "[t]he longer [she is] denied healthcare, the worse [her] symptoms will become." (Benjamin Decl. ¶¶ 25, 27). Ms. Madison likewise testified that her mental health is at risk. (*Id.* ¶¶ 14, 18). These self-reported symptoms were corroborated as typical by Plaintiffs' experts. (Ettner Decl. ¶ 45) ("[W]ithout treatment, individuals with gender dysphoria experience anxiety, depression,

---

[7] The Court addresses State Defendants' arguments regarding the Prisoner Litigation Reform Act in the Class Certification section, below.

suicidality, and other attendant mental health issues and are often unable to adequately function in occupational, social, or other areas of life . . . ."); (Haw Decl. ¶ 17) ("[T]reating gender dysphoria with a 'one-size-fits-all' approach would be medically inappropriate and contrary to accepted standards of medical and other professional care, putting the patient potentially at risk of undue harm from . . . severe mental health exacerbation.").

The Court credits the State's asserted interest in enforcing its laws (Doc. 25 at 18) and recognizes that the State has an interest in declining to fund treatments its taxpayers disagree with. (*Id.* at 1). But the Court must also acknowledge that at the end of the day, "the public . . . has no interest in enforcing an unconstitutional law," *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010), and the State's interest in protecting taxpayer funds is undermined by their failure to allow inmates to pay for the disputed treatments. (Doc. 25 at 25).[8] Furthermore, the State's concerns about administrating its prisons are not undermined by restoring the prisons to an administrative regime they already operated under pre-S.B. 185.

---

[8] Plaintiffs argue that "the cost of gender dysphoria treatment for incarcerated people is 'de minimis.'" (Doc. 3 at 25) (citing Doc. 11-17 at ECF p. 6). Looking at the cited email in context, it is difficult to interpret whether the writer was including hormone therapy in the costs, but Defendants do not rebut Plaintiffs' assertion.

Finally, the Court agrees with Plaintiffs that they seek a status quo injunction. Courts have long held that the status quo for the purposes of considering a temporary restraining order or preliminary injunction refers to the last peaceable uncontested status existing between the parties before the dispute developed. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." (citations omitted));[9] *see also Nutra Health, Inc. v. HD Holdings Atlanta, Inc.*, No. 1:19-cv-05199-RDC, 2021 WL 5029427, at *2 (N.D. Ga. June 29, 2021) (citing *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) for the proposition that "[s]tatus quo does not mean the situation existing at the moment the lawsuit is filed, but the last peaceable uncontested status existing between the parties before the dispute developed."). Any concerns State Defendants expressed at the August 29th hearing about "whiplash" is a product of their own actions implementing an unconstitutional policy, and their arguments about the risks of medical harm from

---

[9] The Eleventh Circuit has adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

reinstating hormone therapy underscore that changes to hormone therapy regimens pose a risk of irreparable harm.

For these reasons, the Court finds that all of the injunctive relief factors weigh in favor of the Plaintiffs, and moreover exercises its discretion not to require Plaintiffs to post a bond.

## II.    Class Certification

Having held that the named Plaintiffs are entitled to injunctive relief, the Court next turns to Plaintiffs' request to provide injunctive relief on a class-wide basis. This request doubtlessly follows from the Supreme Court's decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025), which held that in granting equitable relief, this Court generally may only "administer complete relief between the parties," and no further. *Id.* (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). In application, this rule means that where an injunction already provides a named party complete relief, the Court cannot "[e]xtend[] the injunction to cover all other similarly situated individuals." *Id.* at 2557–58. But the Supreme Court was clear that its ruling did not implicate class actions, so long as they are "properly conducted . . . through the procedure set out in Rule 23." *Id.* at 2555 (quoting *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011)).

Plaintiffs request what they call "provisional class" certification, because the requested certification would "appl[y] only to Plaintiffs' Motion for a Preliminary

Injunction." The availability of class-wide injunctive relief to a putative class is no longer in doubt following the Supreme Court's emergency docket decision in *A. A. R. P. v. Trump*, 145 S. Ct. 1364 (2025). *See id.* at 1369 ("[C]ourts may issue temporary relief to a putative class.") (citing 2 W. Rubenstein, Newberg & Rubenstein on Class Actions § 4:30 (6th ed. 2022 and Supp. 2024)). However, that case involved an All Writs Act injunction to "to preserve [the Court's] jurisdiction pending appeal," so whether such a pre-certification injunction is available other than to preserve jurisdiction is still unclear. *Id.* In any case, the distinction may be academic here, because Plaintiffs assert that they meet all the criteria for merits class certification. (Doc. 2 at 9) ("The analysis is the same as what Rule 23 would require at any other stage of the litigation.") (quoting *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235, 1252 (S.D. Fla. 2025)). The Court agrees.

Plaintiffs seek to certify a 23(b)(2) class, which requires showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). As the Court set out in the Legal Standard section above, a class action may be maintained only when it satisfies all the requirements of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule 23(b), such as 23(b)(2) referenced above. *Jackson*, 130 F.3d at 1005.

46

The requirements of Rule 23(a) are:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These four requirements commonly are referred to as the 'prerequisites of numerosity, commonality, typicality, and adequacy of representation." *Piazza*, 273 F.3d at 1346 (quoting *Gen. Tel. Co. of S.W.*, 457 U.S. at 156). However, before the Court gets to the class requirements, the Court must deal with two threshold matters: standing and ascertainability.

## A.    Standing & Ascertainability

Plaintiffs bear the burden of establishing standing to bring this civil action under the "cases and controversies" clause of Article III of the U.S. Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). A plaintiff must demonstrate three things to establish standing under Article III: she must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan*, 504 U.S. at 560–61). These elements constitute the "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at

47

560. In a putative class action, "Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to [herself], even if it is an injury shared by a large class of other possible litigants." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

There is another "threshold requirement [that] is not mentioned in Rule 23, but is implicit in the analysis: that is, the plaintiff must demonstrate that the proposed class is 'adequately defined and clearly ascertainable.'" *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 Fed. App'x 782, 787 (11th Cir. 2014) (quoting *Little v. T–Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)). While standing focuses primarily (but not exclusively) on the representative plaintiff, ascertainability focuses on the class: "An identifiable class exists if its members can be ascertained by reference to objective criteria." *Id.* (quoting *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 97 (S.D.N.Y .2009)). "The analysis of the objective criteria also should be administratively feasible. 'Administrative feasibility' means 'that identifying class members is a manageable process that does not require much, if any, individual inquiry.'" *Id.* (quoting Newberg on Class Actions § 3.3 p. 164 (5th ed. 2012)).

State Defendants lodge two challenges to Plaintiffs' certification motion because Plaintiffs Benjamin and Madison are not currently receiving hormone therapy. State Defendants argue that this distinction means that these two Plaintiffs lack standing as class representatives and that a class that includes them and similarly situated inmates is not ascertainable. For reference, Plaintiffs'

48

ultimate merits putative class includes "[a]ll individuals with gender dysphoria diagnosis or who meet the criteria for diagnosis who are or will be incarcerated in GDC and subject to SB185's treatment ban," (Doc. 1 ¶ 170), but for the purpose of provisional certification, their proposed class is "all individuals incarcerated in GDC who are seeking or receiving hormone therapy now proscribed by SB185" (Doc. 2 at 8).

State Defendants concede that "[w]hether an inmate is included in that definition is readily ascertainable as to 'receiving' members," but argue that "plaintiffs' inclusion of all inmates 'seeking' cross-sex hormonal interventions introduces a vague and subjective second set of membership criteria that creates issues as to ascertainability." (Doc. 26 at 15). Relatedly, State Defendants argue that Ms. Benjamin and Ms. Madison lack standing to serve as class representatives as to inmates with gender dysphoria who are seeking but not receiving hormone therapy because they cannot show that the hormonal interventions they seek are medically necessary even absent S.B. 185. (*Id.* at 10). The issue is thus what to do with Plaintiffs and class members who are "seeking" but not "receiving" hormone therapy. Although State Defendants raise valid concerns, they are not fatal to Plaintiffs' efforts.

As the Court suggested in its Order and Notice of Hearing (Doc. 10), there is some tension between "persons who were already receiving hormone

replacement therapy (as the term is defined in SB 185) prior to the date of SB 185's effectiveness,"[10] and those who were not. The Court can *sua sponte* amend a class definition and does so here to resolve these issues. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1186 (11th Cir. 2003); *Githieya v. Glob. Tel\*Link Corp.*, No. 1:15-CV-0986-AT, 2020 WL 12948011, at *7 (N.D. Ga. Nov. 30, 2020). The Court, for the reasons given below, certifies the following two classes:

A.    All individuals incarcerated in GDC facilities who are receiving hormone therapy now proscribed by S.B. 185 or who were receiving hormone therapy proscribed by S.B. 185 on May 8, 2025. (Class Representatives: Horton, Wilson, and Doe).

B.    All individuals incarcerated in GDC facilities not in Class A who identify as transgender and request hormone treatment now proscribed by S.B. 185. (Class Representatives: Benjamin and Madison).

As Plaintiffs point out, this Class B language is drawn directly from GDC's prior SOP 508.40 § IV.D, which Defendants have not had difficulty implementing. (Doc. 11-9 at ECF p. 5) ("All offenders who identify as Transgender and request hormone treatment, whether or not they meet criteria for Gender Dysphoria, will be referred

---

[10] Though the Court did not discuss it in that Order, this first category would ostensibly include persons who were taking hormone therapy upon designation to a GDC facility and were placed on a tapering plan because of S.B. 185.

to the Medical Department to be evaluated and referred to an endocrinologist or other appropriate provider.").[11] Moreover, under that same GDC SOP 508.40 § IV.A, this class is ascertainable from Defendants' records because "[o]ffenders self-identified as Transgender that do not meet criteria for Gender Dysphoria will have this condition documented on the Problem List located in the medical record." Moreover, while the Class B definition includes transgender people that do not have a diagnosis of gender dysphoria, the Court's ultimate injunction will not actually require providing hormone therapy to persons who are not ultimately diagnosed with gender dysphoria, as explained below.

Finally, Class B's representatives have standing, because, as Plaintiffs argue in reply, "[t]he 'deni[al of] access to medical personnel capable of evaluating the need for treatment' itself violates the Constitution." (Doc. 35 at 2) (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)) (alterations in original). Class B's injury is not being evaluated for treatment according to the constitutional minimum standard of care and it is redressable by an injunction requiring an evaluation that meets this minimum standard, regardless of whether hormone therapy is ultimately prescribed.

_____

[11] The Court does not constitutionalize GDC's former SOP's—GDC has a range of discretion on how to conform their policies to the Eighth Amendment. The Court merely uses the SOPs to help craft an ascertainable class. *Bussey*, 562 F. App'x at 788 (defendant's records can be consulted in ascertainability analysis).

### B.    Numerosity & Adequacy

There does not appear to be a dispute as to numerosity or adequacy. (Doc. 35 at 13). The Court also determines these requirements are met, first because Defendants' witness acknowledges that "there are approximately 340 persons in GDC's custody who have been diagnosed with gender dysphoria," and "[o]f those, 107 patients were receiving hormone replacement therapy, sometimes referred to as 'HRT,' as of June 30, 2025." (Wynne Decl. ¶ 3). *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) ("[W]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.") (internal quotations omitted). Second, each Plaintiff has "sworn that they understand the responsibility of being a named plaintiff and that they will represent the interests of the class," and the Court can discern no conflict or other issue that would prevent them from adequately representing their respective classes.  (Doc. 2 at 17). The Court also finds proposed class counsel is experienced in class litigation and is capable of diligently prosecuting this action. (Declaration of Amanda Kay Seals dated Aug. 8, 2025 ¶ 5, Doc. 11-22); (Declaration of Emily C. R. Early dated Aug. 8, 2025 ¶ 3–4, Doc. 11-23).

### C.    Commonality & Typicality

"The commonality requirement demands only that there be 'questions of law or fact common to the class.'" *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009) (quoting Fed. R. Civ. P. 23(a)(2)). "This part of the rule 'does not require that all the questions of law and fact raised by the dispute be common,' . . . , or that the common questions of law or fact 'predominate' over individual issues." *Id.* (quoting *Cox*, 784 F.2d at 1557).

In contrast, typicality requires "that 'the claims or defenses of the representative parties [be] typical of the claims or defenses of the class.'" *Id.* at 1275 (quoting Fed. R. Civ. P. 23(a)(3)) (alteration in original). "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3). [T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Id.* (quoting *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322 (11th Cir. 2008) (alteration in original).

As the Supreme Court has observed, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and

adequately protected in their absence." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

349 n.5 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–158, n. 13

(1982)). The Eleventh Circuit distinguishes them as follows:

> Although typicality and commonality may be related, we
> have distinguished the two concepts by noting that,
> "[t]raditionally, commonality refers to the group
> characteristics of the class as a whole, while typicality
> refers to the individual characteristics of the named
> plaintiff in relation to the class."

*Vega*, 564 F.3d at 1275 (quoting *Piazza v. Ebsco Indus., Inc.,* 273 F.3d 1341, 1346 (11th

Cir. 2001)).

All Plaintiffs raise a common question of law: whether S.B. 185's blanket ban

on hormone therapy is constitutional. The claims they raise are typical of the class,

because all class members' claims arise under the Eighth Amendment and § 1983.

As to Class A, Plaintiffs Horton, Wilson, and Doe and the Class A members as a

whole all share a common injury of having their hormone therapy tapered because

of S.B. 185. State Defendants largely do not dispute this, aside from arguing

generalities about claims of inadequate medical care being individualized. (Doc.

26 at 18). But Plaintiffs do not seek a one-size-fits-all treatment regimen, only to

receive hormone therapy as medically necessary without regard to S.B. 185's

restrictions.

As to Class B, both Plaintiffs Benjamin and Madison identify as transgender

and request hormone treatment now proscribed by S.B. 185. Both are also excluded

from Class A by definition, along with the rest of Class B. As the Court explained in the Standing & Ascertainability section above, they share the common injury of not having been evaluated according to the constitutionally minimum standard of care. The Court therefore finds that commonality and typicality are met as to Class B as well.

### D.    Class Injunction

Finally, Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole." For Class A, Defendants have acted on grounds applying generally to the class by tapering their hormone therapy based solely on S.B. 185's prohibitions. For class B, Defendants have refused to act on grounds applying generally to the class by refusing to evaluate class members for hormone therapy for reasons unrelated to medical judgment solely due to S.B. 185. In broad strokes, an injunction that orders Defendants to cease enforcement of S.B. 185 is largely appropriate respecting both classes as a whole. But to ensure the injunction is administrable, the Court will phrase the class injunctions as follows:

**As to Class A**: Defendants are **DIRECTED** to immediately cease tapering hormone therapy doses to class members for the purpose of S.B. 185 compliance. Defendants are **FURTHER DIRECTED** to resume providing class members

hormone therapy according to the applicable standard of care without regard to S.B. 185 compliance. Nothing in this injunction requires Defendants to increase the dosage of hormone therapy (i) against the wishes of a class member or (ii) at a rate that puts an inmate at an unnecessary risk of harm based on the reasonable medical judgment of Defendants' medical professionals.

**As to Class B**: Defendants are **DIRECTED** to evaluate class members for hormone therapy according to the applicable standard of care without regard to S.B. 185 compliance. For the avoidance of doubt, this injunction does not require Defendants to affirmatively identify class members and schedule them for evaluations. It only requires Defendants to follow their usual procedures for evaluating class members who request or are referred for medical evaluation, or who requested or were referred for such evaluation prior to May 8, 2025, without regard to S.B. 185's ban on hormone therapy.

The Court finds that this injunction language complies with Federal Rule of Civil Procedure 65(d) because it states its terms specifically and describes in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required. Moreover, the Court disagrees with State Defendants that the Plaintiffs' sought injunction is a purely facial challenge requiring Plaintiffs to "establish that no set of circumstances exists under which

the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).[12] "[T]he line between facial and as-applied relief is a fluid one, and many constitutional challenges may occupy an intermediate position on the spectrum between purely as-applied relief and complete facial invalidation." *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 865 (11th Cir. 2013). But at least at the preliminary injunction phase, Plaintiffs do not seek to "invalidate" S.B. 185 in all applications. For example, S.B. 185 also prohibits using state funds for "[s]ex reassignment surgeries" and "[c]osmetic procedures or prosthetics," which are not before the Court. O.C.G.A. § 42-5-2(e)(1).[13]

---

[12] It is questionable whether the distinction really matters anymore after *CASA*, because the relief a court can grant a plaintiff mounting a facial versus as-applied challenge is basically the same—an injunction against enforcing the law against the plaintiff or plaintiffs only. *See Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) ("*Salerno* also applies when a court grants relief that is quasi-facial in nature—that is, relief that reaches beyond the plaintiffs in a case.").

[13] The Court acknowledges that in *Scott*, the Eleventh Circuit held that "[i]f a statute has two distinct provisions, and a court strikes down one as unconstitutional (and indeed, one that covers so many employees), we would not say that the relief was as-applied simply because a part of the statute remains." 717 F.3d at 865. But just as the line between as-applied and facial challenges is often blurred, the line between "distinct" portions of a statute are also not always sharp. Even if the Court is wrong about the as-applied nature of the challenge, the Court has trouble envisioning any set of facts where a state can constitutionally prohibit a medical intervention commonly provided to members of the public to be performed on prisoners without any exception for medical necessity. *Keohane*, 952 F.3d at 1266–67.

Additionally, the as-applied nature of the injunctive relief does not impede class relief based on the various class members' respective diagnoses and health profiles because Plaintiffs do not seek an order requiring prisons to provide hormone therapy to each class member. They only seek evaluations untainted by S.B. 185's constraints on what care can be provided. For example, a prisoner that self identifies as transgender but does not meet the criteria for gender dysphoria may be denied hormone therapy. And the Defendants would not be in contempt of the injunction if, unbeknownst to them, a prisoner who would meet criteria for gender dysphoria if diagnosed is never referred (by themselves or by staff) for mental health evaluation or never requests hormone therapy. This sort of tailoring differs from the kinds of broad strokes condemned in *Scott.* 717 F.3d at 864 ("As the district court itself acknowledged, the concession that transformed the lawsuit into an as-applied challenge was the Union's admission that the Fourth Amendment permitted drug tests of state employees in safety-sensitive positions. Yet the district court did not follow that reasoning to its necessary conclusion, which was that the proper scope of the as-applied challenge—and the scope of the relief that it could have granted based on the Union's motion for summary judgment—was limited to those employees not occupying safety-sensitive positions.").

Finally, for the reasons that follow, the Court finds that this injunction complies in all respects with the Prisoner Litigation Reform Act.

### E.    Prisoner Litigation Reform Act

Because this civil action seeks relief with respect to prison conditions under federal law, it is governed by the Prisoner Litigation Reform Act (PLRA).[14] "Congress enacted the PLRA 'to expedite prison litigation and end judicial overreach into the management of prisons.'" *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *7 (11th Cir. Apr. 15, 2022) (quoting *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1205–06 (11th Cir. 2021), *vacated as moot*, 33 F.4th 1325, 1326 (11th Cir. 2022)). "In doing so, Congress established the limited circumstances in which district courts can issue 'prospective relief' in inmates' civil actions challenging their prison conditions." *Id.* (quoting *Ga. Advoc. Off.*, 4 F.4th at 1206). "Specifically, 18 U.S.C. § 3626(a)(1)(A) provides:"

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public

---

[14] Plaintiffs allege and Defendants do not dispute that exhaustion of remedies is not required by 42 U.S.C. § 1997e(a) of the PLRA because GDC policy precludes grievances about matters GDC cannot control under state law. (Doc. 1 ¶ 65).

> safety or the operation of a criminal justice system caused
> by the relief.

*Id.* at *7–8. "Section 3626(a)(1)(A)'s requirements are often referred to as the 'need-

narrowness-intrusiveness' requirements." *Id.* (quoting *Ga. Advoc. Off.*, 4 F.4th at

1206).

"Section 3626(a)(2) sets forth the requirements for preliminary injunctive

relief." *Id.*[15] "The statute 'confirms that courts can issue preliminary injunctions in

prison cases to the extent otherwise authorized by law.'" *Id.* (quoting *Ga. Advoc.

Off.*, 4 F.4th at 1206–07). "The statute also provides that 'preliminary injunctive

relief must meet the need-narrowness-intrusiveness requirements.'" *Id.* (quoting

*Ga. Advoc. Off.*, 4 F.4th at 1207). "And 'it provides that preliminary injunctive relief

---

[15] Section 3626(a)(2) provides in full:

> In any civil action with respect to prison conditions, to the extent
> otherwise authorized by law, the court may enter a temporary
> restraining order or an order for preliminary injunctive relief.
> Preliminary injunctive relief must be narrowly drawn, extend no
> further than necessary to correct the harm the court finds requires
> preliminary relief, and be the least intrusive means necessary to
> correct that harm. The court shall give substantial weight to any
> adverse impact on public safety or the operation of a criminal justice
> system caused by the preliminary relief and shall respect the
> principles of comity set out in paragraph (1)(B) in tailoring any
> preliminary relief. Preliminary injunctive relief shall automatically
> expire on the date that is 90 days after its entry, unless the court makes
> the findings required under subsection (a)(1) for the entry of
> prospective relief and makes the order final before the expiration of
> the 90-day period.

shall expire within 90 days unless the court does two things: (1) makes the need-narrowness-intrusiveness findings for prospective relief under § 3626(a)(1), and (2) makes the order final.'" *Id.* (quoting *Ga. Advoc. Off.*, 4 F.4th at 1207).

As to the named Plaintiffs, the Court finds that its preliminary injunction complies with the PLRA because it does not extend further than necessary to correct the Eighth Amendment violation: it only precludes Defendants from enforcing S.B. 185's hormone therapy ban. It does not require the Defendants to adopt or conform to any particular procedures with respect to evaluating and treating class members. The Court does not even require Defendants to adhere to their pre-S.B. 185 SOPs and policies as requested by Plaintiffs; they may adopt new policies if they wish, so long as the policies do not preclude hormone therapy to inmates for non-medical reasons.

And as to the class members, the Court agrees with Plaintiffs that the PLRA does not inherently conflict with class certification. The only circuit courts to squarely consider the issue have held that a prison conditions class action can be maintained so long as the Rule 23 requirements are satisfied. *Shook v. El Paso Cnty.*, 386 F.3d 963, 970 (10th Cir. 2004); *Yates v. Collier*, 868 F.3d 354, 369 (5th Cir. 2017). The PLRA is no bar to entry of the Court's injunctive relief.

## Conclusion

For the above reasons, it is

61

**ORDERED** that Plaintiffs' Motion for Provisional Class Certification (Doc. 2) is **GRANTED** and the Court **CERTIFIES** the following two classes:

A.    All individuals incarcerated in GDC facilities who are receiving hormone therapy now proscribed by S.B. 185 or who were receiving hormone therapy proscribed by S.B. 185 on May 8, 2025. (Class Representatives: Horton, Wilson, and Doe).

B.    All individuals incarcerated in GDC facilities not in Class A who identify as transgender and request hormone treatment now proscribed by S.B. 185. (Class Representatives: Benjamin and Madison).

It is

**FURTHER ORDERED** that Bondurant, Mixson & Elmore, LLP and the Center for Constitutional Rights are appointed co-class counsel for both classes. It is

**FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 3) is **GRANTED**, and the Court **ENTERS** the following preliminary injunction:

> **As to Class A**: Defendants are **DIRECTED** to immediately cease tapering hormone therapy doses to class members for the purpose of S.B. 185 compliance. Defendants are **FURTHER DIRECTED** to resume providing class members hormone therapy according to the applicable standard of care without regard to S.B. 185

compliance. Nothing in this injunction requires Defendants to increase the dosage of hormone therapy (i) against the wishes of the class member or (ii) at a rate that puts an inmate at an unnecessary risk of harm based on the reasonable medical judgment of Defendants' medical professionals.

**As to Class B**: Defendants are **DIRECTED** to evaluate class members for hormone therapy according to the applicable standard of care without regard to S.B. 185 compliance. For the avoidance of doubt, this injunction does not require Defendants to affirmatively identify class members and schedule them for evaluations. It only requires Defendants to follow their usual procedures for evaluating class members who request or are referred for medical evaluation, or who requested or were referred for such evaluation prior to May 8, 2025, without regard to S.B. 185's ban on hormone therapy.

It is

**FURTHER ORDERED** that under Federal Rule of Civil Procedure 56(f)(3), the Court gives notice that it is considering granting partial summary judgment on its own motion as to Plaintiffs' and the classes' claims for permanent injunctive relief relating to hormone treatment. At the August 29th hearing, State Defendants implied that their position was that they did not need to contradict Plaintiffs' medical evidence to prevail as matter of law.[16] The Parties are directed to file

---

[16] (*See* Aug. 29, 2025 Hrg. Rough Tr. 32:16–23) ("THE COURT: Hold on. Have you put any information in the record showing that the doctors felt that these patients, these plaintiffs, should be taken off the HRT based on no longer having a medical need for it?

simultaneous briefs on this subject **NO LATER THAN** 14 days after the date of entry of this Order, and simultaneous response briefs **NO LATER THAN** 21 days after the date of entry of this Order. The briefs must specify with citations to evidence any genuine, material dispute of fact that would require a bench trial to resolve. The Parties may incorporate their legal arguments by reference to the earlier briefing.

 **SO ORDERED** this 4th day of September, 2025.

       Victoria Marie Calvert
       United States District Judge

---

MR. HARRIS: It was based on – that's not in the record. It was based on the legislature's determination that this category of interventions is not something the state supports. . . .").