**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ISIS BENJAMIN, *et al.*,

        *Plaintiffs*,

v.

COMMISSIONER TYRONE
OLIVER, *et al.*,

        *Defendants*.

Case No. 1:25-cv-04470-VMC

**STATE DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 1

BACKGROUND ....................................................................................................... 4

    I.     States around the country enact cross-sex hormone bans and similar laws regulating sex-change interventions......................................................... 4

    II.    The Supreme Court and the Eleventh Circuit hold that state regulations of cross-sex hormones are subject to rational basis review.......................... 5

    III.   Georgia prohibits using public funds for sex-change procedures in prison, including cross-sex hormonal interventions. ........................................... 7

LEGAL STANDARDS................................................................................................ 9

ARGUMENT........................................................................................................... 10

    I.     The State Defendants are entitled to partial summary judgment. ........... 10

    II.    The State Defendants are entitled to partial summary judgment against Stewart and Madison because neither has standing to seek prospective relief. ...................................................................................................... 17

CONCLUSION ....................................................................................................... 18

CERTIFICATE OF COMPLIANCE............................................................................. 20

CERTIFICATE OF SERVICE .................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Tyson Foods, Inc.*,
121 F.3d 642 (11th Cir. 1997). .............................................................................. 9

*Bayse v. Ward*,
147 F.4th 1304 (11th Cir. 2025) ......................................................................... 15

*Eknes-Tucker v. Governor of* Alabama,
114 F.4th 1241 (11th Cir. 2024) (en banc). ............................................... 1, 6, 11

*Eknes-Tucker v. Governor of Alabama*,
80 F.4th 1205 (11th Cir. 2023) ...................... 1, 2, 5, 6, 10, 11, 13, 14, 15, 17, 18

*Gibson v. Collier*,
920 F.3d 212 (5th Cir. 2019) .............................................................................. 11

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
973 F.3d 1263 (11th Cir. 2020). ......................................................................... 16

*Hydro Sys., Inc. v. Factory Automation Sys.*,
771 F. Supp. 3d 1342 (N.D. Ga. 2025). ........................................................... 9, 10

*Keohane v. Fla. Dep't of Corr. Sec'y*,
952 F.3d 1257 (11th Cir. 2020). ................................................................... 2, 3, 14

*United States v. Skrmetti*,
605 U.S. 495 (2025)............................... 1, 2, 3, 4, 6, 7, 10, 11, 12, 14, 15, 17, 18

*Vacco v. Quill*,
521 U.S. 793 (1997).............................................................................................. 7

*Wade v. McDade*,
106 F.4th 1251 (11th Cir. 2024) (en banc). ................................................... 2, 17

**Statutes & Regulations**

18 U.S.C. §3626 .................................................................................................. 10

Fed. R. Civ. P. 56 .................................................................................................. 9

O.C.G.A. §42-5-2 .................................................................................................. 8

O.C.G.A. §43-34-15 ............................................................................................ 12

**Other Authorities**

Alabama SB184 (2022) .......................................................................................... 4

Arkansas HB1570 (2021).................................................................................... 4, 5

Florida CS/SB254 (2023) .................................................................................. 4, 5

Georgia SB140 (2023) ......................................................................................... 4

Idaho HB71 (2023) .............................................................................................. 4

Indiana SA538 (2023) .......................................................................................... 4

Iowa Senate File 538 (2023) ............................................................................... 4

Kansas SB63 (2025) .......................................................................................... 4, 5

Kentucky SB150 (2023) ....................................................................................... 4

Louisiana HB648 (2023) ...................................................................................... 4

Mississippi HB1125 (2023) ............................................................................... 4, 5

Missouri SB49 (2023) ........................................................................................ 4, 5

New Hampshire HB377 (2025) ............................................................................ 4

North Carolina HB808 (2023) .......................................................................... 4, 5

North Dakota HB1254 (2023) .............................................................................. 4

Ohio HB68 (2024) ............................................................................................. 4, 5

Oklahoma SB613 (2023) ...................................................................................... 4

South Carolina HB4624 (2024) ........................................................................ 4, 5

South Dakota HB1080 (2023) .............................................................................. 4

Tennessee SB1 (2023) .......................................................................................... 4

Texas SB14 (2023) ............................................................................................ 4, 5

Wyoming Senate File SF0099 (2024) .................................................................. 4

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In *United States v. Skrmetti*, the Supreme Court held that bans on sex-change interventions, including the provision of cross-sex hormones, that "turn on age *or* medical use are subject to only rational basis review." 605 U.S. 495, 511 (2025) (emphasis added). If this deferential standard was not forgiving enough, the Court held that the regulation of sex-change interventions, including cross-sex hormones, is an area of "'medical and scientific uncertainty'" where states must be given "'wide discretion to pass legislation.'" *Id.* at 524. Laws drawing such lines "carr[y] with [them] the weight of fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field." *Id.* at 525. But the Constitution "does not resolve these disagreements" or "afford [courts a] license to decide them as [they] see best." *Id.* Instead, it leaves them "to the people, their elected representatives, and the democratic process." *Id.*; *see also Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), *reh'g denied* 114 F.4th 1241 (11th Cir. 2024) (en banc).

This case is about whether, notwithstanding *Skrmetti* and *Eknes-Tucker*, the Eighth Amendment's Cruel and Unusual Punishment Clause prevents the Georgia Legislature from declining to use public funds to facilitate sex-change hormonal interventions for inmates. The answer to that question is simple: nothing in the

1

Eighth Amendment disables the Legislature from acting on this hotly disputed question of public policy.

Plaintiffs attempt to distinguish *Skrmetti* and *Eknes-Tucker* by asserting that those cases involved the Equal Protection or Due Process Clauses rather than Eighth Amendment deliberate indifference claims. But that gets things exactly backwards because the Eighth Amendment standard is, if anything, *more deferential* than the already-deferential test from *Skrmetti* and *Eknes-Tucker*. The Constitution "doesn't require that the medical care provided to prisoners be 'perfect, the best obtainable, or even very good.'" *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). "Rather, 'medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* (cleaned up). Defendants must also have acted with "'subjective recklessness as used in the criminal law,'" which means that they must have "actually knew that [their] conduct—[their] own acts or omissions—put the plaintiff at substantial risk of serious harm." *Wade v. McDade*, 106 F.4th 1251, 1253 (11th Cir. 2024) (en banc). Even then, an Eighth Amendment claim must fail if the defendants "'responded reasonably" to the risk to inmate health and safety. *Id.* This strict standard—which requires both objective and subjective recklessness—is at least as deferential as the rational-basis test that similar laws easily satisfied in *Skrmetti* and *Eknes-Tucker*.

2

Either way, the Legislature's decision here clearly passes muster. Far from being conscience-shocking or subjectively reckless, SB185 is a rational response to a contested question of public policy. Prohibiting the use of public funds for a controversial set of procedures, the purported benefits of which are based on at most low-quality evidence (as even proponents concede), is a quintessentially permissible legislative choice. Plaintiffs cannot second-guess that choice based on "a simple difference in medical opinion" as to the appropriate course of treatment, *Keohane*, 952 F.3d at 1266, or a "so-called expert consensus" that the Supreme Court has already explained does not dictate the constitutional standard, *Skrmetti*, 605 U.S. at 530 (Thomas, J., concurring).

Finally, even if the Court were to rule against the State Defendants as to inmates who were actively receiving cross-sex hormones in GDC custody before SB185 was enacted, it cannot extend that ruling to inmates who have never received such interventions and made no attempt to show that they are entitled to them. The Eighth Amendment claims of this group of Plaintiffs—representatives of the so-called "requesting" class—are purely hypothetical. Such claims will only ripen in the context of a concrete denial of care that (on Plaintiffs' erroneous view of the law) would inflict an Eighth Amendment injury redressable by an injunction directing the State Defendants to provide a particular "requester" their desired intervention. Thus,

3

at minimum, the Court should rule that the "requesting" Plaintiffs lack standing to seek prospective relief.

## BACKGROUND

**I.    States around the country enact cross-sex hormone bans and similar laws regulating sex-change interventions.**

In recent years, a hotly contested question of public policy has involved the extent to which states can ban, prohibit the use of public funds for, or otherwise regulate sex-change interventions like the provision of cross-sex hormones. Faced with "an ongoing debate among medical experts regarding the risks and benefits associated with administering … hormones to treat gender dysphoria, gender identity disorder, and gender incongruence," many states have "respond[ed] directly to [the] uncertainty" by banning the interventions outright, at least in certain circumstances, such as for minors. *Skrmetti*, 605 U.S. at 523.

Over the last several years, the overwhelming trend has been towards greater state regulation of sex-change procedures, including cross-sex hormones. Today, more than twenty states[1] have banned the administration of the hormonal interventions at issue in this case—estrogen, testosterone, and testosterone blockers,

---

[1] *See, e.g.*, Alabama SB184 (2022), Arkansas HB1570 (2021), Florida CS/SB254 (2023), Georgia SB140 (2023), Iowa Senate File 538 (2023), Idaho HB71 (2023), Indiana SA538 (2023), Kansas SB63 (2025), Kentucky SB150 (2023), Louisiana HB648 (2023), Missouri SB49 (2023), Mississippi HB1125 (2023), North Carolina HB808 (2023), New Hampshire HB377 (2025), North Dakota HB1254 (2023), Ohio HB68 (2024), Oklahoma SB613 (2023), South Carolina HB4624 (2024), South Dakota HB1080 (2023), Tennessee SB1 (2023), Texas SB14 (2023), and Wyoming Senate File SF0099 (2024).

*see* SUMF ¶¶1-15 (describing the "receiving" Plaintiffs' previous cross-sex hormone regimens)—in at least some circumstances. Several have made violations of those prohibitions a criminal offense. Many states have prohibited the use of public funds for sex-change procedures under some or all circumstances.[2] And two have enacted laws explicitly permitting insurance plans to exclude coverage for such interventions.[3]

## II.    The Supreme Court and the Eleventh Circuit hold that state regulations of cross-sex hormones are subject to rational basis review.

The trend towards greater state involvement in regulating sex-change procedures unsurprisingly spurred constitutional challenges to such laws. Plaintiffs around the country, having failed to secure their policy preferences through the political process, asked federal courts to enjoin democratically enacted laws banning or refusing to fund sex-change procedures like the hormonal interventions at issue in this case. The most common vehicles for these challenges were, until recently, the Equal Protection Clause and the Due Process Clauses.

The Eleventh Circuit addressed this issue in 2023 when it decided *Eknes-Tucker*, 80 F.4th at 1205. There, transgender-identifying plaintiffs challenged an Alabama law that made it a crime to "'engage in or cause' the prescription or

---

[2] *See* Arkansas HB1570, Florida CS/SB254, Kansas SB63, Missouri SB49, Mississippi HB1125, North Carolina HB808, Ohio HB68, South Carolina HB4624, and Texas SB14.

[3] *See* Arkansas HB1570, Mississippi HB1125.

administration of puberty blocking medication or cross-sex hormone treatment to a minor 'for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex.'" *Id.* at 1210.

Reversing the district court's grant of a preliminary injunction, the Court explained that because the challenged law did not classify based on "sex, gender nonconformity, [or] transgender status," it was subject to rational basis review—a deferential standard that the law was "exceedingly likely to satisfy." *Id.* at 1230. The Eleventh Circuit declined to revisit the case en banc, with Judge Lagoa authoring a separate opinion concurring in the denial of rehearing and reiterating that "'when a legislature undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation.'" *Eknes-Tucker*, 114 F.4th at 1248 (Lagoa, J., concurring).

The Supreme Court took the same approach in its landmark *Skrmetti* decision, which involved an Equal Protection challenge to a similar Tennessee law called SB1. 605 U.S. at 495. Like in *Eknes-Tucker*, the Supreme Court held that SB1 was subject to rational basis review. *Id.* at 522. And like in *Eknes-Tucker*, the Supreme Court concluded that SB1 "clearly" passed constitutional muster under that deferential standard. *Id.* The Court's conclusion that rational basis was the right way to analyze

6

SB1 turned on the fact that the law "classifie[d] on the basis of medical use." *Id.* at 511. In other words, regulated providers could "administer … hormones to minors to treat certain conditions but not to treat gender dysphoria, gender identity disorder, or gender incongruence." *Id.* Such classifications are "subject to only rational basis review." *Id.*; *see also Vacco v. Quill*, 521 U.S. 793, 799-808 (1997) (explaining that state laws outlawing assisted suicide "neither infringe fundamental rights nor involve suspect classifications").

After *Skrmetti*, it is crystal clear the state legislatures have wide deference to enact laws regulating sex-change procedures like the cross-sex hormonal interventions at issue in this case. Such laws permissibly respond to the "ongoing debate among medical experts regarding the risks and benefits associated with administering … hormones to treat gender dysphoria, gender identity disorder, and gender incongruence." *Skrmetti*, 605 U.S. at 523l; *see also* SUMF ¶¶39-66 (discussing several systematic reviews that highlighted weaknesses in the underlying evidence base). When the ordinary political process produces such a response, the federal Constitution has nothing more to say on the matter. *Skrmetti*, 605 U.S. at 525.

## III. Georgia prohibits using public funds for sex-change procedures in prison, including cross-sex hormonal interventions.

On May 8, 2025, Governor Brian Kemp signed SB185, which amended the Georgia Code to prohibit the use of "state funds or resources" for a range of sex-

change procedures in prison, including "[h]ormone replacement therapies." O.C.G.A. §42-5-2(e)(1)(B); SUMF ¶87. Like Tennessee's SB1, SB185 "classifies on the basis of medical use." *Skrmetti*, 605 U.S. at 511. The law contains four exemptions for "medical conditions where such treatments are considered medically necessary, provided that such condition is not gender dysphoria or the purpose of such treatment is not for sex reassignment"; "individuals born with a medically verifiable disorder of sex development,"; "individuals with partial androgen insensitivity syndrome"; and hormonal interventions provided "solely for the purpose of transitioning [existing recipients] off such therapy." O.C.G.A. §42-5-2(e)(2). GDC began planning its implementation of SB185 in June and started the process of tapering off inmates from hormones in early July. *See* SUMF ¶¶31, 89.

On August 8, 2025, three months after SB185 took effect—and a month after GDC began tapering down the doses of inmates who had been receiving hormones—Plaintiffs filed this lawsuit in the Northern District of Georgia. SUMF ¶¶87-88. The complaint named five plaintiffs: Yohansan Jovan Stewart, Sylvester Horton, Terrell Montiel Madison, Brynn Wilson, and John Doe. Horton, Wilson, and Doe had been receiving hormones before SB185 became law and were in the process of being tapered off those hormones when Plaintiffs filed suit. *See* SUMF ¶¶1-15. Stewart and Madison had never received, but claimed to be seeking, similar interventions. *Id.* ¶¶16-21.

This Court issued a preliminary injunction against SB185 with respect to its ban on state funding for cross-sex hormones on September 4, 2025. Dkt.50. That injunction expires by operation of law under the Prison Litigation Reform Act on December 3, 2025. Defendants appealed the preliminary injunction and sought a stay from the Eleventh Circuit on September 8, 2025, but the stay motion remains pending.

Given that the parties already engaged in extensive briefing before this Court and the Court of Appeals on the preliminary injunction and provisional class certification motions, the parties agreed that the appropriate procedure to reduce Plaintiffs' hormones claims to final judgment was to file cross-motions for summary judgment on the existing record.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if its bears on "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). And a fact-dispute is "genuine" if the contested evidence would allow a rational factfinder to decide for the nonmoving party. *Hydro Sys., Inc. v. Factory Automation Sys.*, 771 F. Supp. 3d 1342, 1351 (N.D. Ga. 2025). When, under

the governing law, "the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute." *Id.* at 1352.

Nothing changes when parties cross-move for summary judgment—the Court considers each motion on its own merits and decides "'whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'" *Id.* That said, "[c]ross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Id.* Here, the parties agree that the preliminary injunction record will serve as the partial summary judgment record but disagree on both the governing law and the application of that law to the factual record before the Court. *See* Dkt.69.

Because this is a prison conditions case, it is also subject to the PLRA, which sharply limits the scope of appropriate relief to that which is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. §3626(a)(1)(A).

## ARGUMENT

I. **The State Defendants are entitled to partial summary judgment.**

*Skrmetti* and *Eknes-Tucker* should decide this case. Both decisions rejected constitutional challenges to *outright bans* on cross-sex hormonal interventions after concluding that they were rational responses to an ongoing medical and policy

10

debate. And both decisions recognized the broad role of state legislatures, and the correspondingly limited role of federal courts, in this area. In *Eknes-Tucker*, the Eleventh Circuit explained that Alabama's ban on providing cross-sex hormones as treatment for gender dysphoria in minors was "exceedingly likely to satisfy" rational basis review in the context of substantive due process and equal protection challenges. 80 F.4th at 1226, 1230-31. And, in *Skrmetti*, the Supreme Court held that Tennessee's ban on similar hormonal interventions "clearly me[t]" the rational basis standard. 605 U.S. at 522.

The logic of these cases is straightforward and directly applicable here: the regulation of sex-change procedures like cross-sex hormones "carries with it the weight of fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field." *Id.* at 525; *see also Eknes-Tucker*, 114 F.4th at 1248 (Lagoa, J., concurring) ("'When a legislature undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation.'" (cleaned up)). Just as was true when the Supreme Court handed down its decision in *Skrmetti* a few months ago, the interventions at issue "remai[n] one of the most hotly debated topics within the medical community today." *Gibson v. Collier*, 920 F.3d 212, 223-24 (5th Cir. 2019) (rejecting Eighth Amendment challenge to Texas's blanket

11

refusal to provide sex-reassignment surgeries to inmates). A legislature's policy decisions in this area are thus owed utmost judicial deference.

Here, the Georgia General Assembly acted rationally when it declined to fund cross-sex hormonal interventions for inmates. Although this Court previously ruled that *Skrmetti* and *Eknes-Tucker* "involved issues of constitutional interpretation that did not rely on factual determinations about the medical standard of care," Dkt.50 at 38, that distinction unduly diminishes the importance of those decisions. *Skrmetti* and *Eknes-Tucker* control this case not because they opine on the deliberate indifference standard per se. Instead, they underscore that *state legislatures* have broad authority to make policy regarding sex-change interventions and that the Constitution does not dictate outcomes in this controversial and ever-evolving area. Both cases are crystal clear that legislatures have "'wide discretion'" to act "'in areas where there is medical and scientific uncertainty,'" and may rationally decide as a matter of policy that certain sex-change interventions should be regulated more strictly or even banned outright. *Skrmetti*, 605 U.S. at 524; *Eknes-Tucker*, 114 F.4th at 1248 (Lagoa, J., concurring).

Any other interpretation produces absurd outcomes. In Georgia today, a physician who prescribes cross-sex hormones to a minor violates state law and could lose his or her license. *See* O.C.G.A. §43-34-15. But Plaintiffs' theory is that once one steps inside the correctional system, those *very same interventions* are so far

12

beyond dispute that the Constitution mandates they be provided to inmates at taxpayer expense. In light of *Skrmetti* and *Eknes-Tucker*, Plaintiffs' theory of the Eighth Amendment is simply "inconceivable"—it "cannot possibly be the law." *Keohane*, 952 F.3d at 1278.

Like the state laws at issue in *Skrmetti* and *Eknes-Tucker*, the General Assembly's decision not to fund hormonal interventions for inmates was well-justified by the lack of reliable evidence showing any benefits from such interventions. Defendants have proffered a systematic review of the medical evidence—published by the Endocrine Society and funded by WPATH—acknowledging that the strength of the evidence for the proposition that cross-sex hormones improves quality of life "is low due to concerns about bias in study designs, imprecision in measurement because of small sample sizes, and confounding by factors such as gender-affirming surgery status." Baker, *et al.*, *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, Journal of the Endocrine Society, 5(4) (2021), perma.cc/J7YN-LFG4; SUMF ¶48. And, although proponents of cross-sex interventions (such as Plaintiffs' retained experts) often claim they are needed to prevent suicide, the Baker Systematic Review found that "[i]t was impossible to draw conclusions about the effects of hormone therapy on death by suicide." SUMF ¶55.

The fact that Plaintiffs are proceeding under the Eighth Amendment rather than the Due Process or Equal Protection Clauses does not change the outcome. Prison officials engage in deliberate indifference "'only when [medical care] is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Keohane*, 952 F.3d at 1266. As *Skrmetti* and *Eknes-Tucker* make clear, a state legislature does not act irrationally when it refuses to accede to unfalsifiable claims of medical necessity based on so-called "standards of care" that "lack developmental rigour." Cass, *Independent review of gender identity services for children and young people: Final report* 28 (Apr. 2024), perma.cc/9KSN-UTBE; SUMF ¶61. Such laws are a reasonable response to the facts, not a departure from the Eighth Amendment's constitutional floor.

In arguing that cross-sex hormones are mandated by the Eighth Amendment, Plaintiffs have proffered two reports by retained third-party experts, neither of whom examined the plaintiffs. SUMF ¶¶67-68. Plaintiffs' experts argue that WPATH and the Endocrine Society standards regarding cross-sex hormones should be incorporated into constitutional law because they are endorsed by various medical associations and are allegedly needed to prevent depression, anxiety, and suicidality. *See, e.g.*, SUMF ¶¶72-77, 79, 83-8. Those expert opinions are striking similar to the *unsuccessful* arguments raised by the plaintiffs and their experts in *Skrmetti* and *Eknes-Tucker*. *See* SUMF ¶¶78, 80, Ex.C. But the Supreme Court upheld outright

bans on hormonal interventions for minors, notwithstanding expert submissions that closely parallel Plaintiffs' submissions here.

On a more general level, courts across the country have also rejected the notion that WPATH's SOC and similar standards can dictate constitutional law. *See, e.g.*, *Skrmetti*, 605 U.S. at 543-47 (Thomas, J., concurring); *Eknes-Tucker*, 80 F.4th at 1231; *Gibson*, 920 F.3d at 223-24; *cf. Bayse v. Ward*, 147 F.4th 1304, 1313 (11th Cir. 2025). For good reason. As the widely discussed and cited Cass Review (which was cited by the Supreme Court in *Skrmetti*) concluded, WPATH's standards are severely flawed in their development and implementation and are utterly lacking in high-quality evidentiary support. For example, the Cass Review determined although WPATH "has been highly influential in directing international practice," its guidelines have been found to "lack developmental rigour." SUMF ¶61. It also observed that WPATH's SOCv8 relied on several studies that the Baker Systematic Review had "already deemed as low quality." *Id.* ¶62.

Plaintiffs and the Court have previously criticized the State Defendants for not offering retained third-party expert opinions in support of the Legislature's reasonable decision not to fund cross-sex hormones. *E.g.*, Dkt.50 at 41. But although it is true that, unlike Plaintiffs, the State Defendants did not offer declarations from third-party outside experts, they offered something far more important to the Eighth Amendment inquiry: declarations from Plaintiffs' *treating physicians* who discussed

15

the care available to inmates, the protocols being used to responsibly implement SB185, and GDC's efforts to ensure that all inmates are closely monitored to ensure their safety and well-being. SUMF ¶¶22-38.

These declarations show that Plaintiffs are receiving extensive medical care reasonably calculated to treat their gender dysphoria. They now simply seek one specific *type* of intervention to which they are not entitled under state law. In other words, "[t]he plaintiffs' complaint isn't that [GDC] is providing no care, just that [it] isn't providing the more aggressive—and they say better—care that they desire." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1272 (11th Cir. 2020).

By contrast, Plaintiffs' retained experts did not declare that they had examined any individual inmate (much less any absent class members) and merely opined at a high level about the alleged "standards of care" dictated by WPATH and the Endocrine Society. *See, e.g.*, SUMF ¶¶68, 72-77. But, as already explained, the Supreme Court and Eleventh Circuit have squarely rejected the notion that the Constitution requires states to abide by WPATH or Endocrine Society protocols. In all events, Plaintiffs' expert declarations reflect at most "a simple difference in medical opinion" about the appropriate course of treatment, which is insufficient to state a claim for violation of the Eighth Amendment. *Hoffer*, 973 F.3d at 1273.

Finally, the extensive academic literature and case law acknowledging the weak evidentiary basis underlying cross-sex interventions underscores that the

16

Legislature means that neither the Legislature nor the State Defendants could possibly have acted with the "'subjective recklessness as used in the criminal law'" required to violate the Eighth Amendment. *Wade*, 106 F.4th at 1253. Given the ongoing medical debate, the prominent studies questioning the evidentiary basis for cross-sex hormones, the decisions in *Skrmetti* and *Eknes-Tucker*, the suite of similar state laws that have been passed around the country, and the Eleventh Circuit's extremely deferential deliberate indifference standard, it is inconceivable that the Legislature or prison officials "actually knew" that their conduct was below the constitutional standard. *Id.* Similarly, given the facts and the law the State Defendants' actual implementation of SB185, which has ensured that Plaintiffs continue to receive substantial treatment for their gender dysphoria while being closely monitored for any ongoing mental health issues, is a clear example of prison officials "'respond[ing] reasonably to [a] risk'" to inmate health and safety, which also defeats liability. *Id.*; *see also* SUMF ¶¶22-38.

**II.     The State Defendants are entitled to partial summary judgment against Stewart and Madison because neither has standing to seek prospective relief.**

Even if the Court does not grant the State Defendants partial summary judgment on Plaintiffs' entire hormones claim, two of the named Plaintiffs, Stewart and Madison, lack standing to seek prospective relief.

As the Court has recognized, "there is some tension between 'persons who were already receiving hormone replacement therapy (as the term is defined in SB 185) prior to the date of SB 185's effectiveness,' and those who were not." Dkt.50 at 49-50; *see also* Dkt.10. This "tension" arises because it is not immediately obvious how SB185 can imminently injure inmates "seeking but not receiving hormone therapy" who have not even attempted to "show that that the hormonal interventions they seek" are required by the Eighth Amendment as an individual matter "even absent S.B. 185." Dkt.50 at 49. And it is important because, as the Court's provisional class certification order suggests, the "receiving" Plaintiffs' class's claims are so different from those of the "requesting" class that named plaintiffs from one group cannot adequately represent absent class members from the other. The States Defendants will expand on this argument in their forthcoming opposition to final class certification, but continue to assert, consistent with their arguments at the preliminary injunction stage, that the "requesting" class representatives lack standing to seek prospective relief as a matter of law.

## CONCLUSION

*Skrmetti* and *Eknes-Tucker* hold that questions of policy regarding state regulation of sex-change interventions belong to state legislatures and officials, not federal courts. Notwithstanding those rulings, Plaintiffs argue that the Eighth Amendment constitutionalizes WPATH and Endocrine Society standards with

18

respect to inmates. But it cannot be the law that states have less authority to regulate within prisons than in society at large; if anything, Eighth Amendment caselaw makes clear that the opposite is true. The State Defendants are entitled to partial summary judgment.

Dated: November 10, 2025

/s/ Stephen J. Petrany
Christopher M. Carr
  *Attorney General*
  Georgia Bar No. 112505
Stephen J. Petrany
  *Solicitor General*
  Georgia Bar No. 718981
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
404-458-3408
spetrany@law.ga.gov

*Attorneys for Defendants Tyrone Oliver, Randy Sauls, and Dr. Marlah Mardis*

Respectfully submitted,

Jeffrey M. Harris*
Rachael C. T. Wyrick*
Julius Kairey*
Zachary P. Grouev*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
rachael@consovoymccarthy.com
julius@consovoymccarthy.com
zach@consovoymccarthy.com

*pro hac vice

*Special Assistant Attorneys General and Attorneys for Defendants Tyrone Oliver, Randy Sauls, and Dr. Marlah Mardis*

19

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing motion conforms to the requirements of L.R. 5.1C and this Court's subsequent orders. The brief is prepared in 14-point Times New Roman font.

*/s/ Jeffrey M. Harris*

## CERTIFICATE OF SERVICE

I certify that on November 10, 2025, I electronically filed the foregoing with the Clerk of the Court using the Court's ECF system, which will automatically send email notification to all counsel of record.

s/ *Jeffrey M. Harris*