**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ISIS BENJAMIN, *et al.*,

          *Plaintiffs*,

v.

COMMISSIONER TYRONE
OLIVER, *et al.*,

          *Defendants.*

Case No. 1:25-cv-04470-VMC

**STATE DEFENDANTS' REDACTED LOCAL RULE 56.1 STATEMENT
OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT**

**I.     Plaintiffs[1]**

---

[1] Plaintiffs' complaint and declarations use self-declared names that differ from the names in their official GDC records. Defendants will refer to them by their names in official records.





██  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

## II.    Defendants' Treating Physicians

22.    Defendants provided sworn declarations from Dr. Kathryn Haynes Owen, GDC's Statewide Mental Health Director, and Dr. Gerald E. Wynne, Statewide Medical Director for Centurion of Georgia, LLC, which discussed the medical care available to each of the Plaintiffs. *See* Dkt.28-1; Dkt.46-1; Dkt.25-2 (Owen Decl.).

23.    **Dr. Kathryn Haynes Owen.** Dr. Owen explained that "GDC takes seriously the mental health of all offenders, including Plaintiffs, and will ensure access to appropriate mental health services for all offenders in GDC custody." Dkt.25-2 ¶16.

24.    "All GDC offenders, including each of the named Plaintiffs, have access to mental health resources to address any distress that may result from the implementation of SB 185" and the "full range of mental health services at a facility will be available to offenders with Gender Dysphoria as clinically appropriate." *Id.* ¶7; *see also* Dkt.25-2 at 9 (GDC SOP 508.40(IV)(E)(3)).

25.    These services "may include counseling, support from a psychologist, support from a psychiatrist, psychotropic medication as appropriate, and specialized

housing units and programs." Dkt.25-2 ¶8. Inmates also have access to "[c]risis stabilization and increased counseling for suicide prevention" as needed. *Id.*

26.     Dr. Owen explained that "referrals were made to mental health staff for tapered patients who evidenced clinical need for mental health intervention after beginning the process" and that "[t]he majority of tapering patients … received counseling prior to meeting with a physician to start the tapering process." *Id.* ¶9.

27.     "All tapered patients who were receiving mental health treatment prior to tapering continued to receive counseling and pharmacological treatment as appropriate," and GDC's "referral process for mental health treatment (including self-referrals) ensures that all offenders who [were then] not currently receiving mental health treatment have access to mental health evaluation if the need develops." *Id.* ¶10; *see also* Dkt.25-2 at 12 (GDC SOP 508.15).

28.     "GDC has policies and procedures to address any concerns of risk of self-harm in the offender population," including a policy to immediately refer inmates to mental health staff if determined to potentially be suicidal or self-injurious. *Id.* ¶11; *see also* Dkt.25-2 at 26 (GDC SOP 508.29).

29.     "If an offender's suicide risk is assessed as mild, the offender will receive instruction on 'coping strategies, seeking social support, and problem resolution to help the offender manage current stressors and emotional distress,' an 'appropriate interval for mental health follow-up will be established[,] and the

offender will be informed of the best way to access mental health staff if symptoms worsen.'" Dkt.25-2 ¶13; *see also* Dkt.25-2 at 29 (GDC SOP 508.29(IV)(C)(l)(a)).

30.     "If warranted, an offender will be placed on Suicide Precautions, which includes increased frequency and/or duration of counseling contact and possible pharmacological intervention if not currently on psychotropic medication." Dkt.25-2 ¶14; *see also* Dkt.25-2 at 29 (GDC SOP 508.29(IV)(D)).

31.     **Dr. Gerald E. Wynne.** Dr. Wynne's declaration explained that Centurion began to taper the 107 inmates who had been receiving cross-sex hormones as of June 30, 2025, in early July. Dkt.28-1 ¶¶3-4.

32.     As of August 14, 2025, 17 inmates had completed the tapering process; 3 were released from custody; and 88 were still undergoing tapering. *Id.* ¶4.

33.     One additional covered inmate transferred into GDC custody between June 30 and August 14, which meant that 108 total inmates had either completed or were undergoing tapering at the time of Dr. Wynne's declaration. *Id.*

34.     As of August 14, Dr. Wynne "anticipate[d] that the 88 patients [then] undergoing tapering [would] complete the tapering process by September 30, 2025." *Id.* ¶5.

35.     Some inmates were expected to complete the process "as early as August 30." *Id.*

36.    This "variance in completion dates" was "based on a patient's specific circumstances, including the treatment dosage when tapering began." *Id.*

37.    In short, a "patient on a lower dose of hormone medication [would be expected to] complete the process sooner than a patient receiving a higher dose." *Id.*

38.    "All patients undergoing tapering are monitored by mental health and medical professionals. For medical monitoring, each patient has a meeting with the statewide medical director every four weeks. Patients may submit a request for additional medical care or evaluation if they have acute concerns during the tapering process. In addition, all patients received an initial evaluation by mental health staff prior to tapering. Based on that evaluation, mental health professionals determined how frequently follow-up evaluations should be scheduled based on patient-specific needs. All patients receive follow-up evaluations at least once every four weeks, with some receiving evaluations more frequently." *Id.* ¶6.

## III.    Systematic Reviews of Cross-Sex Hormones

39.    The sex-change interventions at issue in this case are cross-sex hormones like estradiol, spironolactone, and testosterone. *See* Dkt.28-1 ¶¶8-11; Dkt.46-1 ¶5.

40.    Plaintiff's expert Dr. Ettner asserts that the "goals" of administering these interventions to individuals with gender dysphoria are to "significantly reduce the … secondary sex characteristics of the individual's sex assigned at birth" and to

"replace circulating sex hormones associated with the person's sex assigned at birth with feminizing or masculinizing hormones." Dkt.11-1 (Ettner Decl.) ¶67.

41.     The hormonal interventions for which SB185 prohibits state funding—the administration of testosterone, estrogen, and testosterone blockers to induce physical changes to the body to more closely resemble the opposite sex—were also at issue in *United States v. Skrmetti*. *See* Dkt.28-1 ¶¶8-11; Dkt.46-1 ¶5; *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 481 (6th Cir. 2023).

42.     The hormonal interventions for which SB185 prohibits state funding were also at issue in *Eknes-Tucker v. Governor of Alabama*. *See* Dkt.28-1 ¶¶8-11; Dkt.46-1 ¶5; *e.g.*, *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228 (11th Cir. 2023).

43.     Although *Skrmetti* and *Eknes-Tucker* involved minors, the underlying goal of the hormonal interventions at issue—to "significantly reduce the … secondary sex characteristics of the individual's sex assigned at birth" and "replace circulating sex hormones associated with the person's sex assigned at birth with feminizing or masculinizing hormones," *e.g.*, Dkt.11-1 ¶67—is the same in this case as it was in those cases.

44.     **The Baker Systematic Review.** In 2021, Dr. Kellan E. Baker and a group of physicians conducted a systematic review of the evidence underlying cross-sex hormonal interventions. *See* Ex.A (Baker, *et al.*, *Hormone Therapy, Mental*

*Health, and Quality of Life Among Transgender People: A Systematic Review*, Journal of the Endocrine Society, 5(4) (2021), perma.cc/J7YN-LFG4).[2] Their research was partially funded by WPATH and published in the Journal of the Endocrine Society. *Id.* at 14.

45.    The Baker Systematic Review was "one of a series of systematic reviews on gender-affirming care conducted for WPATH to inform the eighth revision of the [WPATH SOC]." *Id.* at 2.

46.    WPATH "provided the research question and reviewed the protocol, evidence tables, and report." *Id.* at 3.

47.    Plaintiffs' expert witnesses extensively relied on WPATH's SOCv8. *See, e.g.*, *infra* ¶78. And WPATH's SOCv8 (at S18 and S182) cited the Baker Systematic Review.

48.    The Baker Systematic Review determined that the strength of evidence for the conclusion that "hormone therapy may improve [quality of life] among" people who identify as transgender is "low due to concerns about bias in study

---

[2] The Baker Systematic Review and the Cass Review were both discussed in Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction. *See* Dkt.25 at 14 (quoting and discussing the Baker Systematic Review); *id.* at 13 (quoting Justice Thomas's discussion of the Cass Review in *Skrmetti*). Both publications are readily accessible online, but Defendants attach full copies here for the Court's convenience. *See* Ex.A (Baker Systematic Review); Ex.B (Cass Review).

designs, imprecision in measurement because of small sample sizes, and confounding by factors such as gender-affirming surgery status." Ex.A at 8.

49.    The Baker Systematic Review determined that the strength of the evidence for the conclusion that "hormone therapy may decrease depression among" people who identify as transgender is "low due to concerns about study designs, small sample sizes, and confounding." *Id.*

50.    The Baker Systematic Review determined that the strength of the evidence for the conclusion that "hormone therapy may decrease anxiety among" people who identify as transgender is "low due to concerns about study designs, small sample sizes, and confounding." *Id.*

51.    The Baker Systematic Review concluded that "[u]ncontrolled confounding was a major limitation in th[e] literature," and that "[a]nother source of potential bias was recruitment of participants from specialized clinics that impose strict diagnostic criteria as a prerequisite for gender-affirming care." *Id.* at 12.

52.    The "dual role of clinicians and researchers as both gatekeepers and investigators may" have "force[d] … study participants to over- or understate aspects of their mental health in order to access gender-affirming care." *Id.*

53.    Similarly, transgender-identifying patients may have felt "that they cannot opt out of research-related activities, which is a serious concern for the validity of psychological outcome measurements." *Id.*

10

54. The Baker Systematic Review found that "[m]ost studies used well-known scales for measuring psychological outcomes" but that they were never "specifically validated for use in" transgender-identifying populations. *Id.*

55. The Baker Systematic Review determined that it could not "draw any conclusions … about whether hormone therapy affects death by suicide among transgender people." *Id.* Thus, "[i]t was impossible to draw conclusions about the effects of hormone therapy on death by suicide." *Id.*

56. In short, the Baker Systematic Review concluded that the "strength of evidence" underlying many of the claimed benefits of cross-sex hormonal interventions "is low due to methodological limitations." *Id.*; *see also id.* at 13 (Table 6, showing only low-quality evidence for purported quality of life, depression, and anxiety benefits and insufficient evidence for purported suicidality benefits).

57. **The Cass Review.** Dr. Hilary Cass was commissioned by the English national healthcare system to conduct an Independent Review of Gender Identity Services for Children and Young People. *See* Ex.B at 16 (Cass, *Independent review of gender identity services for children and young people: Final report* (Apr. 2024), perma.cc/9KSN-UTBE.).

58. Dr. Cass's research, published in 2024, has been cited by both the Supreme Court and the Eleventh Circuit in constitutional challenges to laws regulating sex-change interventions. *See United States v. Skrmetti*, 605 U.S. 495,

524-25 (2025); *id.* at 539-40 (Thomas, J., concurring); *Eknes-Tucker*, 114 F.4th 1241, 1248, 1267-70 (11th Cir. 2024) (Lagoa, J., concurring in the denial of rehearing en banc).

59.    Although the Cass Review primarily focused on sex-change interventions for minors, many of the study's conclusions were also relevant to adults. Many of the studies that Dr. Cass reviewed in her survey of the literature involved adults. *E.g.*, Ex.B at 131 (citing the Baker Systematic Review, which included a significant number of adult studies); *id.* at 185 (citing a Danish national register-based study that included adults as well as minors).

60.    The Cass Review also offered more general criticism about the evidence-base underlying WPATH's standards and the way WPATH has promulgated those standards. *Id.* at 28, 131-32.

61.    The Cass Review determined that, although WPATH "has been highly influential in directing international practice," its "guidelines were found by the University of York appraisal process to lack developmental rigour." *Id.* at 28.

62.    The Cass Review also endorsed the Baker Systematic Review's conclusion that "certainty" in the purported benefits of cross-sex hormones as treatment for gender dysphoria "is limited by high risk of bias in study designs, small sample sizes, and confounding with other interventions." *Id.* at 131. And it further

noted that WPATH's SOCv8 relied on several studies that the Baker Systematic Review had "already deemed as low quality." *Id.*

63.    The Cass Review concluded that "[WPATH's SOCv8] overstat[ed] the strength of the evidence in making [its] recommendations." *Id.* at 132.

64.    The Cass Review concluded that "[s]tudies looking at outcomes of those taking masculinising/feminising hormones are not straightforward." *Id.* at 182.

65.    The Cass Review found that "[i]t is not just the methodological issues highlighted that make it hard to draw firm conclusions about the role of masculinising/feminising hormones in mental health and psychosocial outcomes. There are [also] important clinical considerations that complicate the picture." *Id.* at 184.

66.    Finally, the Cass Review highlighted that, although "[t]ragically deaths by suicide in trans people of all ages continue to be above the national average," there "is no evidence that gender-affirmative treatments reduce this. Such evidence as is available suggests that these deaths are related to a range of other complex psychosocial factors and to mental illness." *Id.* at 195.

## IV.    Plaintiffs' Retained Experts

67.    Plaintiffs retained two expert witnesses for the purpose of litigating this case: Dr. Randi C. Ettner and Dr. Jeehea Sonya Haw.

68.    Neither witness claims to have examined the Plaintiffs or any other member of Plaintiffs' proposed provisional class. *See generally* Dkt.11-1; Dkt.11-2 (Haw Decl.).

69.    **Dr. Randi C. Ettner.** Ettner was Secretary for the World Professional Association for Transgender Health and served as a member of WPATH's Board of Directors for more than a decade. Dkt.11-1 ¶8.

70.    She served on the Curriculum Development Committee for WPATH's Global Education Initiative and currently chairs WPATH's Committee for Institutionalized Persons. *id.* ¶9; *id.* at 65 (App'x A).

71.    Ettner is a co-author of Versions 7 and 8 of WPATH's "Standards of Care." *Id.* ¶9. For SOCv8, Ettner was "co-lead for the chapter on 'Applicability … to People Living in Institutional Environments.'" *Id.*

72.    In the section of her declaration discussing "The Standard of Care for the Treatment of Gender Dysphoria," Ettner asserts that WPATH's SOC "set forth medically accepted standards of care for treatment of gender dysphoria." *Id.* ¶46.

73.    Ettner also asserts that the Endocrine Society Guidelines constitute "authoritative clinical guidance on the administration of hormone therapy to gender dysphoric patients by primary care physicians, endocrinologists, and other medical providers." *Id.* ¶47.

74.    WPATH was a cosponsoring association for the Endocrine Society Guidelines, which reproduce two tables taken from WPATH's SOCv7 purporting to define the "criteria" for administering cross-sex hormones to persons, both adults and minors, who are diagnosed with gender dysphoria. *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. Clinical Endocrinology & Metabolism 102(11) at 3869, 3878 (2017).

75.    Ettner asserts that, together, WPATH's "SOC and the Endocrine Society are the internationally recognized guidelines for the treatment of persons with gender dysphoria." Dkt.11-1 ¶48.

76.    Beginning at ¶44 of her declaration and continuing throughout ¶72, Ettner refers to WPATH's SOC and the Endocrine Society Guidelines at least 20 distinct times. *Id.* ¶¶44-72. The remainder of Ettner's report references these sources at least another 23 distinct times. *See id.* ¶¶73-170.

77.    Ettner cites WPATH SOC-8 as the "standard of care" for gender dysphoria. *Id*. ¶46. And Ettner further asserts that "American Medical Association, the Endocrine Society, the American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology

15

and the National Commission on Correctional Healthcare all endorse protocols in accordance with the SOC and Endocrine Society Guidelines." *Id.* ¶49.

78.     Ettner's opinions offered in this case are extremely similar to those of the plaintiffs' experts in *Eknes-Tucker*. There, the plaintiffs' expert provided a similar list of associational endorsers as proof of a purported "consensus among the larger medical and scientific community about the propriety, safety, and effectiveness of medical care for the treatment of gender dysphoria." Rebuttal Expert Report of Dan H. Karasic, Dkt.592-11 ¶25, *Boe v. Marshall*, No. 22-cv-00184 (M.D. Ala. June 24, 2024) ("The use of the WPATH Standards of Care is supported and/or adopted by, among others, the American Psychiatric Association, the American Psychological Association, the American Medical Association, [and] the American Academy of Pediatrics.").[3]

79.     Ettner further asserts that "[f]or GDC patients with gender dysphoria, even a gradual taper will risk a resurgence of dysphoria, depression, or suicidality." Dkt.11-1 ¶¶117, 125 (asserting that implementation of SB185 would "resul[t] in prolonged psychological suffering; risk of psychological decompensation; and

---

[3] Defendants cited this expert report in their preliminary injunction opposition to underscore the similarities between Plaintiffs' expert opinions and those offered, unsuccessfully, by the plaintiffs in *Eknes-Tucker*. *See* Dkt.25 at 20. The Karasic rebuttal report is available on PACER and is attached here as Exhibit C for the Court's convenience.

increased risks of suicidality, self-harm, and physical injury up to and including death"); *see also id.* ¶¶126, 129, 134-35, 141, 144-47 (similar).

80.    Ettner's proffered opinions about the claimed impact of SB185 are extremely similar to the claims of harm proffered by the plaintiffs' experts in *Eknes-Tucker*. There, the plaintiffs' expert asserted that "[t]he denial of medically indicated care to transgender people not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality." Rebuttal Expert Report of Dan H. Karasic, Dkt.592-11 ¶38, *Boe v. Marshall*, No. 22-cv-00184 (M.D. Ala. June 24, 2024).

81.    **Dr. Jeehea Sonya Haw.** Haw has been a member of the Endocrine Society since 2012. She was also a member of WPATH from 2016-2021 and then from 2024 to the present. Dkt.11-2 at 31 (App'x A).

82.    Like Ettner's, Haw's declaration claims to be based on "national and international medical society guidelines." *Id.* ¶9. The two cited examples are the WPATH SOCv8 and the Endocrine Society Guidelines. *Id.*

83.    Also like Ettner, Haw asserts that WPATH's SOCv8 and the Endocrine Society Guidelines are "accepted as the standard-of-care clinical guidelines for the treatment of Gender Dysphoria that have been endorsed and adopted" by various associations that largely track those invoked in *Eknes-Tucker*. *Id.* ¶14.

17

84. Haw expressly "adopt[s] and incorporate[s] by reference [Ettner's] explanation of the specific modalities of the medical treatment for gender dysphoria set forth in The Endocrine Society Guidelines and SOCv8." *Id.* ¶20.

85. Beginning with ¶15 (and discounting ¶20), Haw's declaration refers to WPATH's SOC and the Endocrine Society Guidelines at least an additional 12 distinct times. *Id.* ¶¶15-64.

## V.   SB185

86. During the legislative debates on SB185, the Center for Constitutional Rights testified against the Act and sent a letter to Jon Burns, Speaker of the Georgia House of Representatives, lobbying against the Act. Dkt.11-21 at 11-13 (App'x A).

87. On May 8, 2025, Governor Brian Kemp signed SB185 into law. Dkt.25 at 1-2. The Act's plain text stated that it would become effective upon the Governor's signature and that any conflicting laws or parts of laws would be repealed. *Id.* at 5; Georgia SB185 (2025).

88. Plaintiffs waited until August 8—three months after SB185 took effect—to file suit and seek "provisional" class certification and an "emergency" preliminary injunction against enforcement of the Act's cross-sex hormone provisions. *See* Dkts.1-3.

89. As Dr. Wynne has explained, the process of tapering inmates from existing cross-sex hormone regimens began in early July, after GDC and Centurion

identified the community of inmates who would need to be tapered in June. Dkt.28-1 ¶¶3-4. Thus, by the time Plaintiffs filed suit, the tapering process had already been underway for the better part of a month. *See id.*

90.    Despite this significant delay, Plaintiffs requested that the Court order Defendants to respond to Plaintiffs' motions for provisional class certification and an "emergency" preliminary injunction within six business days. Dkt.4.

Respectfully submitted this 10th day of November, 2025.

| | |
|---|---|
| Dated: November 10, 2025 | Respectfully submitted, |
| | |
| Christopher M. Carr | */s/ Jeffrey M. Harris* |
| *Attorney General* | Jeffrey M. Harris* |
| Georgia Bar No. 112505 | Rachael C.T. Wyrick* |
| Stephen J. Petrany | Julius Kairey* |
| *Solicitor General* | Zachary P. Grouev* |
| Georgia Bar No. 718981 | CONSOVOY MCCARTHY PLLC |
| Georgia Department of Law | 1600 Wilson Blvd., Suite 700 |
| 40 Capitol Square SW | Arlington, VA 22209 |
| Atlanta, Georgia, 30334 | (703) 243-9423 |
| 404-458-3408 | jeff@consovoymccarthy.com |
| spetrany@law.ga.gov | rachael@consovoymccarthy.com |
| | julius@consovoymccarthy.com |
| *Attorneys for Defendants Tyrone* | zach@consovoymccarthy.com |
| *Oliver, Randy Sauls, and Dr. Marlah* | |
| *Mardis* | *\*pro hac vice* |
| | |
| | *Special Assistant Attorneys General* |
| | *and Attorneys for Defendants Tyrone* |
| | *Oliver, Randy Sauls, and Dr. Marlah* |
| | *Mardis* |

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Local Rule 56.1 statement conforms to the requirements of L.R. 5.1C and 56, and this Court's subsequent orders. The statement is prepared in 14-point Times New Roman font.

*/s/ Jeffrey M. Harris*

## CERTIFICATE OF SERVICE

I certify that on November 10, 2025, I electronically filed the foregoing with the Clerk of the Court using the Court's ECF system, which will automatically send email notification to all counsel of record.

*/s/ Jeffrey M. Harris*