**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ISIS BENJAMIN, *et al.*,

        *Plaintiffs*,

v.

COMMISSIONER TYRONE
OLIVER, *et al.*,

        *Defendants*.

Case No. 1:25-cv-04470-VMC

**STATE DEFENDANTS' RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.     Gender dysphoria is a serious medical condition that appears in the DSM-5. Declaration of Dr. Randi Ettner ("Ettner Decl.") (Doc. 11-1) ¶¶ 24–25; Declaration of Dr. J. Sonya Haw ("Haw Decl.") (Doc. 11-2) ¶¶ 11–12.[1]

**Response:** The State Defendants do not dispute that Plaintiffs' retained experts offered these opinions, that gender identity disorder was included as a diagnosis in the DSM-III, the DSM-III-R, and the DSM-IV, or that the DSM-5 includes gender dysphoria as a diagnosis. *See* Dkt.11-1 (Ettner Decl.) ¶¶24-25; Dkt.11-2 (Haw Decl.) ¶¶11-12.

---

[1] Per the Section III.j of the Court's Standing Order, each numbered paragraph consists of a copy of the equivalent numbered paragraph in Plaintiffs' Local Rule 56.1 Statement of Undisputed Facts, followed immediately by the State Defendants' response. *See* Dkt.71-1.

2.      Gender dysphoria arises from the incongruence between an individual's gender identity and their birth-assigned sex and results in clinically significant distress. Ettner Decl. (Doc. 11-1) ¶¶ 31(a)–(b); Haw Decl. (Doc. 11-2) ¶¶ 11–12.

**Response:** The State Defendants do not dispute that Plaintiffs' retained experts offered these opinions or that the DSM-5's gender dysphoria diagnosis includes the following description: "A marked incongruence between one's experienced/expressed gender and natal gender of at least 6 months in duration, as manifested by at least two of the following:"

    A. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics

    B. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender

    C. A strong desire for the primary and/or secondary sex characteristics of the other gender

    D. A strong desire to be of the other gender (or some alternative gender different from one's designated gender)

    E. A strong desire to be treated as the other gender (or some alternative gender different from one's designated gender)

    F. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's designated gender)

Dkt.11-1 ¶31.

The State Defendants do not dispute that the DSM-5 description further states that "[t]he condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." Dkt.11-1 ¶31.

3.      Some people with gender dysphoria identify as transgender. Ettner Decl. (Doc. 11-1) ¶ 30; Haw Decl. (Doc. 11-2) ¶ 11; Doc. 11-8, NCCHC Position Stmt. at 2.

**Response:** The State Defendants respond that Plaintiffs' retained experts appear to have offered different opinions on this point. Dr. Ettner stated that the terms "gender dysphoria" and "transgender" are "often used interchangeably" because "[e]veryone with a gender dysphoria diagnosis falls under the umbrella of transgender." Dkt.11-1 ¶30. Dr. Haw stated that "[p]eople with gender dysphoria identify as gender diverse *or* transgender." Dkt.11-2 ¶11 (emphasis added); *see also* Dkt.11-8 at 2 (NCCHC Position Statement) ("[N]ot all transgender people experience gender dysphoria symptoms or associated psychosocial impairments, or meet the DSM-5 diagnostic criteria for gender dysphoria.").

4.      Gender dysphoria requires individualized medical treatment based on patient medical need. Ettner Decl. (Doc. 11-1) ¶¶ 45–59, 163–66; Haw Decl. (Doc. 11-2) ¶¶ 16–17, 21–32, 34–35, 54, 61; Doc. 11-10, SOP 507.04.68 (§ IV.C.3); Doc. 11-8, NCCHC Position Stmt. at 2–7.

3

**Response:** The State Defendants do not dispute that Plaintiffs' retained experts cited WPATH and the Endocrine Society Guidelines for this proposition. *See* Dkt.11-1 ¶¶46-49 (citing WPATH and the Endocrine Society); Dkt.11-2 ¶¶21, 25, 27, 30, 34-36, 54 (same).

The State Defendants respond that the Cass Review determined that, although WPATH "has been highly influential in directing international practice," its "guidelines were found … to lack developmental rigour." Defs. SUMF ¶61; Dkt.72-3 at 28. The Cass Review also noted that WPATH's SOCv8 relied on several studies that the Baker Systematic Review had "already deemed as low quality." Defs. SUMF ¶62; Dkt.72-3 at 131. And the Cass Review concluded that "[WPATH's SOCv8] overstat[ed] the strength of the evidence in making [its] recommendations." Defs. SUMF ¶63; Dkt.72-3 at 132.

The State Defendants further respond that WPATH was a cosponsoring association for the Endocrine Society Guidelines, which reproduce two tables taken from WPATH's SOCv7 purporting to define the "criteria" for administering cross-sex hormones to persons, both adults and minors, who are diagnosed with gender dysphoria. *See* Defs. SUMF ¶74; Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. Clinical Endocrinology & Metabolism 102(11) at 3869, 3878 (2017). The Cass Review also concluded that WPATH's SOC and the Endocrine

4

Society Guidelines are "closely interlinked, with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society" Guidelines. Dkt.72-3 at 130.

The cited section of GDC's former SOP speaks for itself. Defendants dispute this paragraph to the extent it suggests that unproven interventions supported only by low-quality evidence are legally or medically "require[d]." *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195.

5.    Medically necessary treatment for gender dysphoria can include hormone therapy. Ettner Decl. (Doc. 11-1) ¶¶ 65–94; Haw Decl. (Doc. 11-2) ¶¶ 14, 19, 21–30; Doc. 11-8, NCCHC Position Stmt. at 2–5; Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.A.7, IV.B.9, IV.G.2–7, IV.K.4–8).

**Response:** The State Defendants do not dispute that Plaintiffs' retained experts cited WPATH and the Endocrine Society Guidelines for this proposition. *See* Dkt.11-1 ¶¶ 65-72 (citing WPATH and the Endocrine Society); Dkt.11-2 ¶¶14, 21, 25, 27, 30 (same). The NCCHC's position statement and the cited former GDC SOPs speak for themselves.

The State Defendants respond that the Cass Review determined that, although WPATH "has been highly influential in directing international practice," its "guidelines were found … to lack developmental rigour." Defs. SUMF ¶61; Dkt.72-

5

3 at 28. The Cass Review also noted that WPATH's SOCv8 relied on several studies that the Baker Systematic Review had "already deemed as low quality." Defs. SUMF ¶62; Dkt.72-3 at 131. And the Cass Review concluded that "[WPATH's SOCv8] overstat[ed] the strength of the evidence in making [its] recommendations." Defs. SUMF ¶63; Dkt.72-3 at 132.

The State Defendants further respond that WPATH was a cosponsoring association for the Endocrine Society Guidelines, which reproduce two tables taken from WPATH's SOCv7 purporting to define the "criteria" for administering cross-sex hormones to persons, both adults and minors, who are diagnosed with gender dysphoria. *See* Defs. SUMF ¶74; Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. Clinical Endocrinology & Metabolism 102(11) at 3869, 3878 (2017). The Cass Review also concluded that WPATH's SOC and the Endocrine Society Guidelines are "closely interlinked, with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society" Guidelines. Dkt.72-3 at 130.

The State Defendants further respond that the Legislature could reasonably conclude that it is not "[m]edically necessary" to provide cross-sex hormonal interventions because multiple systematic reviews of the medical evidence have found that the alleged benefits of such interventions are unproven, speculative, and

based at most on low-quality evidence. *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195.

The State Defendants further respond that these opinions proffered by Plaintiffs' experts are extremely similar to the opinions proffered by the plaintiff's experts in *Eknes-Tucker*. *See* Dkt.72-4 (Karasic Rebuttal Report) ¶¶31, 40, 98, 103 (opining that "the medical treatments Alabama seeks to bar are safe, effective, and medically necessary to relieve gender dysphoria for transgender people").

6.      Counseling is not a substitute for hormone therapy for gender dysphoria patients. Ettner Decl. (Doc. 11-1) ¶¶ 95–97, 120–22, 145–50, 169; Haw Decl. (Doc. 11-2) ¶¶ 33, 43–45, 63; Doc. 11-9, SOP 508.40 (§ IV.D).

**Response:** The State Defendants do not dispute that Plaintiffs' retained experts offered this opinion, relying in part on WPATH's SOC and the Endocrine Society Guidelines. *See, e.g.*, Dkt.11-2 ¶¶33.

The State Defendants respond that the Cass Review determined that, although WPATH "has been highly influential in directing international practice," its "guidelines were found … to lack developmental rigour." Defs. SUMF ¶61; Dkt.72-3 at 28. The Cass Review also noted that WPATH's SOCv8 relied on several studies that the Baker Systematic Review had "already deemed as low quality." Defs. SUMF ¶62; Dkt.72-3 at 131. And the Cass Review concluded that "[WPATH's

SOCv8] overstat[ed] the strength of the evidence in making [its] recommendations." Defs. SUMF ¶63; Dkt.72-3 at 132.

The State Defendants further respond that WPATH was a cosponsoring association for the Endocrine Society Guidelines, which reproduce two tables taken from WPATH's SOCv7 purporting to define the "criteria" for administering cross-sex hormones to persons, both adults and minors, who are diagnosed with gender dysphoria. *See* Defs. SUMF ¶74; Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. Clinical Endocrinology & Metabolism 102(11) at 3869, 3878 (2017). The Cass Review also concluded that WPATH's SOC and the Endocrine Society Guidelines are "closely interlinked, with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society" Guidelines. Dkt.72-3 at 130.

The State Defendants further respond that multiple systematic reviews of the medical evidence have found that the alleged benefits of "hormone therapy" are unproven and speculative and that the evidence supporting such interventions is at most low quality. *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195.

7. Nor are psychotropic drugs a substitute for hormone therapy in gender dysphoria patients, as they will not resolve the anxiety or depression that gender

dysphoria patients experience as a result of treatment denial. Ettner Decl. (Doc. 11-1) ¶¶ 96, 140.

**Response:** The State Defendants do not dispute that one of Plaintiffs' retained experts offered this opinion. *See* Dkt.11-1 ¶¶96, 140.

The State Defendants respond that multiple systematic reviews of the medical evidence have found that the alleged benefits of "hormone therapy" are unproven and speculative and that the evidence supporting such interventions is low quality at most. *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195. The Baker Systematic Review specifically addressed claims that cross-sex hormones reduce anxiety and depression and found the quality of evidence in support of such claims to be "low due to concerns about study designs, small sample sizes, and confounding." Defs. SUMF ¶¶49-50; Dkt.72-2 at 8.

8.    Terminating medically necessary hormone therapy can cause physiological harms, including hormonal disequilibrium, mood destabilization, musculoskeletal effects, metabolic dysregulation, neuroendocrine effects, cardiovascular effects, psychological and neuropsychiatric effects, vasomotor instability, mood dysregulation, and cardiometabolic risks. Ettner Decl. (Doc. 11-1) ¶¶ 151–154; Haw Decl. (Doc. 11-2) ¶¶ 42, 46–49, 61–62.

**Response:** The State Defendants do not dispute that Plaintiffs' retained experts offered these opinions, relying in part on WPATH's SOC and the Endocrine

Society Guidelines. *See* Dkt.11-1 ¶¶151-54 (citing WPATH and the Endocrine Society); Dkt.11-2 ¶¶42, 46-49, 61-62.

The State Defendants respond that the Cass Review determined that, although WPATH "has been highly influential in directing international practice," its "guidelines were found … to lack developmental rigour." Defs. SUMF ¶61; Dkt.72-3 at 28. The Cass Review also noted that WPATH's SOCv8 relied on several studies that the Baker Systematic Review had "already deemed as low quality." Defs. SUMF ¶62; Dkt.72-3 at 131. And the Cass Review concluded that "[WPATH's SOCv8] overstat[ed] the strength of the evidence in making [its] recommendations." Defs. SUMF ¶63; Dkt.72-3 at 132.

The State Defendants further respond that WPATH was a cosponsoring association for the Endocrine Society Guidelines, which reproduce two tables taken from WPATH's SOCv7 purporting to define the "criteria" for administering cross-sex hormones to persons, both adults and minors, who are diagnosed with gender dysphoria. *See* Defs. SUMF ¶74; Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. Clinical Endocrinology & Metabolism 102(11) at 3869, 3878 (2017). The Cass Review also concluded that WPATH's SOC and the Endocrine Society Guidelines are "closely interlinked, with WPATH adopting Endocrine

Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society" Guidelines. Dkt.72-3 at 130.

The State Defendants further respond that multiple systematic reviews of the medical evidence have found that the alleged benefits of "hormone therapy" are unproven and speculative and that the evidence supporting such interventions is at most low quality. *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195.

The State Defendants further respond that these opinions proffered by Plaintiffs' experts are extremely similar to the opinions proffered by the plaintiff's experts in *Eknes-Tucker*. *See* Dkt.72-4 ¶¶38, 69.

The State Defendants further respond that the protocols for tapering inmates off hormones ensure that all inmates including Plaintiffs are closely monitored throughout that process and that all inmates including Plaintiffs have access to extensive mental health resources. *See* Dkt.28-1 ¶¶9, 11; Dkt.46-1 (Suppl. Wynne Decl.) ¶5; Dkt.25-2 (Owen Decl.) ¶¶7-16.

9.    Denying or withdrawing medically necessary hormone therapy can lead to psychological harm such as anxiety, depression, and suicidality, worsening gender dysphoria symptoms, psychological decompensation, and attempts at suicide, self-harm, and self-castration. Ettner Decl. (Doc. 11-1) ¶¶ 124–162, 167; Haw Decl. (Doc. 11-2) ¶¶ 32, 42–43, 49–51, 56–57, 61–62.

11

**Response:** The State Defendants do not dispute that Plaintiffs' retained experts offered these opinions, relying in large part on WPATH's SOC and the Endocrine Society Guidelines. *See* Dkt.11-1 ¶¶130, 144, 152, 155 (citing WPATH and the Endocrine Society); Dkt.11-2 ¶¶32, 42-43, 49-51, 56-57, 61-62.

The State Defendants respond that the Cass Review determined that, although WPATH "has been highly influential in directing international practice," its "guidelines were found … to lack developmental rigour." Defs. SUMF ¶61; Dkt.72-3 at 28. The Cass Review also noted that WPATH's SOCv8 relied on several studies that the Baker Systematic Review had "already deemed as low quality." Defs. SUMF ¶62; Dkt.72-3 at 131. And the Cass Review concluded that "[WPATH's SOCv8] overstat[ed] the strength of the evidence in making [its] recommendations." Defs. SUMF ¶63; Dkt.72-3 at 132.

The State Defendants further respond that WPATH was a cosponsoring association for the Endocrine Society Guidelines, which reproduce two tables taken from WPATH's SOCv7 purporting to define the "criteria" for administering cross-sex hormones to persons, both adults and minors, who are diagnosed with gender dysphoria. *See* Defs. SUMF ¶74; Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. Clinical Endocrinology & Metabolism 102(11) at 3869, 3878 (2017). The Cass Review also concluded that WPATH's SOC and the Endocrine

12

Society Guidelines are "closely interlinked, with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society" Guidelines. Dkt.72-3 at 130.

The State Defendants further respond that multiple systematic reviews of the medical evidence have found that the alleged benefits of "hormone therapy" are unproven and speculative and that the evidence supporting such interventions is at most low quality. *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195. The Baker Systematic Review specifically addressed claims that cross-sex hormones reduce anxiety and depression and found the quality of evidence in support of such claims to be "low due to concerns about study designs, small sample sizes, and confounding." Defs. SUMF ¶¶49-50; Dkt.72-2 at 8.

Both the Baker Review and the Cass Review also found no reliable evidence showing that cross-sex hormonal interventions reduce the risk of suicide. Defs. SUMF ¶55; Dkt.72-2 at 12 (Baker concluding that "[i]t was impossible to draw conclusions about the effect of hormone therapy on death by suicide"); Defs. SUMF ¶66; Dkt.72-3 at 195 (Cass concluding there "is no evidence that gender-affirmative treatments reduce" suicide).

The State Defendants further respond that the opinions proffered by Plaintiffs' experts are extremely similar to the opinions proffered by the plaintiff's experts in *Eknes-Tucker*. *See* Dkt.72-4 ¶¶38, 69.

13

The State Defendants further respond that all Plaintiffs have access to extensive mental health resources and that GDC has exhaustive procedures in place to address any distress, including risk of self-harm. *See* Dkt.25-2 ¶¶7-16.

10. Defendants adopted and/or enforced three standard operating procedures ("SOPs") on gender dysphoria treatment prior to the passage of SB185: Doc. 11-9, SOP 508.40; Doc. 11-10, SOP 507.04.68; Doc. 11-11, SOP 220.09 (collectively "the Gender Dysphoria Policies").

**Response:** The State Defendants do not dispute that GDC enforced the cited former SOPs prior to the enactment of SB185, through which the Legislature abrogated certain aspects of those policies. The cited former SOPs speak for themselves.

11. The Gender Dysphoria Policies acknowledged that:

a. gender dysphoria is "characterized by clinically significant distress." Doc. 11-9, SOP 508.40 (§ III.A)

b. transgender people with gender dysphoria have "serious medical needs which may not be ignored." Doc. 11-10, SOP 507.04.68 (§ IV.A.6).

c. "appropriate management" of gender dysphoria requires individualized medical treatment, Doc. 11-10, SOP 507.04.68 (§§

14

IV.A.6; C.3); Doc. 11-9, SOP 508.40 (§ IV.A–F); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8);

d. gender dysphoria patients should receive care pursuant to "[c]urrent, accepted standards of care." Doc. 11-10, SOP 507.04.68 (§ IV.C.3).

e. hormone therapy can be medically necessary gender dysphoria treatment. Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8).

f. "[o]nly medical practitioners [should] make decisions regarding gender-related hormone treatment needs." Doc. 11-11, SOP 220.09 (§ IV.K.7).

**Response:** The cited former GDC SOPs speak for themselves.

12.    The Gender Dysphoria Policies required that gender dysphoria patients receive comprehensive medical evaluations and individualized treatment plans. Doc. 11-9, SOP 508.40 (§§ IV.A–E); Doc. 11-10, SOP 507.04.68 (§§ I; IV.A.6; IV.C.3); Doc. 11-11, SOP 220.09 (§§ IV.K.4–5).

**Response:** The cited former GDC SOPs speak for themselves.

13.    Based on the Gender Dysphoria Policies, before SB185's enactment, Defendants knew that people with a confirmed or suspected gender dysphoria diagnosis should receive a "thorough medical and mental health evaluation," Doc. 11-10, SOP 507.04.68 (§ IV.A.6), and "be evaluated and referred to an

15

endocrinologist," Doc. 11-9, SOP 508.40 (§ IV.D), to determine, among other things, whether hormone therapy is medically necessary.

**Response:** The cited former GDC SOPs speak for themselves. The State Defendants do not dispute that these SOPs were operative prior to the enactment of SB185 or that they were aware of them. The State Defendants note that the full relevant text of former SOP 508.40, §IV.D stated that inmates "will be referred to the Medical Department to be evaluated and referred to an endocrinologist *or other appropriate provider*." Dkt.11-9 at 5 (emphasis added).

14.    Defendants knew that hormone therapy was only prescribed within GDC "after an individualized assessment of the offender by a medical practitioner." Doc. 11-11, SOP 220.09 (§ IV.K.5).

**Response:** The cited former GDC SOP speaks for itself. The State Defendants do not dispute that these SOPs were operative prior to the enactment of SB185 or that they were aware of them.

15.    Defendants also knew that hormone therapy was authorized in GDC only when GDC healthcare personnel—including Defendant Mardis—deemed it medically necessary care for a patient. Doc. 11-11, SOP 220.09 (§ IV.K.8); Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C.3; IV.D).

**Response:** The cited former GDC SOPs speak for themselves. The State Defendants do not dispute that these SOPs were operative prior to the enactment of SB185 or that they were aware of them.

16.     As of August 2025, there were 340 people with gender dysphoria diagnoses in GDC custody. Wynne Decl. (Doc. 28-1) ¶ 3.

**Response:** No dispute.

17.     Over one hundred of these individuals were receiving hormone therapy as of June 30, 2025, including Plaintiffs Doe, Horton, and Wilson. Wynne Decl. (Doc. 28-1) ¶ 3; Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17.

**Response:** No dispute.

18.     Each of these Plaintiffs and Class Members were prescribed hormone therapy because GDC healthcare providers found it to be medically necessary treatment for their gender dysphoria. *See, e.g.*, Horton Decl. (Doc. 11-4) ¶ 7; Doe Decl. (Doc. 11-7) ¶¶ 7–8; Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C.3; IV.D); Doc. 11-11, SOP 220.09 (§ IV.K.8).

**Response:** The State Defendants do not dispute that the named "receiving" Plaintiffs and other individuals in GDC custody receiving cross-sex hormones before SB185 did so pursuant to GDC's former SOPs.

17

19.     SB185, adopted on May 8, 2025, bans "[h]ormone replacement therapies," among other things, for people in GDC custody. O.C.G.A. § 42-5-2 ("SB185") §§ 1(e)(1)(A)–(C).

**Response:** SB185 speaks for itself.

20.     SB185 prohibits the use of state funds for hormone therapy as gender dysphoria treatment within GDC, and prohibits patients from self-paying for the care. Ga. House of Reps., 2025–2026 Reg. Sess., Pub. & Cmty. Health Comm. Hr'g (Apr. 1, 2025), https://vimeo.com/1071507707?fl=pl&fe=vl (43:24–43:55).

**Response:** SB185 speaks for itself. The State Defendants do not dispute that the law does not contemplate inmates self-paying for hormonal interventions while incarcerated.

21.     In June 2025, the Georgia Board of Corrections released Rule 125-4-4-.13, Treatment of Gender Dysphoria and Intersex Offenders, a regulation implementing SB185. Doc. 11-14, Board Rule 125-4-4-.13 at 4.

**Response:** The State Defendants do not dispute that the Georgia Board of Corrections gave initial approval to the cited rule on June 5, 2025. The State Defendants note that the Board gave final approval to the cited rule on September 4, 2025.

22.     Together, SB185 and Rule 125-4-4-.13 (hereinafter "SB185 and related rules") prohibit hormone therapy as gender dysphoria treatment within GDC, and

contain no medical necessity exception. SB185 §§ 1(e)(1)(B), (e)(2)(A); Doc. 11-14, Board Rule 125-4-4-.13 at 2–3.

**Response:** SB185 and Rule 125-4-4-.13 speak for themselves. The State Defendants further note that both SB185 and Rule 125-4-4-.13 contain four exceptions for: (1) "[t]reatments for medical conditions where such treatments are considered medically necessary, provided that such condition is not gender dysphoria or the purpose of such treatment is not for sex reassignment"; (2) "[t]reatments for individuals born with a medically verifiable disorder of sex development, including individuals born with ambiguous genitalia or chromosomal abnormalities resulting in ambiguity regarding the individual's biological sex"; (3) "[t]reatments for individuals with partial androgen insensitivity syndrome"; and (4) "[h]ormone replacement therapy treatment for state inmates who were being treated with such therapy prior to May 8, 2025, provided that the provision of such therapy is solely for the purpose of transitioning off such therapy." O.C.G.A. §42-5-2(e)(2)(A)-(D).

23.    SB185 and related rules require that gender dysphoria patients currently receiving prescribed hormone therapy be "transition[ed] off such therapy." SB185 §1(e)(2)(D); Doc. 11-14, Board Rule 125-4-4-.13 at 3.

**Response:** SB185 and Rule 125-4-4-.13 speak for themselves.

19

24.     However, hormone therapy remains available when "medically necessary" for conditions that are "not gender dysphoria." SB185 § 1(e)(2)(A) (emphasis added); Doc. 11-14, Board Rule 125-4-4-.13 at 3 (emphasis added).

**Response:** SB185 and Rule 125-4-4-.13 speak for themselves. The State Defendants do not dispute that SB185 provides an exception for "[t]reatments for medical conditions where such treatments are considered medically necessary, provided that such condition is not gender dysphoria or the purpose of such treatment is not for sex reassignment," or that this exception applies to cross-sex hormones. O.C.G.A. §42-5-2(e)(2)(A).

25.     Thus, SB185 and related rules (1) impose a blanket ban on hormone therapy as gender dysphoria treatment in GDC, irrespective of medical need; (2) terminate all hormone therapy already determined to be medically necessary gender dysphoria treatment within GDC; and (3) prohibit gender dysphoria patients in GDC custody from being evaluated for hormone therapy. SB185 § 1(e); Doc. 11-14, Board Rule 125-4-4-.13 at 3–4; Benjamin Decl. (Doc. 11-3) ¶¶ 14–24; Horton (Doc. 11-4) ¶¶ 16–19; Doc. 11-21, July 21 Notice Letter at 3–6.

**Response:** SB185 and Rule 125-4-4-.13 speak for themselves. The State Defendants do not dispute that SB185 and the Board's implementing rule together implement what their plain text requires, subject to the law's four enumerated exceptions.

26.     SB185 and related rules depart from clinical standards of care for the treatment of gender dysphoria in adults, which require individualized treatment and authorize hormone therapy based on patient medical need. Haw Decl. (Doc. 11-2) ¶¶ 53–59; Ettner Decl. (Doc. 11-1) ¶¶ 54–59, 163–66; Doc. 11-21, July 21 Notice Letter at 4–8; Doc. 11-8, NCCHC Position Stmt. at 2–7.

**Response:** The State Defendants do not dispute that Plaintiffs' retained experts cited WPATH's SOC and the Endocrine Society Guidelines for this proposition. *See* Dkt.11-1 ¶¶55, 57, 165 (citing WPATH); Dkt.11-2 ¶54 (citing WPATH and the Endocrine Society). The cited letter from Plaintiffs' counsel articulating Plaintiffs' legal position and the NCCHC position statement speak for themselves.

The State Defendants respond that the Cass Review determined that, although WPATH "has been highly influential in directing international practice," its "guidelines were found … to lack developmental rigour." Defs. SUMF ¶61; Dkt.72-3 at 28. The Cass Review also noted that WPATH's SOCv8 relied on several studies that the Baker Systematic Review had "already deemed as low quality." Defs. SUMF ¶62; Dkt.72-3 at 131. And the Cass Review concluded that "[WPATH's SOCv8] overstat[ed] the strength of the evidence in making [its] recommendations." Defs. SUMF ¶63; Dkt.72-3 at 132.

The State Defendants further respond that WPATH was a cosponsoring association for the Endocrine Society Guidelines, which reproduce two tables taken from WPATH's SOCv7 purporting to define the "criteria" for administering cross-sex hormones to persons, both adults and minors, who are diagnosed with gender dysphoria. *See* Defs. SUMF ¶74; Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. Clinical Endocrinology & Metabolism 102(11) at 3869, 3878 (2017). The Cass Review also concluded that WPATH's SOC and the Endocrine Society Guidelines are "closely interlinked, with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society" Guidelines. Dkt.72-3 at 130.

Defendants further respond that multiple systematic reviews of the medical evidence have found that the alleged benefits of "hormone therapy" are unproven and speculative and that the evidence supporting such interventions is at most low quality. *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195.

Defendants further respond that these opinions proffered by Plaintiffs' experts are extremely similar to the opinions proffered by the plaintiffs' experts in *Eknes-Tucker*. *See* Dkt.72-4 ¶¶25 (asserting that there is an "international consensus" on gender dysphoria treatment "which is published as the WPATH Standards of Care").

27.    SB185 and related rules also depart from GDC's Gender Dysphoria Policies. Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8); Doc. 11-19, GDC May 29 Ltr. at 2.

**Response:** The cited former GDC SOPs and the May 29 letter speak for themselves. The State Defendants do not dispute that SB185 and GDC's subsequent implementation thereof represents an intentional decision on behalf of the Legislature to depart from GDC's previous SOPs covering sex-change interventions.

28.    In July 2025, Defendants Oliver, Mardis, Sauls and Centurion of Georgia, LLC ("Centurion") (collectively "Defendants") began enforcing SB185 across GDC. Doc. 11-20, SB185 Implementation Plan at 2; Wynne Decl. (Doc. 28-1) ¶¶ 4–5.

**Response:** The State Defendants do not dispute that they began implementing SB185 in accordance with its plain terms, subject to the four exceptions identified in the bill and discussed above in the State Defendants' response to Plaintiffs' SUMF ¶22.

29.    Defendants began implementing a ban on hormone therapy as treatment for gender dysphoria with no exception for medical necessity, or provision for self-pay. Horton Decl. (Doc. 11-4) ¶ 19; Doc. 11-20, SB185 Implementation Plan at 10–13; Wynne Decl. (Doc. 28-1) ¶ 4–5; Doc. 25 at 30.

**Response:** The State Defendants do not dispute that they began implementing SB185 in accordance with its plain terms, subject to the four exceptions identified in the bill and discussed above in the State Defendants' response to Plaintiffs' SUMF ¶22.

30.    Defendants prohibited hormone therapy for gender dysphoria patients currently receiving it as treatment, except for the "purpose of transitioning off," consistent with SB185 and related rules. Doc. 11-20, SB185 Implementation Plan at 12; Wynne Decl. (Doc. 28-1) ¶¶ 4–5.

**Response:** The State Defendants do not dispute that they "began tapering all patients off" cross-sex hormones in early July. Dkt.28-1 (Wynne Decl.) ¶4. They also do not dispute that GDC's plan to implement SB185 complied with the law's plain terms, subject to the four exceptions discussed in the State Defendants' response to Plaintiffs' SUMF ¶22 above.

31.    Defendants implemented SB185's blanket ban on hormone therapy treatment and evaluations, despite knowing that doing so carries risks of physiological and psychological harm. Horton Decl. (Doc. 11-4) ¶¶ 16-19; Wilson Decl. (Doc. 11-6) ¶¶ 8-13; Doc. 11-10, SOP 507.04.68 (§§ IV.A.6; IV.C); Doc. 11-16, Oliver-Ammons Text Message at 2; Doc. 11-21, July 21 Notice Letter at 7–8; Doc. 11-20, SB 185 Implementation Plan at 2, 10-14; Doc. 25 at 24.

**Response:** The State Defendants do not dispute that Plaintiff Horton demanded several sex-change procedures, including the continued provision of cross-sex hormones, when GDC began implementing SB185. *See* Dkt.11-4 (Horton Decl.) ¶¶16-19. ███████████████████████

███████████████████████

███████████████████████

███████████████████████

███████████████████████

███████████████████████

The State Defendants further respond that multiple systematic reviews of the medical evidence have found that the alleged benefits of "hormone therapy" are unproven and speculative and that the evidence supporting such interventions is at most low-quality. *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195.

The State Defendants further respond that all Plaintiffs being tapered were closely monitored throughout that process, that all inmates including Plaintiffs have access to extensive mental health resources, and that GDC has exhaustive procedures in place to address any threats of self-harm. *See* Dkt.28-1 ¶¶9, 11; Dkt.46-1 ¶5; Dkt.25-2 ¶¶7-16.

25

32.    Defendants modeled their plan to enforce SB185 after a plan developed for use in Idaho prisons, where a Centurion affiliate is a healthcare contractor. Doc. 11-21, July 21 Notice Letter at 6–7; Doc. 11-18, May 29 Mardis Email at 2.

**Response:** The cited letter from Plaintiffs' counsel articulating Plaintiffs' legal position and the cited email speak for themselves.

33.    The Idaho plan has been repeatedly enjoined. Doc. 11-21, July 21 Notice Letter at 6–7.

**Response:** The cited letter from Plaintiffs' counsel articulating Plaintiffs' legal position speaks for itself. And whether this Court should follow non-precedential, out-of-circuit decisions is a purely legal question.

34.    When a law similar to SB185 was passed in Florida where a Centurion affiliate is the correctional healthcare provider, medically-necessary hormone therapy continued to be provided to gender dysphoria patients. Doc. 11-21, July 21 Notice Letter at 6.

**Response:** The cited letter from Plaintiffs' counsel articulating Plaintiffs' legal position speaks for itself. The State Defendants disagree that this document or the status of an unrelated policy in Florida is legally material to whether SB185 violates the Eighth Amendment.

35.    On July 21, 2025, Plaintiffs' counsel contacted Defendants by letter to inform them that denying gender dysphoria patients access to hormone therapy (even

26

through a gradual taper) and individualized treatment evaluations violated the Eighth Amendment and jeopardized patients' health in ways that counseling could not mitigate. Doc. 11-21, July 21 Notice Ltr. at 4–8.

**Response:** The State Defendants do not dispute that Plaintiffs' counsel sent the cited letter on July 21, 2025. *See* Dkt.11-21. The State Defendants disagree with the legal conclusions stated in the letter that SB185 violates the Eighth Amendment.

36.    Defendants continued implementing SB185 across GDC following Plaintiffs' letter. See, e.g., Benjamin Decl. (Doc. 11-3) ¶¶ 17-24; Horton Decl. (Doc. 11-4) ¶¶ 21–22; Wynne Decl. (Doc. 28-1) ¶¶ 4–11.

**Response:** The State Defendants do not dispute that, notwithstanding a letter from Plaintiffs' counsel delivered more than two months after SB185 was enacted, GDC continued to implement this as-yet-unchallenged and presumptively constitutional state law in accordance with its plain terms.

37.    Because of Defendants' enforcement of SB185, Plaintiffs and Class Members seeking gender dysphoria treatment lost access to hormone therapy (except for the purposes of tapering), and hormone therapy evaluations. Doc. 11-20, SB185 Implementation Plan at 2, 10–13; Wynne Decl. (Doc. 28-1) ¶¶ 4–11.

**Response:** The State Defendants do not dispute that at the time this suit was filed, GDC had been implementing SB185 in accordance with its plain terms, subject

27

to the four exceptions discussed above in the State Defendants' response to Plaintiffs' SUMF ¶22.

38.    Beginning in July, Defendants began terminating hormone therapy for more than one hundred gender dysphoria patients—including Plaintiffs Doe, Horton, and Wilson—despite knowing that GDC healthcare providers had determined that hormone therapy was medically necessary treatment for their gender dysphoria. Wynne Decl. (Doc. 28-1) ¶¶ 4–5, 9, 11; Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Doc. 11-11, SOP 220.09 (§ IV.K.8); Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C; IV.D).

**Response:** The State Defendants do not dispute that, after identifying the relevant populations in June, they began implementing SB185 in accordance with its plain terms by tapering inmates from cross-sex hormones in early July—roughly a month before Plaintiffs filed this lawsuit. *See* Defs. SUMF ¶89; Dkt.28-1 ¶¶3-4. The cited former GDC SOPs speak for themselves.

39.Defendants also stopped offering hormone therapy evaluations to the more than 230 gender dysphoria patients in GDC custody not receiving hormone therapy as treatment. Wynne Decl. (Doc. 28-1) ¶ 3; Doc. 11-20, SB185 Implementation Plan at 10–11; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17.

**Response:** The State Defendants do not dispute that before this suit was filed, GDC was implementing SB185 in accordance with its plain terms, subject to the four exceptions discussed above in the State Defendants' response to Plaintiffs' SUMF ¶22.

40.    Plaintiff Fantasia Horton, a transgender woman, and Plaintiffs Brynn Wilson and John Doe, transgender men, started being tapered off of their medically necessary hormone therapy because of Defendants' enforcement of SB185. Horton Decl. (Doc. 11-4) ¶¶ 7–8, 13–24; Wilson Decl. (Doc. 11-6) ¶¶ 8–10, 13–14; Doe Decl. (Doc. 11-7) ¶¶ 8, 17.

**Response:** The State Defendants do not dispute that Horton, Wilson, and Doe began being tapered from cross-sex hormones, which they had been receiving under GDC's pre-SB185 SOPS, as part of GDC's implementation of SB185. *See* Defs. SUMF ¶89; Dkt.28-1 ¶¶3-4, 9, 11; Dkt.46-1 ¶5.

The State Defendants dispute the characterization of these interventions as "medically necessary" because multiple systematic reviews of the medical evidence have found that the alleged benefits of "hormone therapy" to be unproven and speculative and that the evidence supporting such interventions is at most low quality. *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195.

29

41.    Plaintiff Isis Benjamin, a transgender woman who entered GDC custody in March 2025, was denied evaluations to resume the hormone therapy she was previously prescribed by GDC healthcare providers and has relied on for twenty years—almost half her life. Benjamin Decl. (Doc. 11-3) ¶¶ 17–24.

**Response:** The State Defendants do not dispute that implementing SB185 means that GDC could not provide Benjamin's desired interventions, including cross-sex hormones, unless Benjamin qualified under one of the four statutory exceptions discussed above in the State Defendants' response to Plaintiffs' SUMF ¶22. The State Defendants do not dispute that Benjamin does not qualify for an exception.

42.    Plaintiff Naeomi Madison, who was seeking to start treatment after being prescribed hormone therapy during a previous GDC incarceration, was denied access to hormone therapy evaluations. Madison Decl. (Doc. 11-5) ¶¶ 7–17.

**Response:** The State Defendants do not dispute that implementing SB185 means that GDC could not provide Madison's desired interventions, including cross-sex hormones, unless Madison qualified under one of the four statutory exceptions discussed above in the State Defendants' response to Plaintiffs' SUMF ¶22. The State Defendants do not dispute that Madison does not qualify for an exception. ██

██████████████████████████████████████████████████████

████████████████████████████████████████████

43.    Defendants' decision to terminate access to hormone therapy has put Plaintiffs and Class Members at risk of worsening gender dysphoria symptoms, including depression, anxiety, suicide ideation, physical injury and/or death from self-harm, suicide and castration attempts. Haw Decl. (Doc. 11-2) ¶¶ 42–43, 49–51, 56–57, 61–62; Ettner Decl. (Doc. 11-1) ¶¶ 124–162; Horton Decl. (Doc. 11-4) ¶¶ 6–9, 13–28; Doc. 25 at 24.

**Response:** The State Defendants do not dispute that Plaintiffs' retained experts offered these opinions, relying in large part on WPATH's SOC and the Endocrine Society Guidelines. *See* Dkt.11-1 ¶¶130, 144, 152, 155 (citing WPATH and the Endocrine Society); Dkt.11-2 ¶¶ 32, 42-43, 49-51, 56-57, 61-62.

The State Defendants respond that the Cass Review determined that, although WPATH "has been highly influential in directing international practice," its "guidelines were found … to lack developmental rigour." Defs. SUMF ¶61; Dkt.72-3 at 28. The Cass Review also noted that WPATH's SOCv8 relied on several studies that the Baker Systematic Review had "already deemed as low quality." Defs. SUMF ¶62; Dkt.72-3 at 131. And the Cass Review concluded that "[WPATH's SOCv8] overstat[ed] the strength of the evidence in making [its] recommendations." Defs. SUMF ¶63; Dkt.72-3 at 132.

The State Defendants further respond that WPATH was a cosponsoring association for the Endocrine Society Guidelines, which reproduce two tables taken

from WPATH's SOCv7 purporting to define the "criteria" for administering cross-sex hormones to persons, both adults and minors, who are diagnosed with gender dysphoria. *See* Defs. SUMF ¶74; Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. Clinical Endocrinology & Metabolism 102(11) at 3869, 3878 (2017). The Cass Review also concluded that WPATH's SOC and the Endocrine Society Guidelines are "closely interlinked, with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society" Guidelines. Dkt.72-3 at 130.

The State Defendants further respond that multiple systematic reviews of the medical evidence have found that the alleged benefits of "hormone therapy" are unproven and speculative and that the evidence supporting such interventions is low-quality. *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195. The Baker Review specifically addressed claims that cross-sex hormones reduce anxiety and depression and found the quality of evidence in support of such claims to be "low due to concerns about study designs, small sample sizes, and confounding." Defs. SUMF ¶¶49-50; Dkt.72-2 at 8. Both the Baker Review and the Cass Review also found no reliable evidence showing that cross-sex hormonal interventions reduce the risk of suicide. Defs. SUMF ¶55; Dkt.72-2 at 12 (Baker concluding that "[i]t was impossible to draw conclusions about the effect of

32

hormone therapy on death by suicide"); Defs. SUMF ¶66; Dkt.72-3 at 195 (Cass concluding there "is no evidence that gender-affirmative treatments reduce" suicide).

The State Defendants further respond that "GDC takes seriously the mental health of all offenders, including Plaintiffs, and will ensure access to appropriate mental health services for all offenders in GDC custody." Dkt.25-2 ¶16. To that end, "each of the named Plaintiffs" has "access to mental health resources to address any distress that may result from the implementation of SB 185." Dkt.25-2 ¶7. "The full range of mental health services at a facility," including "counseling, support from a psychologist, support from a psychiatrist, psychotropic medication as appropriate, … specialized housing units and programs," "[c]risis stabilization and increased counseling for suicide prevention" is "available to offenders with Gender Dysphoria as clinically appropriate." *Id.* ¶¶7-8; *see id.* at 9 (GDC SOP 508.40(IV)(E)(3)).

Along the same lines, "tapered patients who evidenced clinical need for mental health intervention after beginning the process" were referred to mental health staff and the majority of tapering patients received counseling prior to starting the process. *Id.* ¶9. And "[a]ll tapered patients who were receiving mental health treatment prior to tapering continued to receive counseling and pharmacological treatment as appropriate" and the referral process "ensures that all offenders who are

33

not currently receiving mental health treatment have access to mental health evaluation if the need develops." *Id.* ¶10; *see id.* at 12-24 (GDC SOP 508.15).

Finally, GDC has "policies and procedures to address any concerns of risk of self-harm in the offender population." *Id.* ¶11. These policies and procedures require immediate referral to mental health staff upon a determination "that an offender may be suicidal or self-injurious" and provide for escalating interventions depending on an offender's assessed suicide risk. *Id.* ¶¶12-14.

The State Defendants further respond that these opinions proffered by Plaintiffs' experts are extremely similar to the opinions proffered by the plaintiffs' experts in *Eknes-Tucker*. *See* Dkt.72-4 ¶38 ("The denial of medically indicated care to transgender people not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality."), ¶69 (claiming that withdrawal of cross-sex hormones will lead to "suicide and self-harm attempts, depression, and deterioration of functioning").

44.    Plaintiffs Horton, Wilson, and Doe and Class Members whose hormone therapy was tapered and/or terminated by Defendants due to SB185, have been, and will continue to be, at risk of hormone withdrawal symptoms such as high blood pressure, muscle wasting, neurological complications, hormonal disequilibrium, metabolic dysregulation, vasomotor instability, thermoregulatory dysregulation,

34

cognitive slowing, insomnia, cardiovascular disease, and neuroendocrine and musculoskeletal effects, among others. Ettner Decl. (Doc. 11-1) ¶¶ 151–162; Haw Decl. (Doc. 11-2) ¶¶ 46–49, 61.

**Response:** The State Defendants do not dispute that Plaintiffs' retained experts offered these opinions, relying in part on WPATH's SOC and the Endocrine Society Guidelines. *See, e.g.*, Dkt.11-1 ¶¶152-55 (citing WPATH and the Endocrine Society).

The State Defendants respond that the Cass Review determined that, although WPATH "has been highly influential in directing international practice," its "guidelines were found … to lack developmental rigour." Defs. SUMF ¶61; Dkt.72-3 at 28. The Cass Review also noted that WPATH's SOCv8 relied on several studies that the Baker Systematic Review had "already deemed as low quality." Defs. SUMF ¶62; Dkt.72-3 at 131. And the Cass Review concluded that "[WPATH's SOCv8] overstat[ed] the strength of the evidence in making [its] recommendations." Defs. SUMF ¶63; Dkt.72-3 at 132.

The State Defendants further respond that WPATH was a cosponsoring association for the Endocrine Society Guidelines, which reproduce two tables taken from WPATH's SOCv7 purporting to define the "criteria" for administering cross-sex hormones to persons, both adults and minors, who are diagnosed with gender dysphoria. *See* Defs. SUMF ¶74; Wylie C. Hembree et al., *Endocrine Treatment of*

35

*Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. Clinical Endocrinology & Metabolism 102(11) at 3869, 3878 (2017). The Cass Review also concluded that WPATH's SOC and the Endocrine Society Guidelines are "closely interlinked, with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society" Guidelines. Dkt.72-3 at 130.

The State Defendants further respond that multiple systematic reviews of the medical evidence have found that the alleged benefits of "hormone therapy" are unproven and speculative and that the evidence supporting such interventions is low-quality. *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195.

As discussed above in their response to Plaintiffs' SUMF ¶43, the State Defendants take all inmates' health very seriously—including Plaintiffs'.

███████████████████████████████████

███████████████████████████████████

45.     Because of Defendants' enforcement of SB185, Plaintiffs and Class Members were experiencing symptoms such as anxiety, depression, suicide ideation, or hormone withdrawal, or stood a risk of the same, prior to the entry of the district court's injunction. Benjamin Decl. (Doc. 11-3) ¶¶ 24–27; Horton Decl. (Doc. 11-4) ¶¶ 6–9, 13–28; Madison Decl. (Doc. 11-5) ¶ 18; Wilson Decl. (Doc. 11-6) ¶¶ 6–11, 13–14, 16; Doe Decl. (Doc. 11-7) ¶¶ 6–15.

**Response:** The State Defendants respond that "GDC takes seriously the mental health of all offenders, including Plaintiffs, and will ensure access to appropriate mental health services for all offenders in GDC custody." Dkt.25-2 ¶16. To that end, "each of the named Plaintiffs" has "access to mental health resources to address any distress that may result from the implementation of SB 185." Dkt.25-2 ¶7. "The full range of mental health services at a facility," including "counseling, support from a psychologist, support from a psychiatrist, psychotropic medication as appropriate, … specialized housing units and programs," "[c]risis stabilization and increased counseling for suicide prevention" is "available to offenders with Gender Dysphoria as clinically appropriate." *Id.* ¶¶7-8; *see* GDC SOP 508.40(IV)(E)(3).

Along the same lines, "tapered patients who evidenced clinical need for mental health intervention after beginning the process" were referred to mental health staff and the majority of tapering patients received counseling prior to starting the process. Dkt.25-2 ¶9. And "[a]ll tapered patients who were receiving mental health treatment prior to tapering continued to receive counseling and pharmacological treatment as appropriate" and the referral process "ensures that all offenders who are not currently receiving mental health treatment have access to mental health evaluation if the need develops." *Id.* ¶10; *see id.* at 12-24 (GDC SOP 508.15).

Finally, GDC has "policies and procedures to address any concerns of risk of self-harm in the offender population." *Id.* ¶11. These policies and procedures require immediate referral to mental health staff upon a determination "that an offender may be suicidal or self-injurious" and provide for escalating interventions depending on an offender's assessed suicide risk. *Id.* ¶¶12-14.

The State Defendants further respond that multiple systematic reviews of the medical evidence have found that the alleged benefits of "hormone therapy" are unproven and speculative and that the evidence supporting such interventions is low-quality. *See* Defs. SUMF ¶¶39-66; Dkt.72-2 at 2-3, 8, 12-14; Dkt.72-3 at 28, 131-32, 182, 184-85, 195. The Baker Review specifically addressed claims that cross-sex hormones reduce anxiety and depression and found the quality of evidence in

support of such claims to be "low due to concerns about study designs, small sample sizes, and confounding." Defs. SUMF ¶¶49-50; Dkt.72-2 at 8. Both the Baker Review and the Cass Review also found no reliable evidence showing that cross-sex hormonal interventions reduce the risk of suicide. Defs. SUMF ¶55; Dkt.72-2 at 12 (Baker concluding that "[i]t was impossible to draw conclusions about the effect of hormone therapy on death by suicide"); Defs. SUMF ¶66; Dkt.72-3 at 195 (Cass concluding there "is no evidence that gender-affirmative treatments reduce" suicide).

The State Defendants further respond that Plaintiffs' claimed harms are extremely similar to those alleged by the plaintiffs and their experts in *Eknes-Tucker*. *See* Dkt.72-4 ¶¶38, 69.

46.    Plaintiffs and Class Members impacted by Defendants' enforcement of SB185 do not have access to specialized counseling related to gender dysphoria; only the ordinary "range of mental health services at a facility." Haynes Owen Decl. (Doc. 25-2) ¶ 7.

**Response:** The State Defendants' note that the paragraph from Dr. Owen's declaration that Plaintiffs partially quote states in full that: "[a]ll GDC offenders, including each of the named Plaintiffs, have access to mental health resources to address any distress that may result from the implementation of SB 185. *The full range of mental health services at a facility will be available to offenders with*

39

*Gender Dysphoria as clinically appropriate.*" Dkt.25-2 ¶7 (emphasis added); *see id.* at 9 (GDC SOP 508.40(IV)(E)(3)). The next full paragraph states that the "full range of mental health services" includes "counseling, support from a psychologist, support from a psychiatrist, psychotropic medication as appropriate, … specialized housing units and programs," "[c]risis stabilization and increased counseling for suicide prevention." *Id.* ¶8.

The State Defendants further emphasize the final paragraph of Dr. Owen's declaration, which states that "GDC takes seriously the mental health of all offenders, including Plaintiffs, and will ensure access to appropriate mental health services for all offenders in GDC custody." *Id.* ¶16.

Dated: November 17, 2025

Christopher M. Carr
  *Attorney General*
  Georgia Bar No. 112505
Stephen J. Petrany
  *Solicitor General*
  Georgia Bar No. 718981
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
404-458-3408
spetrany@law.ga.gov

*Attorneys for Defendants Tyrone Oliver, Randy Sauls, and Dr. Marlah Mardis*

Respectfully submitted,

*/s/ Jeffrey M. Harris*
Jeffrey M. Harris*
Rachael C.T. Wyrick*
Julius Kairey*
Zachary P. Grouev*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
rachael@consovoymccarthy.com
julius@consovoymccarthy.com
zach@consovoymccarthy.com

*\*pro hac vice*

*Special Assistant Attorneys General and Attorneys for Defendants Tyrone Oliver, Randy Sauls, and Dr. Marlah Mardis*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Local Rule 56.1 statement conforms to the requirements of L.R. 5.1C and 56, and this Court's subsequent orders. The statement is prepared in 14-point Times New Roman font.

*/s/ Jeffrey M. Harris*

## CERTIFICATE OF SERVICE

I certify that on November 17, 2025, I electronically filed the foregoing with the Clerk of the Court using the Court's ECF system, which will automatically send email notification to all counsel of record.

*/s/ Jeffrey M. Harris*