**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| ISIS BENJAMIN; FANTASIA HORTON; NAEOMI MADISON; BRYNN WILSON; and JOHN DOE;<br><br>on behalf of themselves and all persons similarly situated,<br><br>    Plaintiffs,<br><br>       v.<br><br>COMMISSIONER TYRONE OLIVER, in his official capacity; ASSISTANT COMMISSIONER RANDY SAULS, in his official capacity; STATEWIDE MEDICAL DIRECTOR DR. MARLAH MARDIS, in her official capacity; and CENTURION OF GEORGIA, LLC,<br><br>    Defendants. | Civ. Case No. 1:25-cv-04470-VMC<br><br>**CLASS ACTION** |

**PLAINTIFFS' REDACTED RESPONSE TO STATE DEFENDANTS'
LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

## I. Plaintiffs

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

**Plaintiffs' Response:** Undisputed.

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

**Plaintiffs' Response:** Undisputed, except for purposes of disputing, here and elsewhere in Plaintiffs' Response, Defendants' use of the term "cross-sex hormones," which is not a medically recognized term. Rather, under well-established, medically accepted standards, the provision of hormones to medically treat gender dysphoria in adults—a serious medical need—based on individualized medical necessity, is referred to as hormone therapy. Ettner Decl. (Doc. 11-1) ¶¶ 65–94; Haw Decl. (Doc. 11-2) ¶¶ 14, 19, 21–30; Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8). Defendants fail to proffer any evidence—expert or otherwise—to support medical acceptance of their term "cross-sex hormones."

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████

**Plaintiffs' Response:** Undisputed.

████████████████████████████████████████

████████████████

**Plaintiffs' Response:** Disputed. Plaintiffs acknowledge that Dr. Gerald Wynne's sealed declaration contains this statement.

However, Plaintiffs dispute that Plaintiff Wilson did not experience additional physical and psychological harms from tapering. Specifically, Plaintiff Wilson has reported experiencing irritation, trouble sleeping, and difficulty concentrating due to tapering under SB185. Wilson Decl. (Doc 11-6) ¶ 14. He also faces risks of additional psychological and physiological harm from tapering, including mood swings, suicidal thoughts, agitation, panic attacks, and anxiety, as well as high blood pressure, muscle wasting, neurological complications, hormonal disequilibrium, metabolic dysregulation, vasomotor instability, thermoregulatory dysregulation, cognitive slowing, insomnia, cardiovascular disease, and neuroendocrine and musculoskeletal effects, among others. *Id.* ¶¶ 6, 13, 16; Ettner Decl. (Doc. 11-1) ¶¶ 151–162; Haw Decl. (Doc. 11-2) ¶¶ 46–49, 61; Doc. 11-20 (SB 185 Implementation Plan) at 2, 10–16; Doc. 11-10, SOP 507.04.68 (§ IV.A.6) (acknowledging that gender dysphoria patients have "serious medical needs which may not be ignored"); Doc. 11-11, SOP 220.09 (§ IV.K.8) (authorizing hormone therapy in cases where there is "a documented medical need").

████████████████████████

3

███████████████████

**Plaintiffs' Response:** Disputed. Plaintiffs acknowledge that Dr. Gerald Wynne's sealed declaration contains this statement. However, this statement is not material because there is no evidence that ████████████████████████ is a substitute for medically necessary hormone therapy, or that it will treat Plaintiff Wilson's gender dysphoria. Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.A.6, IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8).

████████████████████████████

████████████████████████████

█████████████

**Plaintiffs' Response:** Undisputed. However, Plaintiff Horton objects to State Defendants' use of Plaintiff Horton's legal name Sylvester—here and elsewhere. Plaintiff Horton uses, and should be referred to as, Fantasia. Doc. 11-4 (Horton Decl.) at 2 n.1. Plaintiffs further respond that the length of Plaintiff Horton's sentence is immaterial.

████████████████████████████

████████████████████████████

███████████████

**Plaintiffs' Response:** Undisputed. Record evidence further shows that Plaintiff Horton was prescribed hormone therapy because GDC healthcare providers

had determined it was medically necessary treatment for her gender dysphoria. Doc. 11-4 (Horton Decl.) ¶ 7; Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C.3; IV.D); Doc. 11-11, SOP 220.09 (§ IV.K.8).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

**Plaintiffs' Response:** Undisputed.

9. ██████████████████████████████████████████

██████████████████████████

**Plaintiffs' Response:** Disputed. Plaintiffs acknowledge that Dr. Gerald Wynne's declaration contains this statement. However, Plaintiffs dispute that Plaintiff Horton has not experienced any physical health or psychological side effects associated with tapering, as she has reported experiencing irritation, trouble sleeping, and difficulty concentrating due to tapering under SB185. Horton Decl. (Doc 11-4) ¶¶ 6-9, 13-27. She also faces risks of additional psychological and physiological harm from tapering, including panic attacks, anxiety, depression, disassociation episodes, and suicidal ideation, as well as high blood pressure, muscle wasting, neurological complications, hormonal disequilibrium, metabolic dysregulation, vasomotor instability, thermoregulatory

dysregulation, cognitive slowing, insomnia, cardiovascular disease, and neuroendocrine and musculoskeletal effects, among others. *Id.* ¶¶ 6, 14, 17, 23–26; Ettner Decl. (Doc. 11-1) ¶¶ 151–162; Haw Decl. (Doc. 11-2) ¶¶ 46–49, 61; Doc. 11-20, SB 185 Implementation Plan at 2, 10–16; Doc. 11-10, SOP 507.04.68 (§ IV.A.6); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8).

████████████████████████████████████████████████

████████████████████████████

**Plaintiffs' Response:** Undisputed.

11. ████████████████████████████████████████████

████████████████████████████████████████████

**Plaintiffs' Response:** Plaintiffs admit this statement, except to refute Defendants' use of Plaintiff Doe's legal name, ███████████—here and elsewhere—as Plaintiff Doe no longer goes by █████ and instead uses the name ██████ Doe Decl. (Doc. 11-7) at 1 n.1.

████████████████████████████████████████████████

████████████████████████████████████████

**Plaintiffs' Response:** Undisputed. Plaintiffs further respond that Plaintiff ███, known as Plaintiff John Doe, was prescribed hormone therapy because GDC healthcare providers determined it was medically necessary treatment for his gender dysphoria. Doe Decl. (Doc. 11-7) ¶¶ 7-8; Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-

10, SOP 507.04.68 (§§ IV.C.3; IV.D); Doc. 11-11, SOP 220.09 (§ IV.K.8).

███████████████████████████████████████████

████████████

**Response:** Undisputed.

███████████████████████████████████████████

█████████████████████████

**Plaintiffs' Response:** Disputed. Plaintiffs acknowledge that Dr. Gerald Wynne's sealed declaration contains this statement.

However, Plaintiffs dispute that Plaintiff ████ did not, and still does not, face risks of additional psychological and physiological harm from tapering, including suicidal thoughts, depression, anxiety, as well as high blood pressure, muscle wasting, neurological complications, hormonal disequilibrium, metabolic dysregulation, vasomotor instability, thermoregulatory dysregulation, cognitive slowing, insomnia, cardiovascular disease, and neuroendocrine and musculoskeletal effects, among others. has also reported experiencing irritation, trouble sleeping, and difficulty concentrating due to tapering under SB185. Doe Decl. (Doc 11-7) ¶¶ 10-15; Ettner Decl. (Doc. 11-1) ¶¶ 151–162; Haw Decl. (Doc. 11-2) ¶¶ 46–49, 61; Doc. 11-20, SB 185 Implementation Plan at 2, 10–16; Doc. 11-10, SOP 507.04.68 (§ IV.A.6); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8).

███████████████████████████████████████████

**Plaintiffs' Response:** Undisputed.

████████████████████████████████████████████████

████████████████████████████████████████

**Plaintiffs' Response**: Plaintiffs do not dispute this statement, except for purposes of refuting Defendants' reference to Plaintiff Isis Benajmin as Yohansan Jovan Stewart, which is Plaintiff Benjamin's maiden name, used in GDC's system, that she does not use. Plaintiff Benjamin also does not use Yohansan Jovan Benjamin, Plaintiff Benjamin's legal name, and instead only goes by Isis Benjamin. Doc. 11-1 (Benjamin Decl.) at 3 n.1.

Plaintiffs further respond that Plaintiff Benjamin was previously incarcerated in GDC for approximately sixteen months in 2020 and 2021. Doc. 11-3 (Benjamin Decl.) ¶ 4.

████████████████████████████████████████████

**Plaintiffs' Response:** Disputed. Plaintiffs admit that Plaintiff Benjamin has not received hormone therapy, or an evaluation for hormone therapy, during her most recent incarceration with GDC as a result of Defendants' enforcement of SB185, a blanket ban on such care, despite its known harms. Doc. 11-20, SB 185 Implementation Plan at 5, 10–16; Wynne Decl. (Doc. 28-1) ¶¶ 4, 9, 11; Doc. 11-21, July 21 Notice Letter at 2–8. Plaintiffs state further that Plaintiff Benjamin has suffered mental and physical harm, including depression, lack of appetite, mood

swings, and suicidal ideation/suicidality as a result of Defendants' ban.  Benjamin Decl. (Doc. 11-3) ¶¶ 25-27.

During Plaintiff Benjamin's previous incarceration with GDC in 2020 and 2021, however, she received hormone therapy after GDC healthcare providers determined it was medically necessary treatment for her gender dysphoria. Benjamin Decl. (Doc. 11-3) ¶¶ 4, 12-13. Plaintiff Benjamin has suffered mental and physical harm, including recurring depression, lack of appetite, mood swings, and suicidal ideation/suicidality without this medically necessary care, due to Defendants' enforcement of SB185.  Benjamin Decl. (Doc. 11-3) ¶¶ 25-27.

██████████████████████████████████████

██████████████████████████████████████

████████████

**Plaintiffs' Response:** Disputed. Plaintiffs admit that Plaintiff Benjamin had been receiving hormone therapy before entering GDC custody.

Plaintiffs dispute the remainder of the statement because during Plaintiff Benjamin's previous incarceration with GDC in 2020 and 2021, she received hormone therapy after GDC healthcare providers determined it was medically necessary treatment for her gender dysphoria. Benjamin Decl. (Doc. 11-3) ¶¶ 4, 12-13. Further, the only reason Plaintiff Benjamin has not received hormone therapy, or an evaluation for hormone therapy, during her most recent incarceration in GDC is

due to Defendants' decision to implement SB185, a blanket ban on such care, despite its known harms. Benjamin Decl. (Doc. 11-3) ¶¶ 18-24.

███████████████████████████████████████████████████

█████████████████████████████████████████

**Plaintiffs' Response:** Plaintiffs admit this statement, except to refute Defendants' reference to Plaintiff Madison as Terrell Montiel Madison, Plaintiff Madison's legal name that Plaintiff Madison no longer uses. Instead, Plaintiff Madison uses, and should be referred to as, Naeomi Kaiór Madison. Madison Decl. (Doc. 11-5) at 3 n.1.

███████████████████████████████████████████████████

███████████████████████████████

**Plaintiffs' Response:** Disputed. Plaintiffs admit that Plaintiff Madison did not receive hormone therapy during previous periods of incarcerations.

However, Plaintiffs dispute this statement to the extent it implies that Plaintiff Madison has never been prescribed hormone therapy, or that hormone therapy is not medically necessary treatment for her gender dysphoria. Plaintiff Madison was evaluated for, and/or prescribed, hormone therapy that GDC healthcare professionals had determined was medically necessary treatment for her gender dysphoria during a previous period of incarceration with GDC in 2024, but she was released before the prison could initiate treatment. Madison Decl. (Doc. 11-5) ¶¶ 7-10.

████████████████████████████████████████████

████████████████████████████████████████████

███████

**Plaintiffs' Response:** Disputed. Plaintiffs admit that Plaintiff Madison has not been prescribed or otherwise approved to receive hormone therapy to treat her gender dysphoria due to Defendants' enforcement of SB185.

However, Plaintiffs dispute the remainder of this statement because Plaintiff Madison has been denied such treatment because she has been denied an evaluation for hormone therapy due to SB185, and that because of Defendants' denial of an evaluation for hormone therapy, Plaintiff Madison has suffered spontaneous erections, depression, anxiety, panic attacks, and mood swings. Madison Decl. (Doc. 11-5) ¶¶ 14, 18.

## II. Defendants' Treating Physicians[1]

22. Defendants provided sworn declarations from Dr. Kathryn Haynes Owen,

---

[1] Plaintiffs dispute that either Dr. Owen or Dr. Wynne is any Plaintiff's treating physician or treating clinician, as Defendants have not cited any evidence in the record to support that Dr. Owen or Dr. Wynne individually evaluated Plaintiffs or treated Plaintiffs' diagnoses of gender dysphoria based on independent medical judgment. Rather, any medical or mental health services that Defendants have offered Plaintiffs or the Class Members via Dr. Wynne or Dr. Owens were provided solely to address symptoms arising from Defendants' tapering plan due to Defendants' enforcement of SB185. Doc. 11-20, SB185 Implementation Plan at 2; Wynne Decl. (Doc. 28-1) ¶¶ 4–11; Owen Decl. (Doc. 25-2) ¶¶ 7–15; Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17.

GDC's Statewide Mental Health Director, and Dr. Gerald E. Wynne, Statewide Medical Director for Centurion of Georgia, LLC, which discussed the medical care available to each of the Plaintiffs. *See* Wynne Decl. (Doc. 28-1); Doc. 46-1; Owen Decl. (Doc. 25-2).

**Plaintiffs' Response:** Undisputed.

23. **Dr. Kathryn Haynes Owen.** Dr. Owen explained that "GDC takes seriously the mental health of all offenders, including Plaintiffs, and will ensure access to appropriate mental health services for all offenders in GDC custody." Owen Decl. (Doc. 25-2) ¶ 16.

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs acknowledge that Dr. Owen's declaration contains this statement. Plaintiffs, however, dispute that "GDC takes seriously the mental health of all offenders, including Plaintiffs" because Defendants began terminating hormone therapy treatment, including evaluations, for Plaintiffs and Class Members due their enforcement of SB185, despite: (1) Defendants' knowledge that GDC healthcare professionals had determined hormone therapy to be medically necessary treatment for gender dysphoria; (2) Defendants' knowledge of the physical and psychological consequences of the withholding or termination of hormone therapy to treatment gender dysphoria for Plaintiffs and Class Members; (3) and Defendants' knowledge that enforcing a blanket ban would put Plaintiffs and Class Members at a foreseeable

substantial risk of physical and psychological harm. *See, e.g.*, Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17; Doc. 11-11, SOP 220.09 (§ IV.K.8); Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C-D); Doc. 11-20, SB185 Implementation Plan at 10–16; Doc. 11-21, July 21 Notice Letter at 7–8.

Moreover, Defendants have not cited any evidence to show that Plaintiffs and Class Members are receiving "appropriate mental health services" for their serious medical need of gender dysphoria; that "the mental health services available for all offenders is GDC custody" is treatment for gender dysphoria; or that Dr. Owen or Dr. Wynne have prescribed it as medically necessary treatment for gender dysphoria based on independent medical judgment for Plaintiffs and Class Members. *See generally* Wynne Decl. (Doc. 28-1); Owen Decl. (Doc. 25-2). Plaintiffs further dispute—here and elsewhere—the materiality of this statement, as mental health counseling and services are not a substitute for hormone therapy for gender dysphoria patients like Plaintiffs and Class Members, including for patients who are experiencing physical and psychological consequences from the termination of hormone therapy to treat their gender dysphoria. Ettner Decl. (Doc. 11-1) ¶¶ 95–97, 120–22, 145–50, 169; Haw Decl. (Doc. 11-2) ¶¶ 33, 43–45, 63; Doc. 11-9, SOP 508.40 (§ IV.D). Furthermore, Dr. Owen never opined or otherwise stated that

hormone therapy is not medically necessary treatment for Plaintiffs' and Class Members' gender dysphoria. *See generally* Wynne Decl. (Doc. 28-1); Owen Decl. (Doc. 25-2).

24. "All GDC offenders, including each of the named Plaintiffs, have access to mental health resources to address any distress that may result from the implementation of SB 185" and the "full range of mental health services at a facility will be available to offenders with Gender Dysphoria as clinically appropriate." Owen Decl. (Doc. 25-2) ¶ 7; *see also id.* at 9 (SOP 508.40 (§ IV.E.3)).

**Plaintiffs' Response:** Disputed and immaterial**.** Plaintiffs acknowledge that Dr. Owen's declaration contains this statement. But Plaintiffs dispute its accuracy and materiality for the same reasons set forth in Paragraph 23, *supra*, and incorporate their response to Paragraph 23 herein.

25. These services "may include counseling, support from a psychologist, support from a psychiatrist, psychotropic medication as appropriate, and specialized housing units and programs." Dkt.25-2 ¶8. Inmates also have access to "[c]risis stabilization and increased counseling for suicide prevention" as needed. *Id.*

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs acknowledge that Dr. Owen's declaration contains this statement. But Plaintiffs dispute its accuracy and materiality for the same reasons set forth in Paragraph 23, *supra*, and incorporate their response to Paragraph 23 herein.

26. Dr. Owen explained that "referrals were made to mental health staff for tapered patients who evidenced clinical need for mental health intervention after beginning the process" and that "[t]he majority of tapering patients … received counseling prior to meeting with a physician to start the tapering process." *Id.* ¶ 9.

**Plaintiffs' Response:** Disputed and immaterial.  Plaintiffs acknowledge that Dr. Owen's declaration contains this statement. But Plaintiffs dispute its accuracy and materiality for the same reasons set forth in Paragraph 23, *supra*, and incorporate their response to Paragraph 23 herein.

27. "All tapered patients who were receiving mental health treatment prior to tapering continued to receive counseling and pharmacological treatment as appropriate," and GDC's "referral process for mental health treatment (including self-referrals) ensures that all offenders who [were then] not currently receiving mental health treatment have access to mental health evaluation if the need develops." *Id.* ¶10; *see also* Dkt.25-2 at 12 (GDC SOP 508.15).

**Plaintiffs' Response**: Disputed and immaterial.  Plaintiffs acknowledge that Dr. Owen's declaration contains this statement. But Plaintiffs dispute its accuracy and materiality for the same reasons set forth in Paragraph 23, *supra*, and incorporate their response to Paragraph 23 herein.

Plaintiffs further dispute that any patients who were receiving mental health treatment for their gender dysphoria prior to SB185 continue to receive counseling

and pharmacological treatment to treat gender dysphoria. Any counseling and pharmacological treatment that Defendants provide to Plaintiffs and Class Members is due to Defendants' enforcement of SB185, which terminated hormone therapy, including evaluations for the same, as treatment for gender dysphoria for Plaintiffs and Class Members. Doc. 11-20, SB185 Implementation Plan at 2, 10–13; Wynne Decl. (Doc. 28-1) ¶¶ 4–11; Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17.

28. "GDC has policies and procedures to address any concerns of risk of self-harm in the offender population," including a policy to immediately refer inmates to mental health staff if determined to potentially be suicidal or self-injurious. *Id.* ¶11; *see also* Dkt.25-2 at 26 (GDC SOP 508.29).

**Plaintiffs' Response**: Disputed and immaterial. Plaintiffs acknowledge that Dr. Owen's declaration contains this statement. But Plaintiffs dispute its accuracy and materiality for the same reasons set forth in Paragraph 23, *supra*, and incorporate their herein.

Plaintiffs, however, dispute that GDC has "policies and procedures to address any concerns of risk of self-harm in the offender population" that relate to medically necessary treatment for gender dysphoria, or that Defendants have treated Plaintiffs' or Class Members' gender dysphoria based on independent medical judgment

pursuant to these policies as medically required. *See generally* Owen Decl. (Doc. 25-2) ¶¶ 11–15; Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17;  Haw Decl. (Doc. 11-2) ¶¶ 53–59; Ettner Decl. (Doc. 11-1) ¶¶ 54–59, 163–66; Doc. 11-21, July 21 Notice Letter at 4–8; Doc. 11-8, NCCHC Position Stmt. at 2–7. Defendants have revoked their previous gender dysphoria policies and procedures—which recognized gender dysphoria as a "serious medical need," and that hormone therapy can be medically necessary—due to their enforcement of SB185. Doc. 11-10, SOP 507.04.68 (§ IV.A.6); Doc. 11-17, GDC May 12 Email; Doc. 11-19, GDC May 29 Letter.

Plaintiffs state further that Owen's testimony establishes that Defendants knew that enforcing a blanket hormone therapy ban would put Plaintiffs and Class Members at a substantial risk of physical and psychological symptoms from Defendants' enforcement of SB185, but they did so anyways and Plaintiffs and Class Members continue to face harm as a result. Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17; Doc. 11-11, SOP 220.09 (§ IV.K.8); Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C-D); Doc. 11-20, SB185 Implementation Plan at 10–16; Doc. 11-21, July 21 Notice Letter at 7–8.

29. "If an offender's suicide risk is assessed as mild, the offender will receive instruction on 'coping strategies, seeking social support, and problem resolution to help the offender manage current stressors and emotional distress,' an 'appropriate interval for mental health follow-up will be established[,] and the offender will be informed of the best way to access mental health staff if symptoms worsen." Owen Decl. (Doc. 25-2) ¶13; *see also id.* at 29 (SOP 508.29 (§ IV.C.l.a)).

**Plaintiffs' Response**: Disputed and immaterial.  Plaintiffs acknowledge that Dr. Owen's declaration contains this statement. Plaintiffs, however, dispute that any mental health or medical care that Defendants offers or provides to Plaintiffs or Class Members based on their enforcement of SB185 constitutes treatment for their gender dysphoria that GDC healthcare providers determined was necessary based on their independent medical judgment of Plaintiffs' and Class Members' medical needs. *See generally* Wynne Decl. (Doc. 28-1); Owen Decl. (Doc. 25-2) ¶ 13. Indeed, a consensus on the medical necessity of hormone therapy for adults— including the Plaintiffs and Class Members who were prescribed it within GDC— continues to exist. Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8); Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17.

30. "If warranted, an offender will be placed on Suicide Precautions, which

includes increased frequency and/or duration of counseling contact and possible pharmacological intervention if not currently on psychotropic medication." Owen Decl. (Doc. 25-2) ¶ 14; *see also id.* at 29 (SOP 508.29 (§ IV.D)).

**Plaintiffs' Response:** Disputed. Plaintiffs dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 29, *supra*, which Plaintiffs incorporate here.

31. **Dr. Gerald E. Wynne.** Dr. Wynne's declaration explained that Centurion began to taper the 107 inmates who had been receiving cross-sex hormones as of June 30, 2025, in early July. Wynne Decl. (Doc. 28-1) ¶¶ 3-4.

**Plaintiffs' Response:** Undisputed.

32. As of August 14, 2025, 17 inmates had completed the tapering process; 3 were released from custody; and 88 were still undergoing tapering. *Id.* ¶ 4.

**Response:** Undisputed.

33. One additional covered inmate transferred into GDC custody between June 30 and August 14, which meant that 108 total inmates had either completed or were undergoing tapering at the time of Dr. Wynne's declaration. *Id.*

**Response:** Undisputed.

34. As of August 14, Dr. Wynne "anticipate[d] that the 88 patients [then] undergoing tapering [would] complete the tapering process by September 30, 2025." *Id.* ¶ 5.

**Response:** Undisputed.

35. Some inmates were expected to complete the process "as early as August 30." *Id.*

**Plaintiffs' Response:** Undisputed.

36. This "variance in completion dates" was "based on a patient's specific circumstances, including the treatment dosage when tapering began." *Id.*

**Plaintiffs' Response:** Disputed. Plaintiffs acknowledge that Dr. Wynne's declaration contains this statement. However, Plaintiffs dispute that Defendants' tapering is medically necessary treatment for Plaintiffs' and Class Members' gender dysphoria, but is instead based on Defendants' enforcement of SB185. Doc. 11-20, SB185 Implementation Plan at 2, 10–16; Wynne Decl. (Doc. 28-1) ¶¶ 4–11. Rather, a consensus on the medical necessity of hormone therapy for adults—including the Plaintiffs and Class Members who were prescribed it within GDC—continues to exist. Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8); Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17.

37. In short, a "patient on a lower dose of hormone medication [would be expected to] complete the process sooner than a patient receiving a higher dose." *Id.*

**Plaintiffs' Response:** Undisputed.

38. "All patients undergoing tapering are monitored by mental health and medical professionals. For medical monitoring, each patient has a meeting with the statewide medical director every four weeks. Patients may submit a request for additional medical care or evaluation if they have acute concerns during the tapering process. In addition, all patients received an initial evaluation by mental health staff prior to tapering. Based on that evaluation, mental health professionals determined how frequently follow-up evaluations should be scheduled based on patient-specific needs. All patients receive follow-up evaluations at least once every four weeks, with some receiving evaluations more frequently." *Id.* ¶ 6.

**Plaintiffs' Response**: Disputed and immaterial. Plaintiffs acknowledge that Dr. Wynne's declaration contains this statement. Plaintiffs dispute, however, that Defendants are providing the tapering detailed in Paragraph 38 to treat Plaintiffs' and Class Members' gender dysphoria based on GDC healthcare providers' independent medical judgment. Instead, this care is being provided based on the unavailability of hormone therapy to treat gender dysphoria due to Defendants' enforcement of a blanket hormone therapy ban under SB185. *See generally* Wynne Decl. (Doc. 28-1) ¶ 6; Owen Decl. (Doc. 25-2) ¶¶ 7–15; Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17.

III.    **Systemic Reviews of Cross-Sex Hormones**

21

39. The sex-change interventions at issue in this case are cross-sex hormones like estradiol, spironolactone, and testosterone. *See* Wynne Decl. (Doc. 28-1) ¶¶ 8-11; Second Wynne Decl. (Doc. 46-1) ¶ 5.

**Plaintiffs' Response:** Undisputed but immaterial. Plaintiffs admit that the hormones at issue in this case include those identified in Paragraph 39 of Defendants' Statement of Undisputed Material Facts ("SUMF"). Plaintiffs, however, dispute—here and elsewhere in Plaintiffs' Response—Defendants' use of the term "sex-change interventions," which is not a medically recognized term.  Rather, under well-established, medically accepted standards, the provision of hormones to medically treat gender dysphoria in adults—a serious medical need—based on individualized medical necessity, is referred to as hormone therapy.  Ettner Decl. (Doc. 11-1) ¶¶ 65–94; Haw Decl. (Doc. 11-2) ¶¶ 14, 19, 21–30; Doc. 11-8, NCCHC Position Stmt. at 2–5; Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8). Defendants fail to proffer any evidence—expert or otherwise—to support their use of "sex-change interventions" as a medically accepted term.

40. Plaintiff's [sic] expert Dr. Ettner asserts that the "goals" of administering these interventions to individuals with gender dysphoria are to "significantly reduce the … secondary sex characteristics of the individual's sex assigned at birth" and to "replace circulating sex hormones associated with the person's sex assigned at birth

with feminizing or masculinizing hormones." Ettner Decl. (Doc. 11-1) ¶ 67.

**Plaintiffs' Response:** Undisputed.

41. The hormonal interventions for which SB185 prohibits state funding—the administration of testosterone, estrogen, and testosterone blockers to induce physical changes to the body to more closely resemble the opposite sex—were also at issue in *United States v. Skrmetti*. *See* Wynne Decl. (Doc. 28-1) ¶¶ 8-11; Second Wynne Decl. (Doc. 46-1) ¶ 5; *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 481 (6th Cir. 2023).

**Plaintiffs' Response:** Disputed and immaterial. While Plaintiffs acknowledge SB185 and *Skrmetti* involved some of the same gender dysphoria treatments, *Skrmetti* is immaterial to this case. *Skrmetti* concerned the administration of puberty blockers and other treatment to *minors*, rather than the use of hormone therapy in *adults* with gender dysphoria, for whom a consensus on the medical necessity of hormone therapy continues to exist. *Skrmetti*, 605 U.S. at 507 (reviewing law that "does not restrict the administration of…hormones to individuals 18 and over."); *see also* Doc. 72-2, Baker Rev. at 14 (hormone therapy in adults is "essential"); Doc. 72-3, Cass Rev. at 183 (treatment is "well-established" and "transform[ative]"); Ettner Decl. (Doc. 11-1) ¶¶ 65–94, 165 (acknowledging necessity); Haw Decl. (Doc. 11-2) ¶¶ 14, 19, 21–30, 61 (same); Doc. 11-8, NCCHC Position Stmt. at 2–5 (same); Doc.

11-9, SOP 508.40 (§ IV.D) (same); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D) (same); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8) (same).

Plaintiffs further object—here and elsewhere—because this statement relies on caselaw and thus, is not fully supported by evidence of record in this case in violation of L.R. 56.1(B)(1)(a) and (b). *See U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1287–88 (11th Cir. 2001) (reversing verdict based on admission of state judicial opinion). Finally, because the statement attempts to identify and to compare the issues in *Skrmetti* and in this case, the statement is "stated as an issue" and a legal conclusion, in violation of L.R. 56.1(B)(1)(c).

42. The hormonal interventions for which SB185 prohibits state funding were also at issue in *Eknes-Tucker v. Governor of Alabama*. *See* Wynne Decl. (Doc. 28-1) ¶¶ 8-11; Second Wynne Decl. (Doc. 46-1) ¶ 5; *e.g.*, *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228 (11th Cir. 2023).

**Plaintiffs' Response:** Disputed and immaterial. While Plaintiffs acknowledge SB185 and *Eknes-Tucker* involved some of the same gender dysphoria treatments, *Eknes-Tucker* is immaterial to this case. *Eknes-Tucker* concerned the administration of puberty blockers and other treatment to *minors*, rather than the use of hormone therapy in *adults* with gender dysphoria, for whom a consensus on the medical necessity continues to exist. *Eknes-Tucker*, 80 F.4th at 1230 (reviewing law that "distinguishes minors from adults"); *see also* Doc. 72-2, Baker Rev. at 14 (hormone

therapy in adults is "essential"); Doc. 72-3, Cass Rev. at 183 (treatment is "well-established" and "transform[ative]"); Ettner Decl. (Doc. 11-1) ¶¶ 65–94, 165 (acknowledging necessity); Haw Decl. (Doc. 11-2) ¶¶ 14, 19, 21–30, 61 (same); Doc. 11-8, NCCHC Position Stmt. at 2–5 (same); Doc. 11-9, SOP 508.40 (§ IV.D) (same); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D) (same); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8) (same).

Plaintiffs also object because this statement relies on caselaw and thus is not supported by evidence of record in this case, in violation of L.R. 56.1(B)(1)(a) and (b). Finally, because the statement attempts to identify and compare the issues in *Eknes-Tucker* and in this case, the statement is "stated as an issue" and a legal conclusion, in violation of L.R. 56.1(B)(1)(c).

43. Although *Skrmetti* and *Eknes-Tucker* involved minors, the underlying goal of the hormonal interventions at issue—to "significantly reduce the … secondary sex characteristics of the individual's sex assigned at birth" and "replace circulating sex hormones associated with the person's sex assigned at birth with feminizing or masculinizing hormones," *e.g.*, Ettner Decl. (Doc. 11-1) ¶ 67—is the same in this case as it was in those cases.

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs do not dispute that this statement identifies, citing from Dr. Ettner's report, that one of the goals of hormonal interventions to treat gender dysphoria is to "significantly reduce the …

secondary sex characteristics of the individual's sex assigned at birth" and "replace circulating sex hormones associated with the person's sex assigned at birth with feminizing or masculinizing hormones." Plaintiffs further dispute the accuracy, materiality, and propriety of this statement for the same reasons set forth in Paragraphs 41 and 42, *supra*, and incorporate their responses to Paragraphs 41 and 42 herein.

44. **The Baker Systematic Review.** In 2021, Dr. Kellan E. Baker and a group of physicians conducted a systematic review of the evidence underlying cross- sex hormonal interventions. *See* Ex.A (Baker, *et al.*, *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, Journal of the Endocrine Society, 5(4) (2021), perma.cc/J7YN-LFG4).[2] Their research was partially funded by WPATH and published in the Journal of the Endocrine Society. *Id.* at 14.

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs dispute—here and elsewhere in response to statements about the Baker study and any other study cited in Defendants' statements—the admissibility and materiality of the Baker study. Defendants offer no expert to interpret the Baker study or to reliably apply it "to the facts of the case." Fed. R. Evid. 702(d). Even a "reliable, well-conducted scientific study" requires an expert to "explain the link between the study and the facts of the case." *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 644 F. Supp. 3d 1075, 1179 (S.D.

Fla. 2022*)*; *see also Chandler v. Janssen Pharma., Inc.*, 322 F. Supp. 3d 314, 326 (E.D.N.Y. 2018) ("Neither the Court nor a lay jury is capable of assessing the credibility of the two studies, synthesizing the results of the studies … or comparing the results of these studies with other studies that came to contrary conclusions"); *cf. Jones v. Am. Cynamid Co.*, 139 F.3d 890 (4th Cir. 1998) ("citing to an array of medically sophisticated academic journal articles and studies consisting primarily of charts and graphs without offering any accompanying expert testimony to interpret and explain the data" does not create issue of fact).

Plaintiffs further dispute the materiality of this statement because the Baker study does not purport to address the issue in this case: medical necessity of hormone therapy to treat gender dysphoria in adults in the prison context. Indeed, the Baker study does not dispute that hormone therapy is medically necessary for gender dysphoria in adults. *See* Doc. 72-2, Baker Rev. at 14 (hormone therapy is "an essential component of care" in adults). Even if Defendants were qualified to interpret the study (which they are not), they cannot draw conclusions that "exceed[] the boundaries of what the study set out to prove." *In re Zantac*, 644 F. Supp. 3d at 1179.

Plaintiffs also refute Defendants' use of "cross-sex hormones" in the statement because this term is not used in the Baker study and thus, is not supported by the cited evidence. *See generally* Doc. 72-2.

27

45. The Baker Systematic Review was "one of a series of systematic reviews on gender-affirming care conducted for WPATH to inform the eighth revision of the [WPATH SOC]." *Id.* at 2.

**Plaintiffs' Response:** Plaintiffs do not dispute that this statement appears in the cited material. Plaintiffs, however, dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 44, *supra*, which Plaintiffs incorporate here.

46. WPATH "provided the research question and reviewed the protocol, evidence tables, and report." *Id.* at 3.

**Plaintiffs' Response:** Plaintiffs do not dispute this statement appears in the cited material. Plaintiffs, however, dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 44, *supra*, which Plaintiffs incorporate here.

47. Plaintiffs' expert witnesses extensively relied on WPATH's SOCv8. *See, e.g.*, *infra* ¶ 78. And WPATH's SOCv8 (at S18 and S182) cited the Baker Systematic Review.

**Plaintiffs' Response:** Disputed. Plaintiffs do not dispute that Plaintiffs' expert witnesses reference the WPATH's SOCv8 and that WPATH's SOCv8 (at S18 and S182) cited the Baker Systemic Review.

However, Plaintiffs dispute this statement's characterization of the experts' reliance on the reports as "extensive[ ]" because it is stated as an issue, in violation of L.R. 56.1(B)(1)(c). Plaintiffs also dispute the statement to the extent it represents that

Plaintiffs' expert witnesses solely base their reports WPATH's SOCv8, as Plaintiffs' expert witness reports are also based on additional sources, including the experts' professional training and experience, as well as a variety of additional scientific sources. *See* Ettner Decl. (Doc. 11-1) ¶¶ 1, 6–7, 10, 18–19; Haw Decl. (Doc. 11-2) ¶¶ 1, 3–5, 9.

Plaintiffs further respond that because this statement cites Paragraph 78 of Defendants' SUMF, it is not supported by a citation to evidence of record, in violation of L.R. 56.1(B)(1)(a). Moreover, Paragraph 78 cites an expert report that was filed in another case, not *this case*, and thus is inadmissible, in violation of L.R. 56.1(B)(2)(ii). For this same reason, the cited evidence does not support Paragraph 47, in violation of L.R. 56.1(B)(2)(iii).

48. The Baker Systematic Review determined that the strength of evidence for the conclusion that "hormone therapy may improve [quality of life] among" people who identify as transgender is "low due to concerns about bias in study designs, imprecision in measurement because of small sample sizes, and confounding by factors such as gender-affirming surgery status." Ex.A at 8.

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs do not dispute the quoted material in this statement appears in the Baker Review. However, Plaintiffs dispute the materiality of this statement—here and elsewhere in response to statements about the Baker Review—because the Baker review does not conclude

or otherwise state that hormone therapy is *not* medically necessary treatment for gender dysphoria patients. Plaintiffs further dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 44, *supra*, which Plaintiffs incorporate here.

49. The Baker Systematic Review determined that the strength of the evidence for the conclusion that "hormone therapy may decrease depression among" people who identify as transgender is "low due to concerns about study designs, small sample sizes, and confounding." *Id.*

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs acknowledge the quoted language appears in the cited material. However, Plaintiffs dispute this statement because "to the extent that the research on medical and mental health outcomes of transgender individuals after forced discontinuation of hormone therapy is lacking, it is because creating such a study protocol would be deemed unethical by any Institutional Review Board due to the overt harm posed by the forced discontinuation of hormone therapy on transgender individuals, as well as the likely impossibility of securing informed consent from subjects for such a study." Haw Decl. (Doc. 11-2) ¶ 52.

Plaintiffs further dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 44, *supra*, which Plaintiffs incorporate here.

50. The Baker Systematic Review determined that the strength of the evidence

for the conclusion that "hormone therapy may decrease anxiety among" people who identify as transgender is "low due to concerns about study designs, small sample sizes, and confounding." *Id.*

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs acknowledge that the quoted statements appear in the Baker Systemic Review.

However, Plaintiffs dispute the materiality of this statement on the grounds raised in Plaintiffs' response to Paragraph 44, which Plaintiffs incorporate here.

51. The Baker Systematic Review concluded that "[u]ncontrolled confounding was a major limitation in th[e] literature," and that "[a]nother source of potential bias was recruitment of participants from specialized clinics that impose strict diagnostic criteria as a prerequisite for gender-affirming care." *Id.* at 12.

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs do not dispute that the quoted statements appear in the Baker Systemic Review.

However, Plaintiffs dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 44, *supra*, which Plaintiffs incorporate here.

52. The "dual role of clinicians and researchers as both gatekeepers and investigators may" have "force[d] … study participants to over- or understate aspects of their mental health in order to access gender-affirming care." *Id.*

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs do not dispute that the Baker Systemic Review contains the quoted language in this statement.

31

However, Plaintiffs dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 44, which Plaintiffs incorporate here.

53. Similarly, transgender-identifying patients may have felt "that they cannot opt out of research-related activities, which is a serious concern for the validity of psychological outcome measurements." *Id.*

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs acknowledge that the quoted statements appear in the Baker Systemic Review.

However, Plaintiffs dispute this statement's materiality on the grounds raised in Plaintiffs' response to Paragraph 44, which Plaintiffs incorporate here.

54. The Baker Systematic Review found that "[m]ost studies used well- known scales for measuring psychological outcomes" but that they were never "specifically validated for use in" transgender-identifying populations. *Id.*

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs acknowledge that the quoted statements appear in the Baker Systemic Review.

However, Plaintiffs further dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 44, which Plaintiffs incorporate here.

55. The Baker Systematic Review determined that it could not "draw any conclusions … about whether hormone therapy affects death by suicide among transgender people." *Id.* Thus, "[i]t was impossible to draw conclusions about the effects of hormone therapy on death by suicide." *Id.*

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs do not dispute that the quoted statements appear in the Baker Systemic Review.

However, Plaintiffs further dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 44, which Plaintiffs incorporate here.

56. In short, the Baker Systematic Review concluded that the "strength of evidence" underlying many of the claimed benefits of cross-sex hormonal interventions "is low due to methodological limitations." *Id.*; *see also id.* at 13 (Table 6, showing only low-quality evidence for purported quality of life, depression, and anxiety benefits and insufficient evidence for purported suicidality benefits).

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs do not dispute that the Baker Systemic Review contains the quoted statements.

However, Plaintiffs dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 44, which Plaintiffs incorporate here.

Finally, Plaintiffs dispute Defendants' use of "cross-sex hormones" in the statement because this term is not used in the Baker study and thus, is not supported by the cited evidence, in violation of L.R. 56.1(B)(2)(iii). *See generally* Doc. 72-2.

57. **The Cass Review.** Dr. Hilary Cass was commissioned by the English national healthcare system to conduct an Independent Review of Gender Identity Services for Children and Young People. *See* Ex.B at 16 (Cass, Independent *review of gender identity services for children and young people: Final report* (Apr. 2024),

perma.cc/9KSN-UTBE.).

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs dispute the admissibility and materiality of this statement—and all statements—concerning the Cass Review on the same grounds raised in Plaintiffs' response to Paragraph 44, *supra*, which Plaintiffs incorporate here.

Moreover, the Cass Review does not purport to address the issue in this case: medical necessity of hormone therapy to treat gender dysphoria in adults in the prison context. Indeed, the Cass Review does not dispute that hormone therapy is medically necessary for gender dysphoria in adults. Doc. 72-3, Cass Rev. at 183 (describing hormone therapy in adults as "a well-established practice that has transformed the lives of many transgender people"). Thus, even if Defendants were qualified to interpret the study (which they are not), the conclusions they draw improperly "exceed[] the boundaries of what the study set out to prove." *In re Zantac*, 644 F. Supp. 3d at 1179.

Plaintiffs further dispute the admissibility of this statement—here and elsewhere in response to Defendants' statements supported by evidence outside of the record—because this statement relies on evidence that is not a part of the current record. The Parties agreed, and this Court ordered, to limit the record to evidence *filed* as of November 3, 2025, "for purposes of the motions [for partial summary judgment] to be filed on November 10." *See* Doc. 69 ¶ 3 ("*No party will submit*

34

*additional evidence* . . . . The parties stipulate to the admissibility of all evidence *submitted to date*." (emphasis added)); Text Order of Nov. 4, 2025 (approving same). Here, Defendants filed the Cass Review, and cited an online URL to the Cass Review, for the first time when they filed their Motion for Partial Summary Judgment on November 10, 2025, after the evidentiary record in this case closed. *See* Doc. 72-3; Doc. 72 at 18-19. Before the record closed, Defendants merely referenced the Cass Review when quoting Justice Thomas's concurring opinion in *Skrmetti*, which has no precedential effect on this case. Doc. 25 at 18 (citing and quoting *Skrmetti*, 145 S. Ct. at 1845).

58. Dr. Cass's research, published in 2024, has been cited by both the Supreme Court and the Eleventh Circuit in constitutional challenges to laws regulating sex-change interventions. *See United States v. Skrmetti*, 605 U.S. 495, 524-25 (2025); *id.* at 539-40 (Thomas, J., concurring); *Eknes-Tucker*, 114 F.4th 1241, 1248, 1267–70 (11th Cir. 2024) (Lagoa, J., concurring in the denial of rehearing en banc).

59. **Plaintiffs' Response:** Disputed and immaterial. Concurrences are decidedly not decisional law. *Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (statements "contained in a concurrence" do not "constitute[] binding precedent"). Further, Plaintiffs dispute the materiality of this statement on the grounds raised in Plaintiffs' response to Paragraph 57, *supra*, which Plaintiffs incorporate here. Plaintiffs further dispute the accuracy, materiality, and propriety of this statement for the same reasons

set forth in Paragraphs 41 and 42, *supra*, and incorporate their responses to Paragraphs 41 and 42 herein. Although the Cass Review primarily focused on sex-change interventions for minors, many of the study's conclusions were also relevant to adults. Many of the studies that Dr. Cass reviewed in her survey of the literature involved adults. *E.g.*, Ex.B at 131 (citing the Baker Systematic Review, which included a significant number of adult studies); *id.* at 185 (citing a Danish national register-based study that included adults as well as minors).

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs dispute the materiality of this statement on grounds raised in Plaintiffs' response to Paragraph 57, *supra*, which Plaintiffs incorporate here.

60. The Cass Review also offered more general criticism about the evidence-base underlying WPATH's standards and the way WPATH has promulgated those standards. *Id.* at 28, 131-32.

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs dispute the materiality of this statement on the grounds raised in Plaintiffs' response to Paragraph 57, *supra*, which Plaintiffs incorporate here.

61. The Cass Review determined that, although WPATH "has been highly influential in directing international practice," its "guidelines were found by the University of York appraisal process to lack developmental rigour." *Id.* at 28.

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs acknowledge that

the cited material contains this statement. However, Plaintiffs dispute the materiality of this statement on the grounds raised in Plaintiffs' response to Paragraph 57, *supra*, which Plaintiffs incorporate here.

62. The Cass Review also endorsed the Baker Systematic Review's conclusion that "certainty" in the purported benefits of cross-sex hormones as treatment for gender dysphoria "is limited by high risk of bias in study designs, small sample sizes, and confounding with other interventions." *Id.* at 131. And it further noted that WPATH's SOCv8 relied on several studies that the Baker Systematic Review had "already deemed as low quality." *Id.*

**Plaintiffs' Response:** Disputed and immaterial**.** Plaintiffs acknowledge that the quoted statements appear in the Cass Review. However, Plaintiffs dispute this statement's materiality on the grounds raised in Plaintiffs' response to Paragraph 57, *supra*, which Plaintiffs incorporate here.

63. The Cass Review concluded that "[WPATH's SOCv8] overstat[ed] the strength of the evidence in making [its] recommendations." *Id.* at 132.

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs acknowledge that the cited material contains this statement. Plaintiffs, however, dispute the statement on the grounds set forth in Plaintiffs' response to Paragraph 57, *supra*, which Plaintiffs incorporate here.

64. The Cass Review concluded that "[s]tudies looking at outcomes of those

37

taking masculinising/feminising hormones are not straightforward." *Id.* at 182.

**Plaintiffs' Response**: Disputed and immaterial. Plaintiffs acknowledge that the quoted statements appear in the Cass Review. However, Plaintiffs dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 57, *supra*, which Plaintiffs incorporate here.

65. The Cass Review found that "[i]t is not just the methodological issues highlighted that make it hard to draw firm conclusions about the role of masculinising/feminising hormones in mental health and psychosocial outcomes. There are [also] important clinical considerations that complicate the picture." *Id.* at 184.

**Plaintiffs' Response**: Disputed and immaterial. Plaintiffs do not dispute that the cited material contains this statement. However, Plaintiffs dispute this statement on the grounds raised in Plaintiffs' response to Paragraph 57, *supra*, which Plaintiffs incorporate here. Plaintiffs further dispute the statement as immaterial because a consensus on the medical necessity of hormone therapy for adults continues to exist—including for Plaintiffs and Class Members who were prescribed it within GDC. Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8); Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17.

66. Finally, the Cass Review highlighted that, although "[t]ragically deaths by suicide in trans people of all ages continue to be above the national average," there "is no evidence that gender-affirmative treatments reduce this. Such evidence as is available suggests that these deaths are related to a range of other complex psychosocial factors and to mental illness." *Id.* at 195.

**Plaintiffs' Response**: Disputed and immaterial.  Plaintiffs do not dispute that the cited material contains this statement. However, Plaintiffs dispute the materiality of this statement on the grounds raised in Plaintiffs' response to Paragraph 57, *supra*, which Plaintiffs incorporate here. Plaintiffs further dispute the statement as immaterial because a consensus on the medical necessity of hormone therapy for adults continues to exist—including for Plaintiffs and Class Members who were prescribed it within GDC. Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8); Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17.

## IV.   Plaintiffs' Retained Experts

67. Plaintiffs retained two expert witnesses for the purpose of litigating this case: Dr. Randi C. Ettner and Dr. Jeehea Sonya Haw.

**Plaintiffs' Response:** Admitted but immaterial.  Plaintiffs admit this statement. However, this statement is neither material nor supported by a citation to evidence, in

violation of L.R. 56.1(B)(1) and (B)(2)(a)(2).

68. Neither witness claims to have examined the Plaintiffs or any other member of Plaintiffs' proposed provisional class. *See generally* Dkt.11-1; Dkt.11-2 (Haw Decl.).

**Plaintiffs' Response:** Disputed and immaterial. This fact is not material to Defendants' enforcement of SB185's blanket ban of adult hormone therapy for persons with gender dysphoria, particularly because the same can be said of Owen and Wynne, Plaintiffs' so-called "treating physicians." Doc. 72 at 18. Neither Owen nor Wynne claim to have ever individually examined Plaintiffs. *See generally* Owen Decl. (Doc. 25-2); Wynne Decl. (Doc. 28-1). And Owen is not a physician at all. Owen Decl. (Doc. 25-2) ¶ 3. This fact also is "stated as an issue," in violation of L.R. 56.1(B)(1).

69. **Dr. Randi C. Ettner.** Ettner was Secretary for the World Professional Association for Transgender Health and served as a member of WPATH's Board of Directors for more than a decade. Dkt.11-1 ¶8.

**Plaintiffs' Response:** Undisputed, but immaterial.

70. She served on the Curriculum Development Committee for WPATH's Global Education Initiative and currently chairs WPATH's Committee for Institutionalized Persons. *id.* ¶9; *id.* at 65 (App'x A).

**Plaintiffs' Response:** Undisputed, but immaterial.

71. Ettner is a co-author of Versions 7 and 8 of WPATH's "Standards of Care." *Id.* ¶9. For SOCv8, Ettner was "co-lead for the chapter on 'Applicability … to People Living in Institutional Environments.'" *Id.*

**Plaintiffs' Response:** Undisputed, but immaterial. Plaintiffs dispute the materiality of this statement to Plaintiffs' Eighth Amendment blanket hormone therapy ban claim.

72. In the section of her declaration discussing "The Standard of Care for the Treatment of Gender Dysphoria," Ettner asserts that WPATH's SOC "set forth medically accepted standards of care for treatment of gender dysphoria." *Id.* ¶46.

**Plaintiffs' Response:** Disputed. Plaintiffs do not dispute these assertions in Dr. Ettner's expert report. However, Plaintiffs dispute this statement—here and elsewhere in response to statements about Dr. Ettner's reliance on WPATH—to the extent this statement conveys that in her expert witness report, Dr. Ettner only relies on WPATH's SOC to support her opinion that—or that only WPATH's SOC affirms that—hormone therapy is medically necessary treatment for gender dysphoria. Dr. Etter cites multiple authorities in her report, in addition to WPATH, including the National Commission for Correctional Health Care, the Endocrine Society Guidelines, and scientific articles, that confirm hormone therapy as medically necessary treatment for gender dysphoria. *See, e.g.*, Ettner Decl. (Doc. 11-1) ¶¶ 19, 47–49, 103–104, App'x B.

41

Further, Dr. Ettner's experts' opinions are based on her professional training and experience. *Id.* ¶¶ 1, 6–7, 10, 18–19. Defendants' own pre-SB185 policies also confirm that gender dysphoria is medically necessary treatment for gender dysphoria. Doc. 11-9, SOP 508.40 (§IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8).

73. Ettner also asserts that the Endocrine Society Guidelines constitute "authoritative clinical guidance on the administration of hormone therapy to gender dysphoric patients by primary care physicians, endocrinologists, and other medical providers." *Id.* ¶47.

**Plaintiffs' Response:** Disputed. Plaintiffs acknowledge that Dr. Ettner's expert report contains these assertions.

However, Plaintiffs dispute this statement—here and elsewhere in response to statements about Dr. Ettner's reliance on the Endocrine Society Guidelines—to the extent it conveys that in her expert witness report, Dr. Ettner only relies on the Endocrine Society Guidelines to support her opinion that—or that only the Endocrine Society Guidelines affirms that—that hormone therapy is medically necessary treatment for gender dysphoria. Dr. Etter cites multiple authorities in her report, in addition to the Endocrine Society Guidelines. including the National Commission for Correctional Health Care and WPATH, that confirm hormone

therapy as medically necessary treatment for gender dysphoria. *See, e.g.*, Ettner Decl. (Doc. 11-1) ¶¶ 19, 47–49, 103–104, App'x B.

74. WPATH was a cosponsoring association for the Endocrine Society Guidelines, which reproduce two tables taken from WPATH's SOCv7 purporting to define the "criteria" for administering cross-sex hormones to persons, both adults and minors, who are diagnosed with gender dysphoria. *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. Clinical Endocrinology & Metabolism 102(11) at 3869, 3878 (2017).

**Plaintiffs' Response:** Disputed. Plaintiffs object to the admissibility of this statement because, for purposes of the Parties' motions for partial summary judgment, it is not a part of the current record, which the Parties agreed, and this Court ordered, to limit to evidence filed in connection with Plaintiffs' Motion for a Preliminary Injunction and Defendants' opposition thereto. Doc. 69 at 2.

75. Ettner asserts that, together, WPATH's "SOC and the Endocrine Society are the internationally recognized guidelines for the treatment of persons with gender dysphoria." Dkt.11-1 ¶48.

**Plaintiffs' Response:** Undisputed.

76. Beginning at ¶44 of her declaration and continuing throughout ¶72, Ettner refers to WPATH's SOC and the Endocrine Society Guidelines at least 20 distinct

times. *Id.* ¶¶44-72. The remainder of Ettner's report references these sources at least another 23 distinct times. *See id.* ¶¶73-170.

**Plaintiffs' Response:** Undisputed, but immaterial. The number of times Dr. Ettner's report references WPATH's SOC and the Endocrine Society Guidelines is immaterial to Defendants' violation of the Eighth Amendment based on their enforcement of SB185's blanket hormone therapy ban.

77. Ettner cites WPATH SOC-8 as the "standard of care" for gender dysphoria. *Id*. ¶46. And Ettner further asserts that "American Medical Association, the Endocrine Society, the American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology and the National Commission on Correctional Healthcare all endorse protocols in accordance with the SOC and Endocrine Society Guidelines." *Id.* ¶49.

**Plaintiffs' Response:** Undisputed, but immaterial. Plaintiffs dispute the materiality of this statement because Defendants have not offered any evidence that disputes these additional authorities cited in Dr. Ettner's report. Nor have Defendants offered any facts or evidence that hormone therapy is not medically necessary treatment for gender dysphoria. Indeed, a consensus on the medical necessity of hormone therapy for adults—including the Plaintiffs and Class Members who were

44

prescribed it within GDC—continues to exist. Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8); Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17.

78. Ettner's opinions offered in this case are extremely similar to those of the plaintiffs' experts in *Eknes-Tucker*. There, the plaintiffs' expert provided a similar list of associational endorsers as proof of a purported "consensus among the larger medical and scientific community about the propriety, safety, and effectiveness of medical care for the treatment of gender dysphoria." Rebuttal Expert Report of Dan H. Karasic, Dkt.592-11 ¶25, *Boe v. Marshall*, No. 22-cv-00184 (M.D. Ala. June 24, 2024) ("The use of the WPATH Standards of Care is supported and/or adopted by, among others, the American Psychiatric Association, the American Psychological Association, the American Medical Association, [and] the American Academy of Pediatrics.").[3]

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs object to the admissibility of this statement because it relies on evidence that is not a part of the current record, which the Parties agreed, and this Court ordered, to limit to evidence *filed* as of November 3, 2025, "for purposes of the motions [for partial summary judgment] to be filed on November 10." *See* Doc. 69 ¶ 3; Text Order Approving Doc.

69. Here, Defendants did not file the Expert Report of Dan H. Karasic from *Boe v. Marshall* until they moved for partial summary judgment on November 10, 2025. *See generally* Docs. 25, 28-1, & 25-2; *see* Doc. 72-1 at 16 n.3; Doc. 72-4; Doc. 69 at 2.

For this same reason, Plaintiffs also dispute this statement because it is not supported by Defendants' citation to evidence in *this* case, in violation of L.R. 56.1(B)(b)(a).

And assuming the Karasic report could be considered in this case for purposes of Defendants' Motion for Partial Summary Judgment (which it cannot), the cited Karasic report does not support the statement's comparison between the Karasic report and Dr. Ettner's report, in violation of L.R. 56.1(B)(2)(iii). Indeed, the statement does not cite Dr. Ettner's report or identify the content of Dr. Ettner's report that it references.

Plaintiffs further object to this statement—here and elsewhere in response to statements about Dr. Karasic's report—because a report filed by a *different expert* in *another* case, on *different* legal claims and factual grounds, is immaterial. Further, the assertion that Ettner's and Karasic's reports are "extremely similar" is "stated as an issue" and not supported by evidence, in violation of L.R. 56.1(B)(1).

79. Ettner further asserts that "[f]or GDC patients with gender dysphoria, even a gradual taper will risk a resurgence of dysphoria, depression, or suicidality." Dkt.11-

1 ¶¶117, 125 (asserting that implementation of SB185 would "resul[t] in prolonged psychological suffering; risk of psychological decompensation; and increased risks of suicidality, self-harm, and physical injury up to and including death"); *see also id.* ¶¶126, 129, 134-35, 141, 144-47 (similar).

**Plaintiffs' Response:** Undisputed.

80. Ettner's proffered opinions about the claimed impact of SB185 are extremely similar to the claims of harm proffered by the plaintiffs' experts in *Eknes- Tucker*. There, the plaintiffs' expert asserted that "[t]he denial of medically indicated care to transgender people not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality." Rebuttal Expert Report of Dan H. Karasic, Dkt.592-11 ¶38, *Boe v. Marshall*, No. 22-cv-00184 (M.D. Ala. June 24, 2024).

**Plaintiffs' Response**: Disputed and immaterial. Plaintiffs further object to the admissibility of this statement because it relies on evidence that is not a part of the current record, which is limited to evidence *filed* as of November 3, 2025, "for purposes of the motions [for partial summary judgment] to be filed on November 10." *See* Doc. 69 ¶ 3; Text Order Approving Doc. 69. Here, Defendants did not file the Expert Report of Dan H. Karasic from *Boe v. Marshall* until November 10, 2025. *See generally* Docs. 25, 28-1, & 25-2; *see* Doc. 72-1 at 16 n.3; Doc. 72-4; Doc. 69.

Further, the assertion that Ettner's and Karasic's reports are "extremely similar" is "stated as an issue" and not supported by evidence, in violation of L.R. 56.1(B)(1).

81. **Dr. Jeehea Sonya Haw.** Haw has been a member of the Endocrine Society since 2012. She was also a member of WPATH from 2016-2021 and then from 2024 to the present. Dkt.11-2 at 31 (App'x A).

**Plaintiffs' Response:** Undisputed, but immaterial. Plaintiffs dispute the materiality of this statement to Plaintiffs' Eighth Amendment blanket hormone therapy ban claim.

82. Like Ettner's, Haw's declaration claims to be based on "national and international medical society guidelines." *Id.* ¶9. The two cited examples are the WPATH SOCv8 and the Endocrine Society Guidelines. *Id.*

**Plaintiffs' Response:** Disputed. Plaintiffs acknowledge that Dr. Haw's declaration is based on, among other sources, "national and international society guidelines" and that it cites as several examples, among others, WPATH SOCv8 and the Endocrine Society Guidelines. Plaintiffs, however, refute this statement—here and elsewhere in response to statements about Dr. Haw's reliance on international and national guidelines—to the extent it conveys that the data and opinions underlying Dr. Haw's declaration (or Dr. Ettner's declaration, for that matter) are based *only* on "national and international society guidelines" such as WPATH SOCv8 and the Endocrine Society Guidelines or that the WPATH SOCv8 and the

Endocrine Society Guidelines are the *only* two cited examples of those guidelines in their reports. Rather, Dr. Haw's declaration, like Dr. Ettner's, is based on a myriad of authorities, including her extensive professional training and experience. *See* Haw Decl. (Doc. 11-2) ¶¶ 1, 3–5, 9–10, App'x B; Ettner Decl. (Doc. 11-1) ¶¶ 1, 6–7, 10, 18–19, App'x B.  Their views are also consistent with Defendants' own pre-SB185 healthcare policies. Doc. 11-9, SOP 508.40 (§IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.A.7, IV.B.9, IV.G.2–7, IV.K.4–8).

Finally, Plaintiffs object to statement because it attempts to compare Dr. Haw's report to Dr. Ettner's report and therefore, is "stated as an issue" in violation of L.R. 56.1(B)(1)(B).

83.  Also like Ettner, Haw asserts that WPATH's SOCv8 and the Endocrine Society Guidelines are "accepted as the standard-of-care clinical guidelines for the treatment of Gender Dysphoria that have been endorsed and adopted" by various associations that largely track those invoked in *Eknes-Tucker*. *Id.* ¶14.

**Plaintiffs' Response:** Undisputed but immaterial. Plaintiffs acknowledge that Dr. Haw's declaration asserts that WPATH's SOCv8 and the Endocrine Society Guidelines are "accepted as the standard-of-care clinical guidelines for the treatment of Gender Dysphoria that have been endorsed and adopted by' various associations." Plaintiffs, however, dispute the materiality of this statement because it generally references material raised in *another* case, *Eknes-Tucker*, on *different* legal claims

49

and factual grounds, and thus, is immaterial to Plaintiffs' Eighth Amendment adult hormone therapy ban claim in this case. Because the statement generally cites to and relies on material from another case, *Eknes-Tucker*, that is not a part of the evidentiary record in this case, it is inadmissible. Furthermore, a consensus on the medical necessity of hormone therapy for adults continues to exist—including for Plaintiffs and Class Members who were prescribed it within GDC. Doc. 11-9, SOP 508.40 (§ IV.D); Doc. 11-10, SOP 507.04.68 (§§ IV.C–D); Doc. 11-11, SOP 220.09 (§§ IV.K.4–8); Horton Decl. (Doc. 11-4) ¶¶ 16–19; Wilson Decl. (Doc. 11-6) ¶¶ 8–13; Doe Decl. (Doc. 11-7) ¶¶ 7–17; Benjamin Decl. (Doc. 11-3) ¶¶ 17–24; Madison Decl. (Doc. 11-5) ¶¶ 7–17.

Finally, the statement as to the content of Dr. Ettner's report in this Paragraph is not supported by the cited evidence. It does not cite or quote from Etter's report with specific references to page or Paragraph numbers or otherwise identify the content of Dr. Ettner's report.

84. Haw expressly "adopt[s] and incorporate[s] by reference [Ettner's] explanation of the specific modalities of the medical treatment for gender dysphoria set forth in The Endocrine Society Guidelines and SOCv8." *Id.* ¶20.

**Plaintiffs' Response:** Undisputed.

85. Beginning with ¶15 (and discounting ¶20), Haw's declaration refers to WPATH's SOC and the Endocrine Society Guidelines at least an additional 12

distinct times. *Id.* ¶¶15-64.

**Plaintiffs' Response:** Undisputed, but immaterial. The number of times Dr. Haw's report references WPATH's SOC and the Endocrine Society Guidelines is not material to Defendants' violation of the Eighth Amendment based on their enforcement of SB185's blanket hormone therapy ban. Plaintiffs further dispute this statement to the extent it conveys Dr. Haw only relies on the Endocrine Society Guidelines and WPATH to support her opinion that hormone therapy is medically necessary treatment for gender dysphoria. Dr. Haw cites multiple additional sources in her report, including the National Commission for Correctional Health Care and her own professional training and experience, that confirm hormone therapy is medically necessary treatment for gender dysphoria. *See, e.g.*, Haw Decl. (Doc. 11-2) ¶¶ 1, 3–5, 9, App'x B.

## V.   SB185

86. During the legislative debates on SB185, the Center for Constitutional Rights testified against the Act and sent a letter to Jon Burns, Speaker of the Georgia House of Representatives, lobbying against the Act. Dkt.11-21 at 11-13 (App'x A).

**Plaintiffs Response:** Undisputed.

87. On May 8, 2025, Governor Brian Kemp signed SB185 into law. Dkt.25 at 1-2. The Act's plain text stated that it would become effective upon the Governor's signature and that any conflicting laws or parts of laws would be repealed. *Id.* at 5;

Georgia SB185 (2025).

**Plaintiffs' Response:** Undisputed, but immaterial. Plaintiffs dispute the materiality of this statement because Defendants did not enforce SB185 until July 2025. Doc. 11-20, SB 185 Implementation Plan at 2, 10–16; Wynne Decl. (Doc. 28-1) ¶¶ 4–5, 9, 11. They also dispute this statement because the date of effectiveness of SB185 is stated as a legal conclusion, in violation of L.R. 56.1(B)(1), and because the statement cites a legal brief, not evidence of record, in this case, in violation of L.R. 56.1(B)(1)(a).

88. Plaintiffs waited until August 8—three months after SB185 took effect—to file suit and seek "provisional" class certification and an "emergency" preliminary injunction against enforcement of the Act's cross-sex hormone provisions. *See* Dkts.1-3.

**Plaintiffs' Response:** Undisputed, but immaterial. Plaintiffs dispute the materiality of statement's characterization that Plaintiffs "waited until . . . three months after SB185 took effect" to file this lawsuit, as Defendants did not begin enforcing SB185 until July 2025—two months after Governor Kemp signed the law and a month before Plaintiffs filed suit—and had planned to complete the tapering process over the course of several months. Doc. 11-20, SB 185 Implementation Plan at 2, 10–16; Wynne Decl. (Doc. 28-1) ¶¶ 4–5, 9, 11. Plaintiffs also object to the statement's characterization that Plaintiffs "waited" is "stated as an issue," in

52

violation of L.R. 56.1(B)(1)(c) and (B)(2)(a)(2)(iii).

Finally, Plaintiffs object to this statement because it cites Plaintiffs' Complaint and Motions for Preliminary Injunction and Class Certification and thus, does not cite evidence in this case, in violation of L.R. 56.1(B)(1)(a)-(b).

89. As Dr. Wynne has explained, the process of tapering inmates from existing cross-sex hormone regimens began in early July, after GDC and Centurion identified the community of inmates who would need to be tapered in June. Dkt.28- 1 ¶¶3-4. Thus, by the time Plaintiffs filed suit, the tapering process had already been underway for the better part of a month. *See id.*

**Plaintiffs' Response:** Disputed and immaterial. Plaintiffs dispute this statement because it is not material. They also dispute the statement's characterization that the tapering process had already been "well under way" because it is "stated as an issue," in violation of L.R. 56.1(B)(1)(c) and (B)(2)(a)(2)(iii). Defendants did not begin enforcing SB185 until July 2025 and had planned to complete the tapering process over the course of several months. Doc. 11-20, SB 185 Implementation Plan at 2, 10–16; Wynne Decl. (Doc. 28-1) ¶¶ 4–5, 9, 11.

90. Despite this significant delay, Plaintiffs requested that the Court order Defendants to respond to Plaintiffs' motions for provisional class certification and an "emergency" preliminary injunction within six business days. Dkt.4.

**Plaintiffs' Response:** Plaintiffs dispute the materiality of this statement because

Defendants' response deadline to Plaintiffs' Motion for provisional Class Certification and Emergency Preliminary Injunction do not relate to the merits of Plaintiffs' Eighth Amendment deliberate indifference claim. Plaintiffs further dispute this statement because it is "stated as an issue," in violation of L.R. 56.1(B)(1) and (B)(2)(a)(2). The statement's characterization of "significant delay" is also not supported by Defendants' citation to briefings filed on the Docket in this case.

Finally, even if Court were to consider this statement, Plaintiffs object to Defendants' characterization of "significant delay," as this suit was filed a few weeks in August 2024 after Defendants began implementing SB185 in July. Doc. 11-20, SB 185 Implementation Plan at 2, 10–16; Wynne Decl. (Doc. 28-1) ¶¶ 4–5, 9, 11.

Respectfully submitted this 17th day of November 2025.

54

Emily C. R. Early,
GA Bar No. 810206
eearly@ccrjustice.org
A. Chinyere Ezie*
cezie@ccrjustice.org
Celine Zhu*
czhu@ccrjustice.org
Kayla Vinson
kvinson@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Phone: (212) 614-6464

D. Korbin Felder*
kfelder@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
P.O. Box 12046
Jackson, MS 39236
Phone: (601) 228-6101
*Admitted Pro Hac Vice

/s/ Amanda Kay Seals
Amanda Kay Seals
GA Bar No. 502720
seals@bmelaw.com
Matthew R. Sellers
GA Bar No. 691202
sellers@bmelaw.com
BONDURANT, MIXSON & ELMORE, LLP
1201 W Peachtree St NW
Suite 3900
Atlanta, GA 30309
Phone: (404) 881-4100
Fax: (404) 881-4111

*Counsel for Plaintiffs*

**<u>Certificate of Service</u>**

I certify that on November 17, 2025, I submitted the foregoing via the Court's

CM/ECF system, which will serve an electronic copy on all attorneys of record.

<u>*/s/ Amanda Kay Seals*</u>
Amanda Kay Seals